UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MICHELE SPAGNUOLO,<br><br>Defendant. | No. 26 Cr. 278 (AT) |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MICHELE SPAGNUOLO'S MOTION TO DISMISS THE INDICTMENT

Shawn G. Crowley
Michael Ferrara
Andrew L. Chesley
Allison Durkin
Nicole Ng
J. Patrick Hornbeck II
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
scrowley@heckerfink.com
mferrara@heckerfink.com

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 4

A. Polymarket ..... 4

B. Google Year in Search Contracts ..... 6

C. Mr. Spagnuolo's Alleged Year in Search Wagers ..... 7

ARGUMENT ..... 8

I. Legal Standard ..... 8

II. The Commodities Fraud Count Should Be Dismissed Because the Indictment Does Not Allege a Violation of the CEA ..... 9

A. The Commodity Exchange Act and Swaps Regulation ..... 9

B. Year in Search Wagers Are Not Swaps Regulated by the CEA ..... 11

1. The Occurrence of the Event Must Be Associated with a Potential Financial, Economic, or Commercial Consequence ..... 12

2. The Year in Search Contracts Are Not Associated with a Potential Financial, Economic, or Commercial Consequence ..... 17

3. The Year in Search Contracts Are Not Dependent on an "Occurrence" ..... 22

4. Interpreting the Year in Search Contracts to Be Swaps Would Produce Absurd Results ..... 24

5. The History of the CEA Confirms That the Year in Search Wagers Are Not Swaps ..... 25

6. Unduly Broad Interpretations of Criminal Statutes Must Be Avoided ..... 29

III. The Commodities Fraud Count Violates Mr. Spagnuolo's Due Process Rights and Should Be Dismissed ..... 31

A. Criminal Laws Must Provide Fair Warning and Avoid Arbitrary Enforcement ..... 31

B. The Government's Interpretation of the CEA Invites Arbitrary Enforcement and Fails to Give Fair Notice ..... 32

IV. The Indictment Should Be Dismissed Because the Charges Are Impermissibly Extraterritorial ..... 38

A. The CEA Has No Permissible Domestic or Extraterritorial Application to the Alleged Facts ..... 39

B. The Indictment Charges an Impermissible Foreign Application of the Wire Fraud Statute ..... 43

V. The Wire Fraud Count Should Be Dismissed Because the Year in Search Data Are Not "Property" ..... 44

A. Confidential Business Information Is Google's "Property" Only If Its Confidentiality Has Commercial Value to Google ..... 44

B. The Indictment Does Not Allege That the Year in Search Data Mr. Spagnuolo Purportedly Accessed Had Commercial Value to Google ..... 47

VI. The Money Laundering Count Should Be Dismissed ..... 51

CONCLUSION ..... 51

# TABLE OF AUTHORITIES

***CASES***

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
600 U.S. 412 (2023) .......... 3, 38, 43, 44

*Abramski v. United States*,
573 U.S. 169 (2014) .......... 14

*Art & Antique Dealers League of Am., Inc. v. Seggos*,
121 F.4th 423 (2d Cir. 2024) .......... 14

*Bascuñán v. Elsaca*,
927 F.3d 108 (2d Cir. 2019) .......... 38, 43

*Bd. of Trade v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905) .......... 19

*Carpenter v. United States*,
484 U.S. 19 (1987) .......... 46, 49

*CFTC v. Gorman,*
No. 21 Civ. 870, 2023 WL 2632111 (S.D.N.Y. Mar. 24, 2023) .......... 42

*CFTC v. Spagnuolo*,
No. 26 Civ. 4419 (S.D.N.Y. 2026) .......... 7

*Chevron USA Inc. v. Plaquemines Par.*,
146 S. Ct. 1052 (2026) .......... 13, 17

*Ciminelli v. United States*,
598 U.S. 306 (2023) .......... 46, 49

*City of Long Beach v. Total Gas & Power N. Am., Inc.*,
465 F. Supp. 3d 416 (S.D.N.Y. 2020) .......... 10

*Cleveland v. United States*,
531 U.S. 12 (2000) .......... 30

*Coinbase v. Nessel*,
No. 25 Civ. 14092, 2026 WL 2295184 (E.D. Mich. Aug. 7, 2026) .......... 15, 20, 21, 24

*Dole v. United Steelworkers of Am.*,
494 U.S. 26 (1990) .......... 14

*Dubin v. United States*,
599 U.S. 110 (2023)........................................................................................ 29, 30

*In re Fairfield Sentry Ltd.*,
147 F.4th 136 (2d Cir. 2025) ........................................................................... 13, 14

*Fischer v. United States*,
603 U.S. 480 (2024)............................................................................................... 30

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)........................................................................................ 32, 33

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982)........................................................................................ 24, 25

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995)............................................................................................... 16

*Haru Holding Corp. v. Haru Hana Sushi, Inc.,*
No. 13 Civ. 7705, 2016 WL 1070849 (S.D.N.Y. Mar. 15, 2016) ..................................... 4

*Hershey v. Energy Transfer Partners, L.P.*,
610 F.3d 239 (5th Cir. 2010) .................................................................................. 10

*Hill v. Colorado*,
530 U.S. 703 (2000)............................................................................................... 31

*Inv. Co. Inst. v. CFTC*,
891 F. Supp. 2d 162 (D.D.C. 2012)............................................................................ 9

*Jeffery v. City of New York*,
113 F.4th 176 (2d Cir. 2024) .................................................................................. 36

*Johnson v. United States*,
576 U.S. 591 (2015)........................................................................................ 31, 34

*Jordon v. N.Y. Mercantile Exch.*,
571 F. Supp. 1530 (S.D.N.Y. 1983)........................................................................... 27

*KalshiEX LLC v. Cafferelli*,
No. 25 Civ. 2016, 2026 WL 2294589 (D. Conn. Aug. 10, 2026) ............................. *passim*

*KalshiEX LLC v. CFTC,*
No. 23 Civ. 3257, 2024 WL 4164694 (D.D.C. Sept. 12, 2024) ........................................ 9

*KalshiEX LLC v. Johnson*,
832 F. Supp. 3d 954 (D. Ariz. 2026) ........ 21

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) ........ 26

*KalshiEX LLC v. Williams*,
No. 25 Civ. 8846, 2026 WL 2017466 (S.D.N.Y. July 13, 2026) ........ *passim*

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ........ 21, 24

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025) ........ *passim*

*KalshiEX, LLC v. Schuler*,
No. 25 Civ. 1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026) ........ 20, 21, 24, 28

*Kolender v. Lawson*,
461 U.S. 352 (1983) ........ 32, 34

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991) ........ 4

*L.S. v. Webloyalty.com, Inc.*,
954 F.3d 110 (2d Cir. 2020) ........ 14, 15

*Maracich v. Spears*,
570 U.S. 48 (2013) ........ 14

*Marinello v. United States*,
584 U.S. 1 (2018) ........ 30

*Massachusetts v. Morash*,
490 U.S. 107 (1989) ........ 14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ........ 18

*Microsoft Corp. v. AT&T Corp.*,
550 U.S. 437 (2007) ........ 44

*Morrison v. Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010) ........ 38, 39, 43

*N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nev. Gaming Control Bd.*,
815 F. Supp. 3d 1169 (D. Nev. 2025) ..................... 22, 23

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995) ..................... 13

*Nestlé USA, Inc. v. Doe*,
593 U.S. 628 (2021) ..................... 42

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
937 F.3d 94 (2d Cir. 2019) ..................... 42

*QCX LLC v. Nessel,*
No. 26 Civ. 710, 2026 WL 1166362 (W.D. Mich. Mar. 10, 2026) ..................... 23

*QCX LLC v. Nessel*,
No. 26 Civ. 710, 2026 WL 1895958 (W.D. Mich. June 17, 2026) ..................... *passim*

*RJR Nabisco, Inc. v. European Cmty.*,
579 U.S. 325 (2016) ..................... 38, 39, 42

*Skilling v. United States*,
561 U.S. 358 (2010) ..................... 34

*Snyder v. United States*,
603 U.S. 1 (2024) ..................... 30, 34

*In re Soussis*,
136 F.4th 415 (2d Cir. 2025) ..................... 12

*United States v. Aleynikov*,
676 F.3d 71 (2d Cir. 2012) ..................... 8

*United States v. Chastain*,
145 F.4th 282 (2d Cir. 2025) ..................... *passim*

*United States v. Cohen*,
260 F.3d 68 (2d Cir. 2001) ..................... 30

*United States v. Davis*,
588 U.S. 445 (2019) ..................... 31, 33

*United States v. George*,
223 F. Supp. 3d 159 (S.D.N.Y. 2016) ..................... 8

*United States v. Grossman*,
843 F.2d 78 (2d Cir. 1988)........................................................................................ 47

*United States v. Heicklen*,
858 F. Supp. 2d 256 (S.D.N.Y. 2012)........................................................................ 9

*United States v. Lanier*,
520 U.S. 259 (1997)........................................................................ 30, 31, 32, 34, 35

*United States v. Lopez*,
514 U.S. 549 (1995)........................................................................................... 18

*United States v. Mangione*,
818 F. Supp. 3d 509 (S.D.N.Y. 2026)........................................................................ 8

*United States v. Messina*,
806 F.3d 55 (2d Cir. 2015)........................................................................................ 25

*United States v. Minnesota*,
No. 26 Civ. 2661, 2026 WL 2150211 (D. Minn. July 27, 2026)............................... 17, 20

*United States v. Napout*,
963 F.3d 163 (2d Cir. 2020)...................................................................................... 43

*United States v. Nieves*,
58 F.4th 623 (2d Cir. 2023) ...................................................................................... 36

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) ................................................................................ *passim*

*United States v. Pirro*,
212 F.3d 86 (2d Cir. 2000).......................................................................................... 8

*United States v. Rajaratnam,*
No. 09 Cr. 1184, 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ........................................ 8

*United States v. Rowland*,
826 F.3d 100 (2d Cir. 2016)...................................................................................... 12

*United States v. Santos*,
553 U.S. 507 (2008).................................................................................................. 31

*United States v. Savin,*
No. 00 Cr. 45, 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ............................................... 8

*United States v. Wiltberger*,
18 U.S. (5 Wheat.) 76 (1820) ... 3

*United States v. Wisconsin*,
No. 26 Civ. 749, 2026 WL 2474512 (July 29, 2026) ... 20

*Upton v. SEC*,
75 F.3d 92 (2d Cir. 1996) ... 35, 36

*Van Buren v. United States*,
593 U.S. 374 (2021) ... 30

*WesternGeco LLC v. ION Geophysical Corp.*,
585 U.S. 407 (2018) ... 39, 43

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ... 29

*Yates v. United States*,
574 U.S. 528 (2015) ... 16, 30

***US CONSTITUTIONAL PROVISIONS***

U.S. Const. amend. V ... 31

***STATUTES***

7 U.S.C. § 1a(18) ... 5

7 U.S.C. § 1a(47) ... *passim*

7 U.S.C. § 2 ... 4, 5, 24, 39, 40

7 U.S.C. § 5 ... 15

7 U.S.C. § 7 ... 4, 27

7 U.S.C. § 7a ... 26

7 U.S.C. § 9 ... 4, 42

18 U.S.C. § 1343 ... 4

18 U.S.C. § 1956 ... 4, 51

Pub. L. No. 102-546, § 502(a)(2), 106 Stat. 3590 (1992) ... 10

Pub. L. No. 106-554, 114 Stat. 2763 (2000) .......... 11, 28

Pub. L. No. 111-203, § 722, 124 Stat. 1376 (2010) .......... 11, 28

***REGULATIONS***

17 C.F.R. § 38 .......... 4

17 C.F.R. § 180.1 .......... 9, 33, 36

***FEDERAL RULES***

Fed. R. Crim. P. 12(b) .......... 8

Fed. R. Evid. 201(b) .......... 4

***OTHER AUTHORITIES***

40 Fed. Reg. 25849 (June 19, 1975) .......... 28

54 Fed. Reg. 30694 (July 21, 1989) .......... 10

77 Fed. Reg. 48208-01 (Aug. 13, 2012) .......... 29

89 Fed. Reg. 48968 (proposed June 10, 2024) .......... 35

91 Fed. Reg. 12516 (proposed Mar. 16, 2026) .......... 35

91 Fed. Reg. 35806 (June 12, 2026) .......... 15

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) .......... 26, 27

Brief for CFTC as Amicus Curiae Supporting Appellant, *KalshiEX, LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026) .......... 21

Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669 (May 7, 2008) .......... 35

Event Contracts; Notice of Withdrawal of Proposed Regulatory Action, 91 Fed. Reg. 5386 (Feb. 6, 2026) .......... 35

Opposition to Motion to Dismiss, *United States v. Van Dyke*, 26 Cr. 156 (S.D.N.Y. Aug. 19, 2026) .......... 21

Order of Designation, *In re QCX LLC d/b/a Polymarket US*,

CFTC No. 49571 (July 9, 2025) .......................................................................... 4

Order, *In re Blockratize, Inc. d/b/a Polymarket.com*,
CFTC No. 22-09 (Jan. 3, 2022). .......................................................................... 5

S. Rep. No. 111-176 (2010) .......................................................................................... 26

## PRELIMINARY STATEMENT

The government is attempting to prosecute a non-U.S. citizen based on conduct that, even as alleged, occurred entirely outside the United States, involving products listed not in the United States but on a foreign exchange, on one theory that is unresolved even in the civil context, and another that has been wholly foreclosed by the Second Circuit.

For these reasons, among others, Michele Spagnuolo is not guilty of the crimes with which he is charged, and the Indictment fails as a matter of law. Mr. Spagnuolo is an Italian citizen who resided and was in Switzerland at all times relevant to the charges. The alleged "trades" occurred on Polymarket.com, an international prediction market that the Commodity Futures Trading Commission ("CFTC") expressly does not regulate. Polymarket.com prohibits U.S.-based trading and blocks access by U.S. persons.

Those "trades" were not, as the Indictment asserts, "swaps" that are regulated by the Commodity Exchange Act ("CEA"). They were bets on who would or would not be Google's most searched person of 2025. The Indictment's attempt to dress these bets up as "swaps" is at odds with the CEA's language, purpose, and history. It is therefore unsurprising that courts have already rejected similar attempts to rewrite that statute.

Indeed, the regulatory landscape in which the government brings this case is striking. Legislators have introduced, but not yet passed, bills that would govern insider trading on prediction markets—*exactly* the sort of conduct the government tries to shoehorn into existing statutes, which provide no notice of the government's novel theories. States are seeking to ban prediction markets as illegal gambling operations, rejecting the CFTC's attempt to exclusively regulate these markets. The CFTC itself is engaged in rulemaking to determine the types of event contracts prediction markets should be allowed to list.

Meanwhile, in November 2025—*the same month the government claims Mr. Spagnuolo was breaking U.S. law by using inside information to trade on Polymarket.com*—Polymarket's CEO, Shayne Coplan, publicly praised wagering using insider information as a *feature* of prediction markets. Polymarket has encouraged users to make bets based on inside information and even surreptitiously paid influencers to promote the ease with which users can do so.[1]

Against that backdrop, the government here seeks to use the cudgel of federal criminal prosecution to regulate those very prediction markets, which the U.S. Attorney General months ago described as "a relatively new phenomenon."[2] There is no question that the prosecution of Mr. Spagnuolo is unprecedented. This case is only the second in the nation to charge a defendant with engaging in so-called "insider trading" on prediction markets, and the first in which the alleged material, nonpublic information is private rather than governmental. And perhaps as a consequence of their novelty, the charges against Mr. Spagnuolo rest on legal theories that are both untethered from the criminal statutes invoked by the government and wholly divorced from precedent.

Count One charges Mr. Spagnuolo with commodities fraud for allegedly misappropriating purportedly confidential information from Google to wager on who would or would not be announced as the most searched person on Google. That count fails because the Year in Search event contracts are not "swaps" within the meaning of the CEA. The government would have the Court ignore the text and purpose of the statute—as well as the rule of lenity—to extend the statute to event contracts with no conceivable financial, economic, or commercial consequence. But the

---

[1] Katherine Long *et al.*, *They Looked Like They Were Getting Rich on Polymarket—but None of It Was Real*, Wall St. Journal (June 20, 2026), https://www.wsj.com/business/media/polymarket-social-media-bets-prediction-market-441cdeb5.

[2] Press Release, U.S. Dep't of Just., *U.S. Soldier Charged with Using Classified Information to Profit from Prediction Market Bets* (Apr. 23, 2026), https://www.justice.gov/opa/pr/us-soldier-charged-using-classified-information-profit-prediction-market-bets.

CEA's definition of swaps does not embrace Polymarket.com's Year in Search wagers. And even if it arguably could, the statute is too vague to provide fair notice that the conduct charged is criminally proscribed and invites arbitrary enforcement, in contravention of the Due Process Clause's guarantee.

Count Two charges Mr. Spagnuolo with wire fraud on the same "insider trading" theory, which depends on the alleged misappropriation of Google's property. But for a company's confidential information to qualify as property under the wire fraud statute, that company must have a "commercial interest in the confidentiality" of the information. *United States v. Chastain*, 145 F.4th 282, 297 (2d Cir. 2025). Google's trending search terms do not suffice, because Google has no economic interest in, for example, whether Pope Leo XIV was last year's most-searched person. The relative position of individual figures in Google's trending search terms is merely "tangential to" Google's "actual business" and so does not qualify as property under the wire fraud statute. *Id.*

Count Three charges Mr. Spagnuolo with money laundering, premised on the wire fraud count. Because the predicate crime of wire fraud fails, so too does the money laundering count. And none of these charges should have been brought in the United States, because none of the relevant conduct is alleged to have occurred here. This essentially foreign conduct is properly the "domain of foreign law." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023).

At bottom, "[i]t is the legislature, not the Court, which is to define a crime, and ordain its punishment." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820). This Indictment attempts to shoehorn an unprecedented theory of criminal liability into statutes that were never designed to reach it. The Court should reject that attempt and dismiss the Indictment.

## BACKGROUND

On May 27, 2026, Mr. Spagnuolo—an Italian citizen and resident of Switzerland—was on vacation with his wife in the United States when the Federal Bureau of Investigation arrested him at his hotel. The government obtained the Indictment on June 25, 2026, charging Mr. Spagnuolo with commodities fraud, in violation of 7 U.S.C. § 9(1); wire fraud, in violation of 18 U.S.C. § 1343; and money laundering, in violation of 18 U.S.C. § 1956.

### A. Polymarket

Polymarket is a "prediction marketplace" that offers "binary event contracts" that allow users to wager on the outcome of specified events. Dkt. No. 17 ¶ 5.[3] Each contract is framed as a Yes/No question, and users may purchase "YES" or "NO" shares depending on whether they believe the specified event will occur. *Id.* When a contract resolves—because the event has or has not occurred according to the terms of the contract defined by Polymarket—users holding shares on the winning side of the contract are paid $1.00 per share. *Id.* Users holding shares on the losing side receive nothing. *Id.*

Polymarket offers event contracts to users on two prediction market platforms, Polymarket US and Polymarket.com. Polymarket US is a CFTC-regulated Designated Contract Market ("DCM")[4] and, as such, it has been permitted to offer event contracts within the United States since July 2025. *See* Order of Designation at 3–4, *In re QCX LLC d/b/a Polymarket US*, CFTC No. 49571 (July 9, 2025).[5] The CEA makes it unlawful for any person, other than eligible contract

---

[3] Mr. Spagnuolo accepts the truth of the factual allegations in the Indictment solely for purposes of this motion.

[4] A DCM is a board of trade or an exchange that the CFTC has designated to trade futures, options, or swaps and is subject to CFTC regulation. *See* 7 U.S.C. § 7; 17 C.F.R. pt. 38. "An entity that seeks to list and publicly trade its event contracts must apply to the CFTC to be a [DCM]." *KalshiEx LLC v. Williams*, No. 25 Civ. 8846, 2026 WL 2017466, at *2 (S.D.N.Y. July 13, 2026) (citing 7 U.S.C. §§ 2(e), 7(a)).

[5] The Court may take judicial notice of public documents and publicly available government documents, including documents from administrative agencies like the CFTC and filings with government agencies. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *Haru Holding Corp. v. Haru Hana Sushi, Inc.*, No. 13 Civ. 7705, 2016

participants (essentially non-retail participants), to enter into an event contract unless it is offered by a DCM. 7 U.S.C. § 2; *see id.* § 1a(18) (defining eligible contract participants).

By contrast, Polymarket US represents that Polymarket.com is a "distinct" platform that "does not permit trading within the United States." *QCX LLC v. Nessel*, No. 26 Civ. 710, 2026 WL 1895958, at *2 n.3 (W.D. Mich. June 17, 2026). Polymarket.com has never been registered as a DCM. In January 2022, it resolved a CFTC case alleging that it was unlawfully offering event contracts to U.S. customers, paid a $1.4 million civil penalty, and agreed to cease offering its contracts to U.S. persons. *See* Order at 9–10, *In re Blockratize, Inc. d/b/a Polymarket.com*, CFTC No. 22-09 (Jan. 3, 2022). Since then, Polymarket has imposed geographic restrictions to block U.S.-based persons from using Polymarket.com; using the platform in the United States is a violation of Polymarket.com's terms of service.[6]

The Indictment alleges that "Polymarket is operated by Blockratize, Inc., and headquartered in Manhattan." Dkt. No. 17 ¶ 5. Polymarket, however, informs users that it "operates globally through separate legal entities"; whereas "Polymarket US is operated by . . . a CFTC-regulated [DCM]," Polymarket.com is an "international platform [that] is not regulated by the CFTC and operates independently" from Polymarket US.[7] Polymarket.com is owned and operated by a Panamanian corporation, Adventure One QSS Inc.[8]

---

WL 1070849, at *2 (S.D.N.Y. Mar. 15, 2016) (using public documents to take judicial notice of defendant's business status); *see also* Fed. R. Evid. 201(b) (courts may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[6] *See* Geographic Restrictions, Polymarket, https://help.polymarket.com/en/articles/13364163-geographic-restrictions (last accessed Aug, 26, 2026).

[7] *See* Polymarket, https://polymarket.com (last accessed Aug, 26, 2026).

[8] *See* Polymarket.com Terms of Use, Polymarket (Aug. 11, 2026), https://polymarket.com/tos; Ex. A, Adventure One QSS Inc., Articles of Incorporation, República De Panamá (Oct. 15, 2021). Citations to Ex. __ are to the exhibits attached to the Affirmation of Shawn G. Crowley, which is being filed simultaneously with this memorandum of law.

### B. Google Year in Search Contracts

In October 2025, Polymarket.com began offering event contracts relating to Google's most searched terms (the "Year in Search Contracts"). Dkt. No. 17 ¶ 5. Users could wager on whether various politicians, celebrities, businesspeople, or other public figures—like Donald Trump, Pope Leo XIV, Elon Musk, or Kendrick Lamar—were or were not the most searched people on Google during the past year. These contracts were available only on Polymarket.com and have never been offered on the registered DCM operating as Polymarket US.[9]

The contracts were based on the results of Year in Search, a "coordinated marketing campaign" that Google runs annually. Dkt. No. 17 ¶ 2. Although Google publishes trending search data online in real-time,[10] near year end, Google releases "the top trending searches from that year." *Id.* In addition to the top trending "people" from the year, Google releases results of the most searched movies, books, podcasts, songs, sports events, recipes, games, and news events.[11]

The Indictment alleges that the Year in Search campaign "involves driving user interest and engagement by building momentum before announcing the top searches of the year and making a 'splash' with the announcement." *Id.* The Indictment further alleges that "the top-search information"—as distinct from Google's search data more broadly—is "valuable" for Google, because "the commercial impact of the campaign depends on the element of surprise and the coordinated nature of its public reveal." *Id.* ¶ 3. Google purportedly "maintains strict

[9] As a DCM, Polymarket US is required to file submissions with the CFTC self-certifying that an event contract complies with the CEA and its regulations prior to listing the contract. Polymarket US has not filed any certification for the Year in Search Contracts. *See Designated Contract Market Products: QCEX*, CFTC, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts?Category=&Date_From=&Date_To=&Organization=QCEX (last accessed Aug. 24, 2026).

[10] *See* Explore, Google Trends, https://trends.google.com/explore?geo=Worldwide (last accessed Aug, 26, 2026); Trending Now, Google Trends, https://trends.google.com/trending?geo=US (last accessed Aug, 26, 2026).

[11] *See* Year in Search 2025, Google Trends, https://trends.withgoogle.com/year-in-search/2025 (last accessed Aug. 24, 2026).

confidentiality over its Year in Search results until the moment of public release," because "[p]remature disclosure . . . could reduce or eliminate anticipated user engagement, undercut the media interest that sustains brand value, and diminish advertiser revenue tied to the launch." *Id.* The Indictment also alleges that "Google's search data—including data reflecting which terms, topics, people, and events trend on its platform—is commercially valuable proprietary information central to that business." *Id.*

### C. Mr. Spagnuolo's Alleged Year in Search Wagers

The Indictment alleges that, from 2014 through May 2026, Mr. Spagnuolo worked as an engineer at Google, where he had access to an "internal software tool" that provided "access to confidential, nonpublic Year in Search data." *Id.* ¶¶ 2, 4. Mr. Spagnuolo, an Italian citizen, lived and worked in Switzerland during this period; he was not in the United States when any of the alleged bets were made, and the Indictment does not allege that he was.

Between October 15 and December 4, 2025, Mr. Spagnuolo allegedly wagered on who would or would not be announced as Google's top trending person by purchasing Year in Search event contracts on Polymarket.com[12] under the username "AlphaRaccoon" using "confidential information" obtained through his employment at Google.[13] *Id.* ¶ 6. As described in the Indictment, Mr. Spagnuolo wagered on "approximately 23 Google Year in Search events." *Id.* According to the Indictment, on December 4, 2025, Google officially announced that the top five most searched people in 2025 were (1) d4vd, (2) Kendrick Lamar, (3) Jimmy Kimmel, (4) Tyler

---

[12] Although the Indictment does not distinguish between Polymarket US and Polymarket.com, the CFTC's complaint in the parallel civil proceeding alleges that Mr. Spagnuolo used Polymarket.com in relation to the Year in Search Contracts. Compl. ¶¶ 10, 28, 42, *CFTC v. Spagnuolo*, No. 26 Civ. 4419 (S.D.N.Y. May 27, 2026), Dkt. No. 1.

[13] According to Google, Mr. Spagnuolo purportedly "accessed [its] marketing material using a tool available to all employees." *Google Information Security Engineer Charged with Using Inside Information to Make $1M on Polymarket*, ABC News (May 27, 2026), https://abcnews.com/US/google-employee-charged-inside-information-make-1-million/story?id=133350018.

Robinson, and (5) Pope Leo XIV.[14] *Id.* ¶ 7. Mr. Spagnuolo allegedly made a profit of approximately $1.2 million. *Id.*[15]

## ARGUMENT

### I. Legal Standard

Under Federal Rule of Criminal Procedure 12(b), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Because "federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (cleaned up).

Although "a court must assume that the allegations [in] the indictment are true, . . . where a defendant moves to dismiss an indictment 'solely upon an issue of law, and not fact,' a court may resolve the legal dispute before trial." *United States v. Mangione*, 818 F. Supp. 3d 509, 518 (S.D.N.Y. 2026) (quoting *United States v. George*, 223 F. Supp. 3d 159, 163 (S.D.N.Y. 2016)). "The sufficiency of an indictment and the interpretation of a federal statute are both matters of law." *Aleynikov*, 676 F.3d at 76. Where, as here, the allegations in the indictment do not constitute an offense under the applicable federal statute, the indictment is legally insufficient and must be dismissed. *See id.* at 79, 82 (holding that indictment was legally insufficient because transferring proprietary computer source code did not constitute an offense under the National Stolen Property Act or the Economic Espionage Act); *United States v. Pirro*, 212 F.3d 86, 92–93 (2d Cir. 2000)

---

[14] *See* Year in Search 2025, Google Trends, https://trends.withgoogle.com/year-in-search/2025/ (last accessed Aug. 24, 2026).

[15] To date, the government has not specified which of Mr. Spagnuolo's alleged trades were based on misappropriated, material, nonpublic information, nor has it specified what that material, nonpublic information is. Mr. Spagnuolo may move for a bill of particulars on both points. *See United States v. Rajaratnam*, No. 09 Cr. 1184, 2010 WL 2788168, at *2, *9 & n.4 (S.D.N.Y. July 13, 2010); *United States v. Savin*, No. 00 Cr. 45, 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001).

(affirming dismissal of false statement count because conduct alleged did not violate the applicable statute); *United States v. Heicklen*, 858 F. Supp. 2d 256, 276 (S.D.N.Y. 2012) (dismissing indictment that failed to allege elements of attempting to influence a juror).

## II. The Commodities Fraud Count Should Be Dismissed Because the Indictment Does Not Allege a Violation of the CEA

Count One of the Indictment charges Mr. Spagnuolo with violating Sections 9(1) and 13(a)(5) of the CEA and Rule 180.1 of the regulations promulgated thereunder for using "material nonpublic information" in breach of a duty to "execute swap transactions for personal gain" by wagering on Google Year in Search results. Dkt. No. 17 ¶ 9. But the Indictment's allegations cannot establish that Mr. Spagnuolo committed commodities fraud as a matter of law because Polymarket's Year in Search Contracts are not "swaps" covered by the CEA.

### A. The Commodity Exchange Act and Swaps Regulation

The CEA was enacted in 1936 to regulate derivatives products, which are "financial instrument[s] or contract[s] whose price is directly dependent upon . . . the value of one or more underlying assets—for example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX LLC v. Williams*, No. 25 Civ. 8846, 2026 WL 2017466, at *1 (S.D.N.Y. July 13, 2026) (cleaned up). Derivatives are used to hedge against commercial or economic risk and for price discovery in the underlying cash or spot markets. *See KalshiEX LLC v. CFTC*, No. 23 Civ. 3257, 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024) (observing derivatives "provide a way to transfer market risk or credit risk between two counterparties" (quoting *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 168 n.3 (D.D.C. 2012))). Whereas futures or traditional options "contemplate delivery of or performance related to a commodity at some future time, swaps are 'pure financial instrument[s] . . . based on the difference between two fluctuating values.'" *United*

*States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (quoting *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 243 (5th Cir. 2010)).

Parties to a swap agree to exchange cash flows or liabilities, based on an agreed-upon formula or terms, typically to manage or hedge against risk presented by the underlying reference asset, such as an interest rate, foreign exchange rate, price index, commodity index, or credit event.[16] For example, in an interest rate swap, parties may agree to exchange payments based on a fixed interest rate and a floating interest rate, such as the Secured Overnight Financing Rate, often to hedge against fluctuations in interest rates. Credit default swaps are tied to the occurrence of credit events to hedge against credit losses; for example, a supplier of auto parts to an automotive company might purchase a credit default swap on that company's bond to hedge against the risk of a default.[17] Swaps may also be referenced to the price of commodities like metals and energy products to hedge price volatility. *See City of Long Beach v. Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416, 427 (S.D.N.Y. 2020) (discussing swaps referenced to the price of natural gas). And weather swaps, which provide for the exchange of payments tied to a weather index, allow businesses whose revenues are sensitive to weather conditions to hedge against the financial impact of abnormal weather.[18]

Although swaps have been offered and sold since the 1980s, for decades they were largely excluded from regulation under the CEA.[19] In 2000, Congress passed the Commodity Futures

---

[16] *See Swaps Report Data Dictionary*, CFTC, https://www.cftc.gov/MarketReports/SwapsReports/DataDictionary/index.htm (discussing asset classes for swaps).

[17] *See* Rena S. Miller, Cong. Rsch. Serv., R40646, *Derivative Regulation and Legislation Through the 111th Congress* 2 (2012).

[18] *See, e.g.*, *Weather Products*, CME Group, https://www.cmegroup.com/markets/weather.html (last accessed Aug. 26, 2026).

[19] *See* Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30694, 30694-96 (July 21, 1989); Futures Trading Practices Act of 1992, Pub. L. No. 102-546, § 502(a)(2), 106 Stat. 3590, 3629 (1992) (authorizing the CFTC to exempt over-the-counter swap transactions from the exchange trading requirement); The President's Working Grp. on Fin. Mkts., Over-the-Counter Derivatives Markets and the Commodity Exchange Act 1 (1999),

Modernization Act of 2000 ("CFMA"), which expressly exempted most over-the-counter derivatives, including swap transactions, from the exchange trading requirement and CEA oversight. *See* Pub. L. No. 106–554-App. E, §§ 103 & 105(b), 114 Stat. 2763A-377–79. In the wake of the 2008 financial crisis, however, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), which brought swaps under federal regulation for the first time. Pub. L. No. 111-203, § 722, 124 Stat. 1376, 1672 (2010); *see also Phillips*, 155 F.4th at 113. Unregulated swaps—particularly credit default swaps—were seen as a "contributing cause" of the financial crisis, and "[t]he Act's goal was to 'promote the financial stability of the United States by improving accountability and transparency in the financial system.'" *Phillips*, 155 F.4th at 113 (quoting the Dodd-Frank Act, 124 Stat. at 1376).

As amended by the Dodd-Frank Act, the CEA now contains a six-part definition of a swap. The government's theory of the case appears to be that event contracts on Polymarket.com are swaps within the meaning of subpart (ii) of the definition, which includes "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

**B. Year in Search Wagers Are Not Swaps Regulated by the CEA**

A contract allowing users to wager on whether a specific individual will be announced as 2025's most searched person on Google is not a swap within the meaning of the CEA. Although the definition of a swap is "broad[]," *Phillips*, 155 F.4th at 113, it is not unbounded. Section

---

https://home.treasury.gov/system/files/236/Over-the-Counter-Derivatives-Market-Commodity-Exchange-Act.pdf (concluding that the trading of swaps "should be excluded from the CEA" to avoid legal uncertainty and regulatory burden).

1a(47)(A)(ii)'s text, combined with the CEA's structure, purpose, and history, leave no doubt that Congress intended swaps to reach financial instruments tied to the occurrence of events that are inherently joined or connected with a potential financial, economic, or commercial consequence to facilitate hedging or price discovery. Interpreting the definition of "swaps" to encompass any wager with a conceivable financial, economic, or commercial impact—like who was or was not the year's most searched person on Google—would fly in the face of the statute's purpose and history, result in a definition without limit, and stretch the CEA beyond any reasonable interpretation of the statute.

#### 1. The Occurrence of the Event Must Be Associated with a Potential Financial, Economic, or Commercial Consequence

When interpreting statutes, courts begin with "the text of the relevant statutory provisions to discern their plain meaning[,] . . . draw[ing] on the 'specific context in which that language is used, and the broader context of the statute as a whole.'" *In re Soussis*, 136 F.4th 415, 427 (2d Cir. 2025) (quoting *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016)). Here, the applicable statutory definition of a "swap" requires that payment under the contract be "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

Subpart (ii) contains two operative phrases, each of which must be given effect. First, the contract must be dependent on the occurrence of an event (or its nonoccurrence or extent of occurrence), meaning an event "happening" or "tak[ing] place."[20]

Second, the event that the contract references must be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). "[A]ssociated with" means

---

[20] *See Occurrence*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/occurrence (last accessed Aug. 26, 2026) ("the action or fact of happening or occurring"); *Occurrence*, Black's Law Dictionary (12th ed. 2024) ("[s]omething that happens or takes place").

being "connected" with or "related" to.[21] *See In re Fairfield Sentry Ltd.*, 147 F.4th 136, 151 (2d Cir. 2025) (observing similarity of phrases "associated with," "related to," and "in connection with"). A "consequence" is a "result that follows as an effect of something that came before."[22] And the financial, economic, or commercial consequence need only be a "potential" one, meaning one that is "[c]apable of coming into being."[23] Taken together, these terms mean that it is the fact of the event happening (or not happening) that must be connected with or related to a financial, economic, or commercial result or effect that is capable of resulting in the future—not the swap transaction or the act of purchasing or selling the contract itself.

The qualifier "associated with" provides further meaning to the scope of the "potential financial, economic, or commercial consequence" captured by the CEA. In interpreting the analogous phrase "relating to," the Supreme Court has observed that while "everything is related to everything else" in a literal sense, the "ordinary meaning" of the phrase "is not 'so broad that it is meaningless'" and instead "requires a connection that is not 'tenuous, remote, or peripheral.'" *Chevron USA Inc. v. Plaquemines Par.*, 146 S. Ct. 1052, 1061 (2026) (cleaned up); *see N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (reading "related to" "to extend to the furthest stretch of its indeterminacy" would "be to read Congress's words of limitation as mere sham" because "really, universally, relations stop nowhere" (cleaned up)). Determining the reach of indeterminate phrases like "associated with" or "in connection

[21] *Associated*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/associated (last accessed Aug. 26, 2026) ("related, connected, or combined together"); *see Associate*, Black's Law Dictionary (12th ed. 2024) ("[t]o connect or put together mentally").

[22] *Consequence*, Black's Law Dictionary (12th ed. 2024); *see Consequence*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/consequence (last accessed Aug. 26, 2026) ("something produced by a cause or necessarily following from a set of conditions").

[23] *Potential*, Black's Law Dictionary (12th ed. 2024); *see Potential*, Merriam-Webster (2026), https://www.merriam-webster.com/dictionary/potential (last accessed Aug. 26, 2026) ("existing in possibility"; "capable of development into actuality").

with" requires looking for "a limiting principle consistent with the structure of the statute and its other provisions" and the "objectives" of the statute. *Maracich v. Spears*, 570 U.S. 48, 60 (2013) (cleaned up). So too here does "associated with"—a phrase "synonymous" with "related to," *In re Fairfield Sentry*, 147 F.4th at 151—require more than some connection to an attenuated, incidental, or downstream potential economic consequence, because "[*a*]*nything* can potentially have economic ramifications given enough attenuation and happenstance," *QCX LLC v. Nessel*, 2026 WL 1895958, at *3; *see KalshiEX LLC v. Cafferelli*, No. 25 Civ. 2016, 2026 WL 2294589, at *10 (D. Conn. Aug. 10, 2026) (recognizing that "the Court must give independent meaning to the phrase 'associated with' by identifying a meaningful boundary on what it requires" given that "virtually any uncertain event could produce some downstream financial effect").

The purpose and structure of the CEA leave no doubt that the occurrence of the reference event must itself have a close or inherent connection to a potential financial, economic, or commercial consequence that allows for hedging or facilitates price discovery. *See L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 115 (2d Cir. 2020) (observing that, in interpreting a statute, courts "interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose" (quoting *Abramski v. United States*, 573 U.S. 169, 179 (2014))); *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36-37 (1990) ("[I]n expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." (quoting *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989))).[24] As set forth in the "[f]indings and purpose" provision of the CEA, the Act serves the national public interest by "providing a means for managing and assuming price risks, discovering prices,

[24] That the CFTC believes the Year in Search Contracts to be swaps is of no matter, because "interpretation of the statute is a question of law, and accordingly, it is the court, and not the administrative agency, that determines its meaning." *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 435 (2d Cir. 2024).

or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a); *see Webloyalty*, 954 F.3d at 115-16 (determining statutory purpose from findings and purpose section).[25] By the CEA's own terms, then, contracts subject to the CEA are intended to improve commodities markets by facilitating hedging and price discovery. To fall within the CEA's ambit, the event referenced in an event contract must be sufficiently "associated with a potential financial, economic, or commercial consequence" to allow for hedging risk or facilitating price discovery for market participants—not every downstream hypothetical consequence imaginable will suffice. *See Coinbase Fin. Mkts. v. Nessel*, No. 25 Civ. 14092, 2026 WL 2295184, at *9 (E.D. Mich. Aug. 7, 2026).[26]

That interpretation is consistent with the CEA's requirement that the financial, economic, or commercial consequence need only be a "potential" one. Although "potential" contemplates that the financial, economic, or commercial consequence need not be *certain* to occur, the consequence cannot be so hypothetical or speculative that it has no possibility or is incapable of coming to fruition in the future. That meaning makes sense in light of the context and purpose of the CEA. As defined in Section 1a(47)(A)(ii), swaps are forward-looking, probabilistic instruments where payoff depends on whether the referenced event occurs in the future after the contract's creation. The economic, financial, or commercial consequence associated with the occurrence of the event must be capable of coming into fruition. The likelihood of the economic, financial, or commercial consequence coming into being may vary depending on whether the event

[25] The CFMA amended the current findings and purpose section of the CEA, but the "[l]egislative findings" section that CFMA superseded also recognized the value of futures trading for "hedging . . . against possible loss through fluctuations in price" and options trading for "risk shifting and other purposes." 7 U.S.C. § 5 (2000).

[26] The CFTC itself acknowledges that swaps tied to the occurrence of events are intended to serve these purposes. In attempting to craft regulations around prediction markets, the CFTC has described event contracts as serving "information aggregation, price discovery, and price dissemination functions," and "allow[ing] market participants to hedge exposure to a wide array of events." Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35806, 35807 (June 12, 2026).

occurs or the extent to which it occurs, and that is why swaps have utility for hedging and price discovery. But "potential" does not alter the nature of the connection required between the contract's referenced event and the financial, economic, or commercial consequence with which it is connected. After all, the phrase "associated with" modifies "potential financial, economic, or commercial consequence."

Other components of the CEA's comprehensive definition of a "swap" reinforce the conclusion that the referenced event itself must have a potential financial, economic, or commercial consequence by its own nature, not one that arises from "external market activity." *See Cafferelli*, 2026 WL 2294589, at *10. The CEA lists various types of instruments that constitute a swap, all of which "cabin the contextual meaning" of the terms in subpart (ii). *See Yates v. United States*, 574 U.S. 528, 529 (2015). Subpart (i) defines a swap to include price-related options that are "for purchase or sale, or based on the value, of . . . interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind." 7 U.S.C. § 1a(47)(A)(i). Subpart (iii) includes contracts that provide for the exchange of payments and transfer of "financial risk" based on the value of these reference assets, rates, or indices, and specifically lists 22 commonly known swaps. *Id.* § 1a(47)(A)(iii). Subpart (v) defines swap agreements based on the "price, yield, value, or volatility of any security." *Id.* § 1a(47)(A)(v).[27] Because "a word is known by the company it keeps," subpart (ii) must be read in the context of these other definitions to "avoid ascribing to [it] a meaning so broad that it is inconsistent with its accompanying words." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 576 (1995). Read in context, the occurrence of the referenced event

[27] Subpart (iv) is a gap-filling provision that defines a swap to mean a contract "that is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv). Subpart (vi) covers any contract that is "any combination or permutation of, or option on," any of the contracts defined in subparts (i) to (v). *Id.* § 1a(47)(A)(vi).

in subpart (ii) must—like "the company it keeps," *id.*—have an inherent potential economic, financial, or commercial consequence, and not merely cause some attenuated or downstream economic impact or effect. *See KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1028 (D. Nev. 2025).

### 2. The Year in Search Contracts Are Not Associated with a Potential Financial, Economic, or Commercial Consequence

The Year in Search wagers fall squarely outside the text and purpose of the CEA. Although the Indictment alleges the purported ways in which Google considers the Year in Search results and campaign valuable for its own "commercial objectives," Dkt. No. 17 ¶¶ 2-3, that is insufficient to convert the contracts into swaps. By the plain terms of the CEA, it is the occurrence of the event specified in the contract—here, whether a certain person would or would not be the most searched person on Google in 2025—that must be connected to a potential economic, commercial, or financial consequence. In other words, the fact that Kendrick Lamar, Tyler Robinson, or Pope Leo might be the most searched person on Google in 2025 must carry a potential financial, economic, or commercial consequence that is not "tenuous, remote, or peripheral." *Chevron*, 146 S. Ct. at 1061.

The identity of the most-searched person is immaterial to the purported value of the Year in Search campaign for Google. It is insufficient for the government to point to some potential economic ramification associated with, however tangentially, the relative popularity of Kendrick Lamar, Tyler Robinson, and Pope Leo XIV to bring the Year in Search wagers within the CEA's ambit. *See United States v. Minnesota*, No. 26 Civ. 2661, 2026 WL 2150211, at *15 (D. Minn. July 27, 2026) (observing that "one is hard pressed to imagine the financial, economic, or commercial consequences" of "which couple will win season eight of Love Island USA" "unless the words of limitation in 7 U.S.C. § 1a(47)(A)(ii) are stretched so broadly that they impose no

limit on the CFTC's jurisdiction at all"); *see also United States v. Lopez*, 514 U.S. 549, 565 (1995) (rejecting interpretation of effect on commerce that "lacks any real limits because, depending on the level of generality, any activity can be looked upon as commercial").

More fundamentally, whether Pope Leo XIV or Kendrick Lamar was Google's most-searched person of 2025 is of no meaningful financial, economic, or commercial consequence to any market participant, which the CEA requires. Unlike credit-default, interest-rate, or other long-recognized swaps, wagering on whether someone was the most-searched person in the prior year does not serve any conceivable purpose of hedging commercial risk or offsetting financial exposure, and the Indictment does not even try to allege as much (because it cannot). Nor do the Year in Search Contracts facilitate any type of price discovery, as they merely track the likelihood or probability that the referenced event occurs, and settle based on historic data about Google search trends that fail to inform any economic, commercial, or financial decision.

To be sure, not every party to a true swap or futures contract has an interest in hedging. Speculators who have no direct economic interest in the underlying commodity or referenced asset may take positions on the expectation of pure financial gain. But speculation complements hedging, as "'hedging' is facilitated by the availability of speculators willing to assume the market risk that the hedging [counterparty] wants to avoid." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358-59 & n.11 (1982). The trading activity of speculators and the attendant liquidity enable the transfer of financial or market risk from one party to another. By contrast, when purchasing the Year in Search contracts at issue here, parties to *both* sides of the wager are merely engaged in speculation about who Google will announce is the most searched person: There is no transfer or assumption of risk as there is when hedging. Indeed, in distinguishing futures trading from gambling, the Supreme Court has differentiated between

contracts involving "self-protection in business" from "a speculation entered into for its own sake." *Bd. of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 249 (1905). Speculation in futures markets has "value . . . as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Id.* at 247. That is not the kind of risk transfer present when parties bet on whether someone was the most searched person on Google.

At bottom, the Year in Search results are no more than a corporate announcement of curated, historical, search-trend data—data that are freely available to parties online. *See supra* note 10. The Year in Search results carry a financial consequence only to the Polymarket.com users who chose to wager on the bet Polymarket.com created. Such circular reasoning is insufficient: The existence of the wager cannot itself supply the financial, economic, or commercial consequence that the statute demands, and to hold otherwise would mean every bet is a swap simply because people decided to wager on it. *See Hendrick*, 817 F. Supp. 3d at 1028 ("[E]xternalities like whether people bet on an event or contingency . . . are not sufficient."); *Cafferelli*, 2026 WL 2294589, at *9 ("[T]he relevant consequence must arise from the event or contingency itself, rather than from externalities such as downstream financial effects created by third parties' independent decisions to bet on the event.").[28] The CEA does not support that logic.

Courts across the country have rejected attempts to stretch the CEA to cover bets like those at issue here, holding that, for an event to be "associated with a potential financial, economic, or commercial consequence," the event "requires an inherent connection with potential economic consequences." *QCX LLC v. Nessel*, 2026 WL 1895958, at *8; *see Hendrick*, 817 F. Supp. 3d at

[28] Nor can it be the case that a contract becomes a swap simply because it is traded on a designated market or an exchange. For one thing, that argument has no applicability here, because Polymarket.com is not a DCM subject to the CEA. For another, the logic of that argument would be circular and finds no support in the statutory text, because "being tradeable is not included in the CEA's definition of a swap." *Hendrick*, 817 F. Supp. 3d at 1030; *see QCX LLC v. Nessel*, 2026 WL 1895958, at *8 (rejecting the suggestion that being traded on a DCM "causes something to be a swap when it otherwise would not have been").

1026–27; *Cafferelli*, 2026 WL 2294589, at *9–10; *see also KalshiEX, LLC v. Schuler*, No. 25 Civ. 1165, 2026 WL 657004, at *5-6 (S.D. Ohio Mar. 9, 2026) (concluding that the interpretation that swaps are limited to "events and contingencies that have a . . . direct and inherent association with matters of financial, economic, or commercial consequence . . . better serves the purpose of the statute"); *Coinbase v. Nessel*, 2026 WL 2295184, at *8–10 (rejecting Coinbase's interpretation that subpart (ii) covers "all 'economic ramifications'"); *United States v. Wisconsin*, No. 26 Civ. 749, 2026 WL 2474512, at *10–11 (July 29, 2026) (finding "persuasive" decisions limiting the "breadth and imprecision" of subpart (ii)'s definition); *Minnesota*, 2026 WL 2150211, at *12 (concluding "associated with" "reflects congressional intent to require some connection between the outcome of the event and a potential financial, economic, or commercial consequence"). As these courts have explained, the "event or contingency itself [must] ha[ve] some potential financial, economic, or commercial consequence without looking at externalities like potential downstream financial consequences such as parties extrinsic to the event betting on it." *Hendrick*, 817 F. Supp. 3d at 1027. To read the CEA's definition of a "swap" to "include agreements with underlying events that are connected to financial consequences only through downstream, and theoretically infinite, chains of potential consequences" would render the statute's terms "meaningless" and stretch the CEA beyond its text and purpose. *QCX LLC v. Nessel*, 2026 WL 1895958, at *3, *6. That is because "[i]f the existence of some downstream economic consequence [was] sufficient to transform an event into a swap, the statute would encompass virtually any uncertain event with economic ramifications," which is impossible to reconcile with the text Congress enacted. *Cafferelli*, 2026 WL 2294589, at *8.

On this reasoning, courts have held that event contracts pertaining to sporting events—such as contracts tied to the outcome of football games and the number of points scored in a

game—are not "swaps."[29] Even if the outcome of sporting contests may have commercial consequences insofar as they affect hotel room rentals, food sales, advertising dollars, athlete sponsorships, and coaching staff salaries (as part of the global sports industry that generates, by one estimate, $2.3 trillion in annual revenue[30]), those are incidental and downstream consequences that "arise from externalities surrounding the event rather than from the event itself." *Cafferelli*, 2026 WL 2294589, at *10; *see Hendrick*, 817 F. Supp. 3d at 1026–28; *Schuler*, 2026 WL 657004, at *5; *QCX v. Nessel*, 2026 WL 1895958, at *8; *Coinbase v. Nessel*, 2026 WL 2295184, at *9-10.

The Year in Search Contracts are even more divorced from any potential financial, economic, or commercial consequence than contracts tied to the outcome of sporting events. To the extent a sporting-event contract carries economic consequence within the meaning of the CEA, as a minority of courts have held, it is because the event may affect "stakeholders [that] have financial exposure to the underlying events' outcomes," *KalshiEX LLC v. Johnson*, 832 F. Supp. 3d 954, 962 (D. Ariz. 2026), such as "sponsors, advertisers, television networks, [or] franchises," *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227-28 (3d Cir. 2026). But even if a sporting-event contract could "offset financial exposure" to that event, *KalshiEX LLC v. Johnson*, 832 F. Supp. 3d at 962, if one looked far enough downstream,[31] that is plainly not the case for Google's Year

[29] In *Williams*, this Court "assume[d] without deciding that Kalshi's sports-event contracts are swaps under the CEA," and held that Kalshi had not shown a likelihood of success as to whether the CEA preempts New York's gambling laws. 2026 WL 2017466, at *6. As much as the government may suggest that an assumption that prediction market contracts are themselves swaps is similar to a decision on that question, *see* Opp'n to Mot. to Dismiss at 9-10, *United States v. Van Dyke*, 26 Cr. 156 (S.D.N.Y. Aug. 19, 2026), Dkt. No. 25 (hereinafter, "Van Dyke Opposition"), the Court has not resolved this issue, let alone as to the Year in Search Contracts involved in this case.

[30] Tony Simpson, Jennifer Tsim & David Gandarillas, *Unlocking the Trillion-Dollar Potential in Sports Economy*, Oliver Wyman (Feb. 2026), https://www.oliverwyman.com/our-expertise/insights/2026/feb/sports-economy-for-people-and-planet.html.

[31] *See* Brief for CFTC as Amicus Curiae Supporting Appellant at 13, *KalshiEX, LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), Dkt. No. 31 ("'Whether LeBron James will score 20 or more points in a game' or 'whether the combined score in the annual Ohio State-Michigan football game will be over or under 50.5 points' can be associated with potential economic consequences—how many LeBron James jerseys are sold, how many viewers stay tuned into the Ohio State-Michigan game, ticket prices for future events, and so on." (cleaned up)).

in Search results. The Year in Search Contracts present no identifiable market participant that carries any commercial, financial, or economic risk or interest associated with whether a specific person was Google's most-searched person of 2025. No publisher's revenue depends on whether Pope Leo or Kendrick Lamar was the most searched person. No advertiser's costs fluctuate based on that ranking. No commodity price is affected. The Indictment does not allege, nor could it allege, that any party to these Contracts was hedging exposure to the Year in Search results. Instead, parties to the Year in Search Contracts are engaged in speculation wholly untethered from any underlying commercial activity.

### 3. The Year in Search Contracts Are Not Dependent on an "Occurrence"

As noted above, the statutory definition of a "swap" requires that the contract be "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A)(ii). In addition to being "associated with a potential financial, economic, or commercial consequence," the contract must depend on an "event's" "occurrence" as those terms are used in the CEA. *Id.* The Year in Search Contracts do not depend on the *occurrence* of an event and so fail to meet the statutory definition of a swap for that additional, independent reason.

As several district courts have recognized in the context of sports betting, "Congress chose different words for occurrence and event in the definition of a swap" and there must be "some significance to that decision." *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nev. Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1182 (D. Nev. 2025). Both words cannot mean "anything that happens." *Id.* at 1183. Among other canons of statutory interpretation, if "event" had its broadest possible meaning, there would be no reason for Congress to have defined other kinds of swaps in the CEA besides the one at issue here, as the "event" definition would subsume all others. *Id.* at 1184.

Instead, in the context of sports betting, "event" means "the sporting event itself, not who wins it." *Id.* at 1183. And a sports bet may be a "swap" if it is a bet on the "occurrence" of that "event": "a boxing match could either take place (occurrence), not take place (nonoccurrence), or go only three rounds (extent of the occurrence)." *Id.* Where a prediction market offers contracts based not on "whether the Kentucky Derby (the event) will take place (occur, not occur, or extent of occurrence) but on who will win it (the outcome)," those contracts are not swaps under the CEA's definition. *Id.* at 1184; *see also Cafferelli*, 2026 WL 2294589, at *7 ("The Court finds that the statutory phrase 'occurrence, nonoccurrence, or the extent of the occurrence of an event' is concerned with whether an event takes place and to what extent it occurs, not various outcomes of or embedded within that event."); *QCX LLC v. Nessel*, No. 26 Civ. 710, 2026 WL 1166362, at *2 (W.D. Mich. Mar. 10, 2026) (concluding that a definition of "event" that meant "essentially anything that happens" would extend the statute's "reach beyond any logical limit").

These courts have adopted a definition of "event" used in the *Nevada* decision: "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." 815 F. Supp. 3d at 1183. Applying this definition to the government's charges against Mr. Spagnuolo, a prediction market wager on whether Google will release its Year in Search list for a given year could be a contract dependent on the occurrence or nonoccurrence of an event. But the Year in Search Contracts at issue here concerned whether particular individuals would rank in various places on the list. That is an *outcome* of an event, not the event itself, and so those contracts are not swaps.[32]

[32] The government may argue, as the prediction markets have argued in the sports-betting cases, that the markets are phrased as outcomes (i.e., "Will Pope Leo XIV be the #1 searched person on Google this year," Dkt. No. 1 ¶ 8.b). But allowing clever contract drafting to trump the language of the statute would mean there is "no limiting principle": "If

#### 4. Interpreting the Year in Search Contracts to Be Swaps Would Produce Absurd Results

Interpreting bets on Polymarket.com around Google's trending searches to be swaps would also produce absurd results. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). The Indictment's concept of a swap would sweep under the CEA's jurisdiction "any agreement or transaction dependent on anything happening that could conceivably result in any degree of financial consequence for anyone." *QCX LLC v. Nessel*, 2026 WL 1895958, at *6; *see Hendrick*, 817 F. Supp. 3d at 1027. Taken to its logical end, the CEA's definition of a "swap" would reach virtually every kind of wager that could possibly exist, no matter how attenuated the economic consequence, including wagers on the outcome of a "neighborhood ping pong match," wagers between friends about the outcome of a reality television show, or even charity raffles. *Flaherty*, 172 F.4th at 233 (Roth, J., dissenting). All such wagers would be forced onto DCMs or else constitute a felony, because the CEA makes it unlawful for any person to enter into a swap unless it is registered on a DCM. 7 U.S.C. § 2(e); *see QCX LLC v. Nessel*, 2026 WL 1895958, at *8 (noting "absurd result of forcing broad swaths of ordinary transactions onto designated markets"); *Schuler*, 2026 WL 657004, at *6; *Coinbase v. Nessel*, 2026 WL 2295184, at *9.[33] Such an outcome defies reason, and Congress could not have intended it.

---

everything can be defined as an event, the statutory words either have no meaning or have such a broad meaning that they would render superfluous other portions of the CEA's definition of a swap." *Nevada*, 815 F. Supp. 3d at 1183.

[33] The relevant DCM to this case is Polymarket US. As noted above, *see supra* note 9, Polymarket US did not list the Year in Search Contracts, which were instead available only on Polymarket.com, which is not a DCM. Accordingly, Polymarket US has never self-certified that the Year in Search Contracts comply with the CEA. It would be particularly absurd to conclude that specific event contracts that a registered DCM has never self-certified as compliant with the CEA are swaps, when every indication points in the other direction.

While not reflected in the Indictment, the government has produced discovery in this case that suggests some counterparties to Mr. Spagnuolo's alleged Year in Search wagers included U.S.-based users of Polymarket.com. If the

Here, "a non-absurd interpretation" of the definition of a "swap" is "not only available, it is compelled by the plain meaning of the statutory text," *United States v. Messina*, 806 F.3d 55, 70 (2d Cir. 2015) (cautioning that "absurd results are to be avoided if alternative interpretations" are available (quoting *Griffin*, 458 U.S. at 575)). An event contract within the meaning of the CEA's definition of a "swap" must reference an event that itself has an economic, commercial, or financial consequence—and the Year in Search Contracts fail that requirement.

Mr. Spagnuolo's case is the second criminal prosecution in connection with alleged insider trading on Polymarket that the government has undertaken in recent months. The first, *United States v. Van Dyke*, No. 26 Cr. 156 (MMG), involves the alleged use of classified government information to bet on contracts offered on Polymarket.com relating to the U.S. military operation to capture Nicolás Maduro in Venezuela. Mr. Van Dyke recently moved to dismiss the indictment against him on some of the same grounds raised in this motion, and the government filed their opposition last week. *See* Van Dyke Opposition. In responding to Mr. Van Dyke's argument that the government's broad definition of swap would make the CEA essentially limitless, the government characterized his argument as an "academic objection" with "little relevance to this prosecution," and argued that his "hypotheticals are cases for another day." *Id.* at 13. That day has come very quickly, as the prosecution of Mr. Spagnuolo under the government's capacious interpretation of the CEA shows exactly the dangers of a limitless statute.

### 5. The History of the CEA Confirms That the Year in Search Wagers Are Not Swaps

The conclusion that the Year in Search wagers are not swaps is also consistent with the legislative history of swaps regulation under the CEA. When Congress enacted the Dodd-Frank

Year in Search Contracts were swaps, that would mean that every one of those U.S.-based persons committed a felony each and every time they wagered on Google's most-searched person.

Act, it was responding to the near-collapse of the U.S. financial system, caused in large part by unregulated, over-the-counter derivatives—particularly credit default swaps—that had been "explicitly exempted" from CFTC oversight and posed a "systemic threat" to the U.S. economy. S. Rep. No. 111-176, at 29-30 (2010). The Dodd-Frank Act was intended to ensure that over-the-counter derivatives were "regulated by the SEC and the CFTC" and that "all trades will be reported so that regulators can monitor risks." *Id.* at 32. In adding "swaps" to the CEA, "Congress was bringing risky financial products out of the shadows that had threatened the stability of the entire U.S. financial sector," *Hendrick*, 817 F. Supp. 3d at 1031, not creating a regulatory apparatus for every type of wager, particularly where they serve no conceivable economic purpose beyond facilitating gambling (to the extent facilitating gambling even qualifies as an economic purpose).

That Congress did not seek to permit all modes of wagering is clear from the legislative record. In amending the CEA under the Dodd-Frank Act, Congress created a "Special Rule" authorizing the CFTC to review and prohibit certain types of contracts that are "contrary to the public interest" because they involve "unlawful" activity, "terrorism," "assassination," "war," "gaming," or other activity determined by the CFTC by "rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). As this Court has observed, the congressional record "supports the view that when enacting the Special Rule, Congress sought to prohibit" event contracts tied to the outcome of sports events that are akin to gambling. *Williams*, 2026 WL 2017466, at *9. In particular, Senator Dianne Feinstein expressed concern that "derivative contract[s]" would be "used predominantly by speculators or participants not having a commercial or hedging interest," and did not understand the Dodd-Frank Act to authorize "gambling" or gaming contracts that "served no commercial purpose at all." 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010); *see KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 683-84 (D. Md. 2025). Senator

Blanche Lincoln explained that "an 'event contract' around sporting events" would "not serve any real commercial purpose," but instead "would be used solely for gambling." 156 Cong. Rec. S5902-01, S5906 (July 15, 2010). This history reinforces the conclusion that Congress did not, when it defined "swap" in the CEA, intend to reach or authorize all types of event contracts without limit.

In *Van Dyke*, the government characterizes the "Special Rule" as a mere "narrow safety valve" that creates "discretionary, case-by-case authority to bar particular swaps," in comparison to the "categorical *ex ante* gatekeeping" embodied in the "economic-purpose requirement" of the CEA that the CFMA purportedly "eliminated" in 2000. Van Dyke Opposition at 17. Based on the so-called "abolish[ment]" of the "economic-purpose requirement" and Congress's purported decision not to "revive" the economic-purpose requirement when it added swaps and event contracts as part of the Dodd-Frank Act in 2010, the government suggests that the CEA cannot be read to impose the requirement that swaps serve an economic purpose in facilitating hedging or price discovery. *Id.* But that argument rests on a mischaracterization of the statutory history.

From 1974 until the enactment of the CFMA, the CEA required that a DCM demonstrate that its futures contracts "will not be contrary to the public interest." 7 U.S.C. § 7(7) (1994 & Supp. V). Although the legislative history of the CEA suggests that "public interest" was intended to embody an "economic-purpose test," *Jordon v. N.Y. Mercantile Exch.*, 571 F. Supp. 1530, 1555 (S.D.N.Y. 1983), it was in fact the CFTC that took the position, for decades, that "public interest" required that every proposed futures contract satisfy an economic-purpose test, that is, that the contract "reasonably can be expected" to serve, on more than an "occasional" basis, as a price

discovery or hedging tool for users of the underlying commodity.[34] The CFMA repealed this "public interest" requirement as part of its deregulation of swaps and other over-the-counter derivatives. *See* Pub. L. No. 106-554, 114 Stat. 2763A, 2763A-383 (2000). Yet when Congress passed the Dodd-Frank Act, it revived the same "public interest" requirement that had been codified in the CEA in the Special Rule. This time, however, it gave the CFTC the authority to determine whether contracts were contrary to the public interest, including because they amounted to mere gambling, among other things. *See* Dodd-Frank Act § 745(b), 124 Stat. at 1735.

To say that Congress chose not to "revive the old economic-purpose requirement" in adding swaps to the CEA, Van Dyke Opposition at 17, thus misreads the statutory history. Congress in no way disclaimed (expressly or by implication) an economic-purpose requirement; rather, it delegated to the CFTC the authority to prohibit contracts that are contrary to the public interest, which could include contracts that serve no conceivable economic purpose. Indeed, the congressional record of the Dodd-Frank Act—which this Court has found persuasive—shows that in enacting the Special Rule, Congress sought to prohibit event contracts that lack an economic purpose and are akin to "gaming," such as sporting event contracts. *Williams*, 2026 WL 2017466, at *9. The CFTC's recent "inaction" under the Special Rule with respect to contracts that serve no economic purpose and instead resemble gambling "is not proof that the . . . contracts are regulated by or permissible under the CEA." *Id.* (quoting *Schuler*, 2026 WL 657004, at *9). In short, the Special Rule cannot be read, as the government suggested in the *Van Dyke* case, to reject limits on the bounds of the definition of a swap.

[34] *See Guideline on Economic and Public Interest Requirements for Contract Market Designation*, 40 Fed. Reg. 25849, 25850 (June 19, 1975).

The CFTC's own post-enactment guidance further bolsters the understanding that "swaps" do not encompass wagers of any kind: During rulemaking, the CFTC expressly disclaimed any intention "to suggest that many types of consumer and commercial arrangements that historically have not been considered swaps are within the swap or security-based swap definitions."[35] Instead, it was "understood that Congress used 'swap' to refer to financial instruments at the root of the financial crisis." *QCX LLC v. Nessel*, 2026 WL 1895958, at *4. Against this backdrop, Congress could not have silently intended the CEA to reach purely speculative wagers on the results of Google's Year in Search and to extend the CFTC's jurisdiction over all markets involving gaming. *See Hendrick*, 817 F. Supp. 3d at 1031 (in adding swaps to the CEA, "Congress was not enabling nationwide gambling on CFTC-designated exchanges"). As the Supreme Court has repeatedly observed, Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

**6. Unduly Broad Interpretations of Criminal Statutes Must Be Avoided**

As discussed above, an analysis of the text, structure, and purpose of the CEA makes clear that Polymarket.com's Year in Search Contracts are not swaps. A contrary holding would require adopting an interpretation of the CEA that has no limits and would sweep in every conceivable wager or bet, injecting "staggering breadth" and arbitrariness into a statute with criminal penalties. *Dubin v. United States*, 599 U.S. 110, 129 (2023).

But "[t]ime and again," the Supreme Court "has prudently avoided reading incongruous breadth into opaque language in criminal statutes," *id.*, resisting invitations to effect "a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress,"

[35] Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208-01, 48248 (Aug. 13, 2012).

*Cleveland v. United States*, 531 U.S. 12, 24-25 (2000); *see also Yates*, 574 U.S. at 548-49. The Court has rejected interpretations of criminal statutes that would have "far-reaching consequences" and "attach criminal penalties to a breathtaking amount of commonplace . . . activity." *Van Buren v. United States*, 593 U.S. 374, 393-94 (2021); *see Marinello v. United States*, 584 U.S. 1, 9-10 (2018); *Dubin*, 599 U.S. at 130-31; *see also Fischer v. United States*, 603 U.S. 480, 496-98 (2024) ("Our usual approach in obstruction cases has been to 'resist reading' particular sub-provisions 'to create a coverall' statute, as the Government would have us do here."). And the Court has rejected interpretations of statutes that fail to provide "clear lines" separating "innocuous" and "criminal" conduct. *Snyder v. United States*, 603 U.S. 1, 15-16 (2024); *see Van Buren*, 593 U.S. at 395-96. So too here should the Court "exercise[] restraint in assessing the reach" of criminal liability under the CEA. *Dubin*, 599 U.S. at 129. Before choosing the "harsher alternative"—subjecting all wagers with any conceivable economic consequence to the CEA and its criminal provisions—the Court should require that Congress "sp[eak] in language that is clear and definite." *Cleveland*, 531 U.S. at 25.

Finally, to the extent there is any ambiguity remaining in the CEA, the rule of lenity counsels against the government's application of the CEA here. That rule requires that any "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," *id.*, and it applies with greater force in cases where, as here, the government seeks to extend the law into novel territory without precedent. *See United States v. Cohen*, 260 F.3d 68, 76 (2d Cir. 2001) ("The rule exists to prevent courts from 'applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.'" (quoting *United States v. Lanier*, 520 U.S. 259, 266–67 (1997))). Here, courts' diverging conclusions as to the definition of a swap and the types of event contracts it reaches are a hallmark

of statutory ambiguity that warrants lenity. In these circumstances, "the tie must go to the defendant." *United States v. Santos*, 553 U.S. 507, 514 (2008).

## III. The Commodities Fraud Count Violates Mr. Spagnuolo's Due Process Rights and Should Be Dismissed

Dismissal of the commodities fraud count is required for another reason: Interpreting prediction market contracts like the Year in Search Contracts to be "swaps" under the meaning of the CEA and subject to its fraud provisions would fail to provide defendants like Mr. Spagnuolo with fair notice of the unlawfulness of their alleged conduct and invite arbitrary enforcement, thereby violating fundamental principles of due process.

### A. Criminal Laws Must Provide Fair Warning and Avoid Arbitrary Enforcement

The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." A corollary of this venerable guarantee is that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Lanier*, 520 U.S. at 265. "[T]he Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). "A statute can be impermissibly vague" if it fails for "either of [these] two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). This "doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers," for "[o]nly the people's elected representatives in the legislature are authorized to make an act a crime." *United States v. Davis*, 588 U.S. 445, 451 (2019) (cleaned up). "Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide." *Id.*

To avoid "arbitrary enforcement," a criminal statute must "establish minimal guidelines to govern law enforcement," to prevent "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them."). To provide fair notice, "a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender*, 461 U.S. at 357. The Supreme Court has identified "three related manifestations of the fair warning requirement":

> First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Second, as a sort of junior version of the vagueness doctrine, the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.

*Lanier*, 520 U.S. at 266–67 (cleaned up).

### B. The Government's Interpretation of the CEA Invites Arbitrary Enforcement and Fails to Give Fair Notice

The Indictment is "a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.* at 266. Mr. Spagnuolo's prosecution for engaging in so-called insider trading on prediction markets is only the second of its kind, and the first in which the alleged material, nonpublic information belonged to a private entity. The first, *Van Dyke*, commenced on April 23, 2026—months after the conduct alleged in the case at bar.

Never before April 2026 had the government brought criminal charges for wagers made on a prediction market, and with good reason. Congress has considered but not passed legislation that would bring prediction markets—and insider trading on such markets—within the CEA's jurisdiction.[36] Whether to criminalize such conduct is a policy decision for Congress, not prosecutors. *See Davis*, 588 U.S. at 470 ("But these are options that belong to Congress to consider; no matter how tempting, this Court is not in the business of writing new statutes to right every social wrong it may perceive."). To reach a contrary conclusion would be to violate separation of powers principles, stripping "the people's elected representatives" of their sole "authori[ty] to make an act a crime," *id.* at 451, and "impermissibly delegat[ing] basic policy matters" to the other branches of government, *Grayned*, 408 U.S. at 108–109; *see Davis*, 588 U.S. at 451 ("Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges"). The Supreme Court has repeatedly rejected invitations to expand federal criminal jurisdiction in the absence of a clear, unambiguous statement from Congress, and so too should this Court. *See supra* Section II(B)(6); *Davis*, 588 U.S. at 468 ("In our republic, a speculative possibility that a man's conduct violated the law should never be enough to justify taking his liberty."). Mr. Spagnuolo had no fair notice that Section 6(c) and Rule 180.1 would prohibit the conduct alleged.

The commodities fraud count turns on the meaning of "swap." But, for all the reasons set forth above, *see supra* Section II, Section 1a(47)(A)(ii) is both too vague a statute to give fair notice that purchasing an event contract on Polymarket.com would constitute a "swap" and "invites arbitrary enforcement by judges," thereby "produc[ing] more unpredictability and

---

[36] *See* Alexander H. Pepper and Karl E. Schneider, *Prediction Markets Legislation in the 119th Congress*, Library of Congress (Apr. 21, 2026), www.congress.gov/crs-product/IF13207 (proposing legislation that would extend the CEA to prohibit conduct like that alleged in the Indictment).

arbitrariness than the Due Process Clause tolerates." *Johnson v. United States*, 576 U.S. at 597–98. This indeterminacy leaves individuals "at sea" to guess what kind of bet constitutes a swap within the CEA's jurisdiction and what does not. *Snyder*, 603 U.S. at 16 ("The Government's so-called guidance would leave state and local officials entirely at sea to guess about what gifts they are allowed to accept under federal law, with the threat of up to 10 years in federal prison if they happen to guess wrong. That is not how federal criminal law works."); *see also Skilling v. United States*, 561 U.S. 358, 402 (2010) (criminal statutes must have "sufficient definiteness [for] ordinary people [to] understand what conduct is prohibited"). While most courts to reach the issue have concluded that a prediction market event contract does not constitute a swap, courts' disparate interpretation of the statutory text bolsters the conclusion that it is constitutionally vague. *See Johnson v. United States*, 576 U.S. at 598 ("[T]his Court's repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm its hopeless indeterminacy."); *Lanier*, 520 U.S. at 266 ("[T]he vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." (cleaned up)).

On the government's interpretation of the CEA, any wager associated with some economic consequence, anywhere in the world, could be subject to U.S. criminal enforcement. But Section 1a(47)(A)(ii) does not provide adequate guidelines to prosecutors, law enforcement, and juries as to which transactions constitute a swap and which do not. *See Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (To avoid "arbitrary enforcement," a statute must "establish minimal guidelines to govern law enforcement," to prevent "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.").

Whether event contracts constitute swaps—and thus whether the prediction markets are within the jurisdiction of the CEA—is a question that has long vexed the CFTC, too. As early as 2008, the CFTC solicited comment in part to assess "[w]hether event contracts are within the Commission's jurisdiction and if so, why (or why not)?"[37] In 2024, the CFTC issued proposed rules regarding what event contracts fell within the scope of a particular provision of the CEA.[38] To date, it has issued no final rules answering those questions. To the contrary, the CFTC recently issued a new notice of proposed rulemaking, seeking comment on the types of event contracts that can permissibly be offered under the CEA and what guidance to provide.[39]

Neither "the statute nor any prior judicial decision has fairly disclosed" that the alleged conduct would be "within [the statute's] scope." *Lanier*, 520 U.S. at 266. Indeed, the CFTC had taken "no steps to advise the public that it believed the practice was questionable" until after the alleged conduct occurred. *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996). The first time the CFTC publicly declared its policy on insider trading on prediction markets under the misappropriation theory was on February 25, 2026—months after the conduct alleged here—when it issued an enforcement advisory.[40] This advisory indicated that the CFTC was aware of but was not pursuing enforcement action in two cases "involving misuse of nonpublic information and fraud" on

---

[37] Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25669 (May 7, 2008), https://www.federalregister.gov/documents/2008/05/07/E8-9981/concept-release-on-the-appropriate-regulatory-treatment-of-event-contracts#citation-5-p25670.

[38] Event Contracts, 89 Fed. Reg. 48968 (proposed June 10, 2024), https://www.federalregister.gov/documents/2024/06/10/2024-12125/event-contracts. But it later withdrew them. *See* Event Contracts; Notice of Withdrawal of Proposed Regulatory Action, 91 Fed. Reg. 5386 (Feb. 6, 2026), https://www.federalregister.gov/documents/2026/02/06/2026-02454/event-contracts-withdrawal-of-proposed-regulatory-action.

[39] Prediction Markets, 91 Fed. Reg. 12516 (proposed Mar. 16, 2026), https://www.federalregister.gov/documents/2026/03/16/2026-05105/prediction-markets#p-62.

[40] *See* Advisory on Enforcement Authority over Event Contracts, Release Number 9185-26 (Feb. 25, 2026), https://www.cftc.gov/PressRoom/PressReleases/9185-26.

Kalshi—for reasons it did not explain.[41] Because there was "substantial uncertainty in the Commission's interpretation" of the CEA and Rule 180.1's application to prediction markets as of December 2025, and the CFTC did not "reasonably communicate[]" its policy on the use of material, non-public information on prediction markets to the public until after the alleged conduct occurred, Mr. Spagnuolo "was not on reasonable notice that [the alleged] conduct might violate" these provisions, *Upton*, 75 F.3d at 98.

Around the time of the alleged conduct, Polymarket itself was *promoting* the view that insider trading was legal and encouraged in its markets.[42] When asked at a November 2025 Axios Business event what Polymarket does to "basically guard against insider trading," Polymarket Founder and CEO Shayne Coplan responded that insider trading is a feature of prediction markets, not a bug:

> A. I think what's cool about Polymarket is that it creates this financial incentive for people to go and divulge the information to the market and the market can change and all of a sudden it's trading at 95 cents and people are like—
>
> Q. When you say divulge, you mean people who actually know?
>
> A. Yea. Or someone tells someone and then the market responds.[43]

Mr. Coplan doubled down on this idea a week later in a *60 Minutes* interview:

> Q. But predictive markets do rely on someone having some inside information.

---

[41] *Id.*

[42] *See* Long *et al.*, *supra* note 1 ("Polymarket has paid clippers to promote at least 19 videos discussing opportunities to use inside information or other tactics to manipulate markets.").

As the Second Circuit has recognized, the Court may take "judicial notice of the fact that news articles and their contents exist, without respect to the truth of those contents." *United States v. Nieves*, 58 F.4th 623, 634 (2d Cir. 2023); *see also Jeffery v. City of New York*, 113 F.4th 176, 179 (2d Cir. 2024) (taking judicial notice of "news reports insofar as they demonstrate the sort of information available to City officials"). Here, the Court may take judicial notice of these articles insofar as they demonstrate the information available to ordinary persons like Mr. Spagnuolo.

[43] Axios, *Polymarket's Shayne Coplan & Axios' Dan Primack*, at 13:04 (YouTube, Nov. 19, 2025), https://www.youtube.com/watch?v=x3kJ3H8l8B4.

A. Yea, I think that people going and having an edge to the market is a good thing.[44]

Polymarket's views were consistent with a broader understanding in the market that insider trading was permitted on prediction markets as a way to aid information discovery. In September 2025, Bill Ackman, the founder and CEO of Pershing Square Capital Management, who has a substantial social media following, encouraged then-Mayor Eric Adams to purchase an event contract about his own election before dropping out, because, as Mr. Ackman put it: "There is no insider trading on Polymarket."[45]

Nor could there have been fair notice that conduct on Polymarket.com, a foreign exchange that the CFTC does not regulate, would constitute a swap subject to regulation under the CEA. While "[e]xtraterritorial application of a statute also does not necessarily vitiate fair notice," *Phillips*, 155 F.4th at 132, here, the CFTC's prior enforcement order abdicating authority over Polymarket.com activity abroad weighs in favor of finding lack of fair notice. Following a "wind down" of markets that did "not comply with the [CEA] and applicable CFTC regulations," Polymarket.com established a U.S. geo-block and has never obtained designation as a DCM in the United States.[46] Any U.S. person who may have circumvented the geo-block to access Polymarket.com to wager on Google's trending search terms did so illegally, any connection to U.S. commerce was unlawful, and Mr. Spagnuolo could not have known that the alleged conduct was subject to U.S. regulation. Indeed, in responding to criticism about the CFTC's inaction in regulating prediction market contracts, the Chairman of the CFTC himself has said in no uncertain

---

[44] 60 Minutes, *Polymarket CEO Says His Prediction Market Is "The Most Accurate Thing We Have as Mankind Right Now,"* at 6:20 (YouTube, Nov. 30, 2025), https://www.youtube.com/watch?v=ZA5bY4K9XPs.

[45] Bill Ackman (@BillAckman), X (Sept. 6, 2025 at 12:40pm ET), https://x.com/BillAckman/status/1964368044588724465.

[46] CFTC, *CFTC Orders Event-Based Binary Options Markets Operator to Pay $1.4 Million Penalty* (Jan. 3, 2022), https://www.cftc.gov/PressRoom/PressReleases/8478-22.

terms that alleged market manipulation on foreign prediction markets like Polymarket.com is "fake news" because those allegations involve contracts that "are not listed in the United States" and conduct that "occurred offshore."[47] There was no fair notice that such conduct was, in fact, subject to regulation under U.S. law.

For all the reasons set forth above, the Court should dismiss the commodities fraud charge because Mr. Spagnuolo lacked fair notice as to the conduct alleged and the government's interpretation of the CEA would invite arbitrary enforcement.

## IV. The Indictment Should Be Dismissed Because the Charges Are Impermissibly Extraterritorial

Neither the CEA nor the wire fraud statute applies to Mr. Spagnuolo's alleged foreign conduct. "It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Abitron*, 600 U.S. at 417 (cleaned up). Pursuant to this presumption against extraterritoriality, "foreign conduct is generally the domain of foreign law." *Id.* Congress may legislate against this presumption when it "expressly states that a statute applies to foreign conduct." *Phillips*, 155 F.4th at 114. But even "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 265 (2010).

If, on the other hand, a statute does not apply extraterritorially, the court must assess whether the case "involve[s] a permissible *domestic* application" of the statutory provision. *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 336 (2016). It does so by evaluating "whether the conduct relevant to [the statute's] 'focus' occurred in the United States." *Bascuñán v. Elsaca*, 927

[47] *Chairman Selig Announces Inaugural CFTC Innovation Advisory Committee Meeting on August 20*, at 2:55:14 (YouTube, Aug. 20, 2026), https://www.youtube.com/watch?v=9rTCARzj98I&t=10526s.

F.3d 108, 121 (2d Cir. 2019). "The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protec[t] or vindicate." *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413–14 (2018) (quoting *Morrison*, 561 U.S. at 267) (cleaned up). If conduct relevant to the statutory focus did not occur domestically but abroad, "then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR Nabisco*, 579 U.S. at 337; *see also Morrison*, 561 U.S. at 266 ("For it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case.").

Here, the CEA, which incorporates a narrow extraterritoriality provision, and the wire fraud statute, which applies only domestically, have no permissible application to the facts at bar because all of the relevant conduct occurred outside of the United States. The Indictment should therefore be dismissed.

### A. The CEA Has No Permissible Domestic or Extraterritorial Application to the Alleged Facts

Section 2(i), which governs the extraterritorial application of the CEA, establishes that the Act's provisions pertaining to swaps "shall not apply to activities outside the United States unless those activities . . . have a direct and significant connection with activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i)(1). "Congress's choice of wording" in this provision "suggests that it intended to regulate commodities trading abroad that has a direct and significant connection with commercial activities occurring in the United States," or, "when there

is no such connection, to regulate only trading with a direct and significant effect on the U.S. economy." *Phillips*, 155 F.4th at 117.[48] The charged foreign conduct fails to satisfy either measure.

*First*, there can be no serious dispute that the conduct at issue did not satisfy the latter, more exacting standard. The Second Circuit has expressed skepticism that even "commit[ting] a $20 million fraud in a multi-trillion-dollar industry" would constitute a "significant *effect on* U.S. commerce writ large." *Id.* Plainly then, the alleged purchase of event contracts resulting in no more than $1.2 million in profit, which concerned who was or was not Google's most searched person in 2025, could not have significantly affected the U.S. economy "writ large." *Id.*

*Second* and similarly, the activities alleged did not "have a direct and significant connection with activities in . . . commerce of the United States." 7 U.S.C. § 2(i)(1). A connection to U.S. commercial activities is "direct" if "the activity outside the United States directly and immediately affected activity in commerce of the United States without deviation or interruption." *Phillips*, 155 F.4th at 120-21; *see also Direct*, Black's Law Dictionary (12th ed. 2024) (defining "direct" as "straight; undeviating," or "[f]ree from extraneous influence; immediate"). Unlike *Phillips*, in which a U.S. bank "was required to pay $20 million as an immediate consequence of Phillips's actions that triggered the option," *id.* at 121, no immediate commercial consequence arose in the United States due to Mr. Spagnuolo's alleged wagers on Year in Search results. The Indictment does not allege that Google suffered the loss of its trade secrets or the diminishment of the commercial impact of its Year in Search rollout. Polymarket US did not offer Year in Search Contracts, and Polymarket.com did not offer those contracts (or any others) in the United States.

[48] The government's case against Neil Phillips was a "'first of its kind' prosecution under § 2(i)(1)." *Phillips*, 155 F.4th at 132. Accordingly, the Second Circuit's September 2025 decision in *United States v. Phillips* is the leading authority interpreting the CEA's extraterritoriality provision and there is otherwise a marked "paucity of precedent." *Id.* at 114.

The activities associated with the Year in Search event contracts did not have an undeviating and immediate connection with activities in U.S. commerce.

To satisfy Section 2(i)'s extraterritoriality provision, any direct connection with activities in U.S. commerce must also be significant, as "determined from the perspective of U.S. commercial activities." *Phillips*, 155 F.4th at 119. A "significant" connection is one "[o]f special importance; momentous, as distinguished from insignificant." *Significant*, Black's Law Dictionary (12th ed. 2024). The mere involvement of a "U.S. entity" alone, including as counterparty, will not suffice to establish significance to activities in U.S. commerce. *Phillips*, 155 F.4th at 122. Unlike a $20 million swap impacting a U.S. banking institution, *see id.* at 121-22, no facts could render the charged conduct—Mr. Spagnuolo's supposed examination of information that Google itself was sharing with scores of people inside and outside the company, including journalists—of "special importance" or "momentous" with respect to activities in U.S. commerce.[49] The alleged bets and associated activities had no impact on activities in U.S. commerce—direct, significant, or otherwise.

In short, the reasons why the alleged conduct does not have a direct and significant connection to the United States are "simple." *CFTC v. Gorman*, No. 21 Civ. 870, 2023 WL 2632111, at *10 (S.D.N.Y. Mar. 24, 2023). Mr. Spagnuolo is a foreign national who purportedly purchased event contracts while in Switzerland, allegedly using information obtained from his office in Switzerland, to purchase event contracts on Polymarket.com, a foreign exchange that is a subsidiary of a Panamanian company.[50] Pursuant to CFTC order, Polymarket.com does not operate in the United States and employs a geo-block to prevent U.S. users from purchasing

[49] *See* Ex. B, List of External Recipients of Year in Search (USAO_04_0000002188).

[50] *See* Ex. A.

contracts on its website. Mr. Spagnuolo's activities, as alleged in the Indictment, "lack any connection, let alone a direct and significant one, to the United States." *Id.* (rejecting extraterritorial application of the CEA where the defendant "was in Japan when he quoted the price of the swaps at issue; the Bank was Japanese; the Issuer was Japanese; . . . the transaction was governed by Japanese law" and "all of the allegedly fraudulent statements were made in Japan").

Nor can there be any domestic application of the CEA here. Section 6(c)(1) of the CEA makes it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance." 7 U.S.C. § 9(1). The Second Circuit has held that the "focus" of this provision is "manipulation in commodities markets." *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 107 (2d Cir. 2019).

Taken on its face, the conduct relevant to the statute's focus—the alleged misappropriation and use of this information to place wagers—would have occurred in Switzerland, not the United States. *Cf. id.* at 107-08 ("All of the conduct relevant to *that* focus [manipulation in commodities market] occurred abroad—Defendants are alleged to have manipulated the physical Brent crude market near Europe's North Sea by engaging in fraud there."). The only connection the Indictment alleges to the United States—the presence of Polymarket employees in the district, Dkt. No. 17 ¶ 5—is not central to Section 6(c)(1)'s focus. *See RJR Nabisco*, 579 U.S. at 337 (where conduct relevant to the statute's focus did not occur domestically, "then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory"); *cf. Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 634 (2021) ("[A]llegations of general corporate activity—like decisionmaking—cannot alone establish domestic application of [a statute].").

Even if the event contracts at issue were swaps (and they are not), the CEA would have no application here. Accordingly, the commodities fraud charge against Mr. Spagnuolo should be dismissed as impermissibly extraterritorial.

**B. The Indictment Charges an Impermissible Foreign Application of the Wire Fraud Statute**

Unlike the CEA, the wire fraud statute "do[es] not indicate an extraterritorial reach." *Bascuñán*, 927 F.3d at 121. Accordingly, the court must "resolve[] whether the suit seeks a (permissible) domestic or (impermissible) foreign application of the provision." *Abitron*, 600 U.S. at 418. As before, it does so by evaluating "whether the conduct relevant to [the statute's] 'focus' occurred in the United States." *Bascuñán*, 927 F.3d at 121.

The focus of the wire fraud statute is "the use of . . . wires in furtherance of a scheme to defraud." *Id.* at 122 (emphasis omitted); *see also United States v. Napout*, 963 F.3d 163, 179–80 (2d Cir. 2020). A wire fraud charge therefore "involves sufficient domestic conduct when (1) the defendant used . . . wires in furtherance of a scheme to defraud, and (2) the use of . . . wires was a core component of the scheme to defraud." *Bascuñán*, 927 F.3d at 122.

Insubstantial domestic activity will not suffice. "[I]n order for incidental domestic wire transmissions not to haul essentially foreign allegedly fraudulent behavior into American courts, 'the use of the wires must be essential, rather than merely incidental, to the scheme to defraud.'" *Napout*, 963 F.3d at 179 (cleaned up) (quoting *Bascuñán*, 927 F.3d at 122); *cf. WesternGeco*, 585 U.S. at 416 ("Those overseas events were merely incidental to the infringement. In other words, they do not have 'primacy' for purposes of the extraterritoriality analysis." (quoting *Morrison*, 561 U.S. at 267)). "This ensures that the domestic tail not wag, as it were, the foreign dog." *Napout*, 963 F.3d at 179.

In the instant case, the alleged scheme occurred entirely in a foreign country using a foreign exchange. *Cf. id.* at 180-81 (reviewing "ample evidence that the appellants had used American wire facilities and financial institutions to carry out their fraudulent schemes" and concluding that such wires were "integral to the transmission of the bribes in issue"). When Mr. Spagnuolo allegedly accessed Google's Year in Search results and made wagers on Polymarket.com, he was at all times outside the United States. The Indictment does not identify any wires that passed through this district. The wire fraud charge should be dismissed as impermissibly extraterritorial, as should the money laundering charge, which is predicated on it. Dkt. No. 17 ¶ 13.

* * *

On these facts, it "bears repeating [the Supreme Court's] longstanding admonition that 'United States law governs domestically but does not rule the world.'" *Abitron*, 600 U.S. at 428 (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). Because the charges are impermissibly extraterritorial, the Indictment should be dismissed.

## V. The Wire Fraud Count Should Be Dismissed Because the Year in Search Data Are Not "Property"

Count Two of the Indictment charges Mr. Spagnuolo with wire fraud for using Google's "valuable confidential business information, which was subject to a duty of confidentiality, . . . to obtain cryptocurrency in breach of his duties." Dkt. No. 17 ¶ 11. As described in the Background section, the Indictment contains various allegations about the commercial value of both Google's search data and the Year in Search campaign itself. *See supra* Background Section B. These allegations are insufficient to constitute wire fraud under binding precedent.

### A. Confidential Business Information Is Google's "Property" Only If Its Confidentiality Has Commercial Value to Google

The Second Circuit's recent decision in *United States v. Chastain*, 145 F.4th 282 (2d Cir. 2025), forecloses Count Two. Nathaniel Chastain was the first head of product at OpenSea, an

online marketplace for non-fungible tokens (“NFTs”). *Id.* at 286-87. Among his responsibilities was selecting the NFTs that OpenSea would promote in a “featured” section of its website. *Id.* at 287. Operating on his understanding that featuring an NFT typically caused its price to increase, Chastain purchased NFTs before they were featured and sold them afterward at a profit. *Id.* OpenSea’s co-founders testified that they understood the confidentiality agreement Chastain signed when he joined the company to cover the identity of the NFT to be featured, and OpenSea asked Chastain to resign after a user publicly identified his trading. *Id.* at 288-89. Chastain was convicted of wire fraud and of money laundering after the district court instructed the jury that information is “confidential business information” so long as it “was acquired or created by a business for a business purpose, and the business both considered and treated that information in a way that maintained the company’s exclusive right to that information”—and that, although the jury “may also consider whether the information had economic value to the employer,” “the government is not required to prove that the information had such value.” *Id.* at 290 (emphases omitted).

The Second Circuit vacated Mr. Chastain’s conviction. It held that “confidential business information must have commercial value to a company to qualify as its property under the wire fraud statute,” and that the district court therefore “erred by instructing the jury that it could find Chastain guilty of wire fraud even if it found that he misappropriated information that lacked commercial value to OpenSea.” *Id.* at 291–92. That holding follows from first principles: Because the wire fraud statute “protect[s] property rights only” and “reaches only traditional property interests,” an intangible right qualifies only if it protects “an interest that had long been recognized as property” when the statute was enacted. *Id.* at 292 (quoting *Ciminelli v. United States*, 598 U.S. 306, 312, 314, 316 (2023)). Confidential information that lacks commercial value “has not been

so recognized." *Id.* at 294. Thus, "[i]nformation cannot qualify as a traditional property interest if its holder has no economic interest in its exclusive use or in otherwise keeping the information confidential," *id.*, and a bare "right to exclusive use of information, without evidence that maintaining the confidentiality of the information had economic value to the company, is an intangible interest unconnected to traditional property rights that cannot qualify as property under the wire fraud statute," *id.* at 295 (cleaned up) (quoting *Ciminelli*, 598 U.S. at 312). In other words, to qualify as property under the wire fraud statute, the confidentiality of the misappropriated confidential business information must itself provide some value to the business.

In assessing prejudice, the Second Circuit explained why the featured-NFT information was "so tangential to OpenSea's business that it lacked commercial value to the company." *Id.* at 297. OpenSea did not commercialize the choice of which NFT to feature: It collected the same "standard 2.5 percent fee" regardless of which NFT was featured, it did not charge creators to be featured, it did not trade featured NFTs itself, and it had no organized selection process. *Id.* Chastain picked the featured NFT after sharing ideas with colleagues and with the public, and OpenSea publicly invited anyone to submit candidates. *Id.* at 288, 297. Testimony that employee trading "could compromise OpenSea's brand and stance as a neutral and fair marketplace" did not suffice, because "aside from speculation about 'trust,' there was no evidence that maintaining confidentiality was necessary to the firm's reputation, with the result that it would not lose its clients." *Id.* at 297 (cleaned up). "An abstract reputational harm that does not affect the economic interests of the company is too 'ethereal' to qualify as a traditional property interest." *Id.* (quoting *Carpenter v. United States*, 484 U.S. 19, 25 (1987)). Confidential business information is property, in other words, only where the information is "gathered and arranged at some cost and sold as a commodity on the market," or its disclosure would inflict concrete commercial harm, *id.* at 293–

94, 297 (cleaned up), as with the newspaper's prepublication "stock in trade" in *Carpenter*, 484 U.S. at 26, or the client confidences that a law firm was paid to protect in *United States v. Grossman*, 843 F.2d 78, 86 (2d Cir. 1988).

### B. The Indictment Does Not Allege That the Year in Search Data Mr. Spagnuolo Purportedly Accessed Had Commercial Value to Google

The government's theory here is meaningfully weaker than the one the Second Circuit considered and rejected in *Chastain*. There, the government argued that the confidentiality of the featured-NFT selection bore on OpenSea's brand and its users' trust. *Chastain*, 145 F.4th at 297. Here, the Indictment does not allege that the confidentiality of the particular information Mr. Spagnuolo is said to have used to trade had any commercial value to Google at all. The Indictment's allegations of value are directed elsewhere: It alleges that Google "invests substantial financial and personnel resources in a coordinated marketing campaign called 'Year in Search,'" that the campaign "involves driving user interest and engagement by building momentum before announcing the top searches of the year and making a 'splash' with the announcement," and that "[b]ecause the commercial impact of the campaign depends on the element of surprise and the coordinated nature of its public reveal, the top-search information is valuable." Dkt. No. 17 ¶¶ 2-3. In other words, what the Indictment alleges to be commercially valuable to Google is the release of Year in Search—the timing, coordination, and publicity of a marketing event—*not* the contents of the underlying data (i.e., who fell where in the rankings). And it is only the contents of the data that Mr. Spagnuolo is alleged to have used: He purportedly wagered on "who would, and who would not, be announced as the top trending searched persons on Google." *Id.* ¶ 6.

That mismatch is fatal to Count Two. Google has no alleged or even plausible economic interest in whether d4vd, Kendrick Lamar, Tyler Robinson, or Pope Leo XIV was the most searched person in 2025, and the Indictment nowhere alleges otherwise. Google does not sell the

Year in Search rankings; it gives them away, for free, to the entire world, along with the year's most searched movies, books, podcasts, songs, sports events, recipes, games, and news events.[51] Google also publishes—for free—real-time trends and search data throughout the year.[52] It does this, as the Indictment acknowledges, because Year in Search is a marketing exercise. Dkt. No. 17 ¶ 2. Google, too, characterizes Year in Search the same way, describing Mr. Spagnuolo as allegedly having "accessed our marketing material using a tool available to all employees."[53] Indeed, Google's public release of its search data goes far beyond Year in Search: Google publishes trending search data on a rolling, real-time basis at no charge. *See supra* note 10. The rankings are thus the antithesis of information "gathered and arranged at some cost and sold as a commodity on the market." *Chastain*, 145 F.4th at 294 (cleaned up). Whatever value the campaign holds for Google—as the Indictment describes it, "driving user interest and engagement" and "making a 'splash'"—is identical no matter which name appears at the top of the list. Just as OpenSea collected a "standard fee" regardless of which NFT was featured, *id.* at 297, Google's advertising revenue, media coverage, and user engagement do not turn on the identity of the top-searched person. The specific information Mr. Spagnuolo allegedly used is therefore "tangential" to Google's business in precisely the sense that was dispositive in *Chastain*. *Id.* at 296.

At most, the Indictment alleges that Google had an interest in controlling the *timing* of the disclosure so as to maximize the promotional impact of a marketing campaign. But an interest in orchestrating publicity is not a traditional property interest. "The Supreme Court has recently

---

[51] *See* Year in Search 2025, Google Trends, https://trends.withgoogle.com/year-in-search/2025 (last accessed Aug. 25, 2026).

[52] *See* Explore, Google Trends, https://trends.google.com/explore?geo=Worldwide (last accessed Aug. 25, 2026); Trending Now, Google Trends, https://trends.google.com/trending?geo=US (last accessed Aug. 25, 2026).

[53] *Google Information Security Engineer Charged with Using Inside Information to Make $1M on Polymarket*, ABC News (May 27, 2026), https://abcnews.com/US/google-employee-charged-inside-information-make-1-million/story?id=133350018.

emphasized that the mail and wire fraud statutes do not protect 'intangible interests' in the control of information that are 'unconnected to traditional property rights.'" *Id.* at 294 n.3 (quoting *Ciminelli*, 598 U.S. at 312). The Second Circuit applied that principle in *Chastain* to reject precisely the theory the government advances here—that a company's desire to keep information to itself until it chooses to reveal it supplies the property interest, *see id.* at 295 (holding instruction was erroneous because it would permit conviction "even if OpenSea thought it was merely unseemly to reveal the planned featured NFT before it appeared on the website"). The Indictment's allegations that premature disclosure "could reduce or eliminate anticipated user engagement, undercut the media interest that sustains brand value, and diminish advertiser revenue tied to the launch," Dkt. No. 17 ¶ 3, are the same kind of speculative, downstream, reputational harms that *Chastain* held "too 'ethereal' to qualify as a traditional property interest," 145 F.4th at 297 (quoting *Carpenter*, 484 U.S. at 25). And in all events, those allegations concern the effect of disclosing the Year in Search results to the public before the launch. Mr. Spagnuolo is not alleged to have disclosed anything to anyone; he is alleged to have placed anonymous wagers on a foreign prediction market. Dkt. No. 17 ¶ 6. The Indictment does not allege that his wagers spoiled the surprise, reduced user engagement, dampened media interest, or cost Google a dollar of advertising revenue.

The Indictment's reliance on the confidentiality markings of the internal tool cannot fill this gap. The Indictment alleges that "[t]he software tool [Mr. Spagnuolo] could use to access the data bore a banner reading 'Google Confidential' in red text." *Id.* ¶ 4. That allegation is misleading and incomplete. The banner does not state that the tool's output is confidential. It states, "[redacted]" and it then identifies the two

categories of data that Google actually restricted in that way: (1) "[redacted]"[54] and (2) "[redacted]" Ex. C (USAO_04_0000002236) (emphasis added).[55] Mr. Spagnuolo is not alleged to have disclosed either category of information. He is alleged to have used information about the relative popularity of persons—that is, whether Kendrick Lamar was searched more frequently in 2025 than was Pope Leo—but that information does not fall within the banner's scope. Google's own instruction to its engineers thus confirms what the Indictment's allegations of value already reveal: Google had no economic interest in the exclusivity of the information Mr. Spagnuolo allegedly used. *See Chastain*, 145 F.4th at 294. A company that tells its employees that only two enumerated categories of a tool's output "[redacted]" has not treated the remainder as a commercially valuable asset it holds to the exclusion of others.

The Indictment alleges that Mr. Spagnuolo used information that was confidential in name only. Google in fact had no economic interest in the confidentiality of the Year in Search data and accordingly took no steps to protect it. The Indictment therefore fails to allege the misappropriation of "property" under the wire fraud statute and Count Two should be dismissed. *See Chastain*, 145 F.4th at 291-95.

---

[54] [redacted] Google's Year in Search results are not based on absolute search volumes; they reflect "the search terms that saw the highest increase in traffic between January 1, 2025 and November 25, 2025, compared to the same period last year." *The Year in Search Film, Social and Lists Data Methodology*, Google Trends, https://trends.withgoogle.com/year-in-search/data-methodology (last accessed Aug. 25, 2026).

[55] Should the Court decline to dismiss the wire fraud count, Mr. Spagnuolo intends to vigorously contest this charge on the same and other grounds at trial. Mr. Spagnuolo acknowledges that the sufficiency of the evidence is not considered on a motion to dismiss the indictment, *see supra* note 3, and will elicit additional documentary and testimonial evidence at trial that the confidentiality of the content of the Year in Search data was not commercially valuable to Google. But the Indictment's incomplete and misleading quote from this exhibit merits a response here.

**VI. The Money Laundering Count Should Be Dismissed**

Because the wire fraud count requires dismissal, the derivative money laundering count in Count Three falls as well. Count Three of the Indictment alleges that Mr. Spagnuolo engaged in a financial transaction that "involved the proceeds of specified unlawful activity," specifically the proceeds derived from the alleged wire fraud, in violation of 18 U.S.C. § 1956. Dkt. No. 17 ¶ 13. Because the predicate crime of wire fraud fails, *see supra* Section V, the Court should dismiss Count Three of the Indictment*, see Chastain*, 145 F.4th at 298 (vacating conviction for "wire fraud and for money laundering predicated on the fraud").

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Indictment in its entirety.

Dated: New York, New York
August 26, 2026

Respectfully submitted,

Shawn G. Crowley
Michael Ferrara
Andrew L. Chesley
Allison Durkin
Nicole Ng
J. Patrick Hornbeck II
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
scrowley@heckerfink.com
mferrara@heckerfink.com

*Attorneys for Michele Spagnuolo*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2026, I electronically filed a redacted version of the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of Electronic Filing to the following: Thomas Burnett, Ryan Finkel, and Allison Nichols, Assistant United States Attorneys, 26 Federal Plaza, 38th Floor, New York, NY 10278.

Copies of the unredacted document and of the sealed exhibits have been served by electronic mail on AUSAs Thomas Burnett, Ryan Finkel, and Allison Nichols.

