UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

MICHELE SPAGNUOLO,

Defendant.

**26 Cr. 278 (AT)**

**GOVERNMENT'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS**

SEAN S. BUCKLEY
Deputy United States Attorney,
Attorney for the United States, Acting Under Authority Conferred by 28 U.S.C. § 515
Southern District of New York
26 Federal Plaza
New York, New York 10278

Thomas S. Burnett
Ryan Finkel
Allison Nichols
Assistant United States Attorneys
*Of Counsel*

**TABLE OF CONTENTS**


PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 2

I. Factual Overview ........ 2

A. Polymarket ........ 2

B. Insider Trading Scheme by Michele Spagnuolo a/k/a "AlphaRaccoon" ........ 2

II. The Indictment and Prosecution ........ 3

ARGUMENT ........ 4

I. Count One Adequately Alleges Misconduct in Connection with a Swap ........ 4

A. Applicable Law ........ 5

B. Year In Search Event Contracts Are Subject to the CEA ........ 6

II. The CEA's Application to Spagnuolo Does Not Offend Due Process ........ 17

III. The Motion to Dismiss the Wire Fraud Count Should be Denied ........ 20

A. The Indictment Alleges that Spagnuolo Misappropriated Google's Property ........ 20

B. *Chastain* Does Not Support Dismissing the Indictment ........ 22

C. Spagnuolo's Factual Arguments for Dismissal are Meritless ........ 25

D. The Profits Spagnuolo Obtained From Counterparties is "Money" or "Property" ........ 28

IV. The Commodities- and Wire-Fraud Charges Are Not Impermissibly Extraterritorial ........ 31

A. Spagnuolo's Extraterritoriality Arguments Are Not a Basis for Dismissal ........ 31

B. The Commodities-Fraud Count is Not Impermissibly Extraterritorial ........ 33

C. The Wire-Fraud Charge is a Proper Domestic Application of the Statute ........ 39

V. The Court Should Deny the Defendant's Motion to Suppress His Statements ........ 40

A. Applicable Law ........ 41

B. Relevant Facts ........ 45

C. Discussion ........ 50

CONCLUSION ........ 58

# TABLE OF AUTHORITIES

*Alabama v. North Carolina*,
560 U.S. 330, 352 (2010) .......... 9
*Azima v. Dechert LLP*,
2024 WL 4665106, at 28-29 (S.D.N.Y. Sept. 26, 2024) .......... 29
*Barton v. Barr*,
590 U.S. 222, 239 (2020) .......... 11
*Berghuis v. Thompkins*,
560 U.S. 370, 387 (2010) .......... 45, 54, 55
*Berk*emer v. McCarty,
*468 U.S. 420, 433 n.20 (1984)* .......... 44
*Buscanan v. Elsaca*,
927 F.3d 108, 122 (2d Cir. 2019) .......... 40
*Carpenter v. United States*,
484 U.S. 19, 25 (1987) .......... 23, 25, 28
*CFTC v. Minnesota*,
2026 WL 2150211, at *13 (D. Minn. July 27, 2026) .......... 10
*Chapman v. United States*,
500 U.S. 453, 463 (1991) .......... 17
Ciminelli V. United States,
598 U.S. 306 (2023) .......... 27
*Chavez v. Martinez*,
538 U.S. 760, 769 (2003) .......... 45
*Cleveland v. United States*,
531 U.S. 12, 22 (2000) .......... 23
*Colorado v. Connelly*,
479 U.S. 157, 167-69 (1986) .......... 41, 56
*Colorado v. Spring*,
479 U.S. 564, 574 (1987) .......... 41
*Costello v. United States*,
350 U.S. 359, 365 (1956) .......... 5
*Davis v. United States*,
512 U.S. 452, 458-59 (1994) .......... 42, 43, 51, 52
*Duncan v. Walker*,
533 U.S. 167, 174 (2001) .......... 9
*Diaz v. Senkowski*,
76 F.3d 61, 64-65 (2d Cir. 1996) .......... 42
*Edwards v. Arizona*,
451 U.S. 477, 481 (1981) .......... 41, 42, 43, 56
*Grayned v. City of Rockford*,
408 U.S. 104, 108-09 (1972) .......... 18

*Green v. Scully*,
850 F.2d 894, 901 (2d Cir. 1987) ... 43, 57
*Harris v. New York*,
401 U.S. 222, 226 (1971) ... 57
*Haynes v. Washington*,
373 U.S. 503, 514-15 (1963) ... 43
*In re Platinum & Palladium Antitrust Litig.*,
61 F.4th 242, 267 (2d Cir. 2023) ... 33
*Jordon v. New York Mercantile Exch.*,
571 F. Supp. 1530, 1555 (S.D.N.Y. 1983) ... 10
*Kalshiex LLC v. Orgel*,
2026 WL 474869, at *8 (M.D. Tenn. Feb. 19, 2026) ... 9
*KalshiEX, LLC v. Assad*,
2026 WL 2543846, at *6 (9th Cir. Aug. 28, 2026) ... 14, 15
*KalshiEX, LLC v. Flaherty*,
172 F.4th 220, 227 (3d Cir. 2026) ... 7, 15, 16
*Kelly v. United States*,
140 S. Ct. 1565, 1573 (2020) ... 22, 30
*Kalshiex LLC v. Williams*,
25 Civ. 8846 (AT), 2026 WL 2017466 (S.D.N.Y. July 13, 2026) ... 14
*Kousisis v. United States*,
605 U.S. 114, 133 (2025) ... 31
*Loughrin v. United States*,
573 U.S. 351, 358 (2014) ... 7, 30
*Lynumm v. Illinois*,
372 U.S. 528, 534 (1963) ... 43
*Maryland v. Shatzer*,
559 U.S. 98, 103 (2010) ... 41, 42
*Massachusetts v. E.P.A.*,
549 U.S. 497, 530 (2007) ... 19
*McNeil v. Wisconsin*,
501 U.S. 171, 176-177 (1991) ... 42
*McNeil*,
501 U.S. at 176-77 ... 55
*Michigan v. Mosley*,
423 U.S. 96, 104 n.10 (1975) ... 50
*Miranda v. Arizona*,
384 U.S. 436, 470-71 (1966) ... 41
*Montejo v. Louisiana*,
556 U.S. 778, 787 (2009) ... 42
*Moran v. Burbine*,
475 U.S. 412, 433 n.4 (1986) ... 50, 52
*Morrison v. National Australia Bank Ltd.*,
561 U.S. 247 (2010) ... 32, 34
*N. Am. Derivatives Exch., Inc. v. Nevada*,
815 F. Supp. 3d 1169 (D. Nev. 2025) ... 14

*Oncale v. Sundowner Offshore Servs.*,
523 U.S. 75, 79 (1998) ........ 17
*Oregon v. Bradshaw*,
462 U.S. 1039 (1983) ........ 56
*Oregon v. Elstad*,
470 U.S. 298, 304 (1985) ........ 43, 44
*Pasquantino v. United States*,
544 U.S. 349, 356 (2005) ........ 23
*Perez v. United States*,
402 U.S. 146, 154 (1971) ........ 38
*Prime Int'l Trad. v. BP PLC*,
937 F.3d 94, 102 (2d Cir. 2019) ........ 33, 34, 35, 38
*QCX LLC v. Nessel*,
2026 WL 1166362, at *2 (W.D. Mich. Mar. 10, 2026) ........ 14
*RJR Nabisco, Inc. v. European Cmty.*,
136 S.Ct. 2090, 2101 (2016) ........ 33
*Schneckloth v. Bustamonte*,
412 U.S. 218, 226 (1973) ........ 44, 45
*SIFMA v. CFTC*,
67 F. Supp. 3d 373, 384 (D.D.C. 2014) ........ 6, 34
*Skilling v. United States*,
561 U.S. 358, 399-402 (2010) ........ 23
*Smith v. Illinois*,
469 U.S. 91, 97-98 ........ 52
*State v. Burbine*,
451 A.2d 22, 28 ........ 52
*United States v. Alfonso*,
143 F.3d 772, 776 (2d Cir. 1998) ........ 21, 32
*United States v. Berroa*,
856 F.3d 141, 156-57 (1st Cir. 2017) ........ 30
*United States v. Blaszcak*, Superseding Indictment,
17 Cr. 357, Dkt. 137, 86, 92, 98 (Mar. 5, 2018) ........ 31
*United States v. Blumeyer*,
114 F.3d 758, 767-68 (8th Cir. 1997) ........ 30
*United States v. Chastain*,
22 Cr. 305 (JMF), 2022 WL 13833637, at *2-3 (S.D.N.Y. Oct. 21, 2022) ........ 21
*United States v. Chastain*,
145 F.4th 282, 298 (2d Cir. 2025) ........ 22, 23, 24, 25
*United States v. Cherif*,
943 F.2d 692 (7th Cir. 1991) ........ passim
*United States v. Choudhry*,
24 F. Supp. 3d 273, 279-80 (E.D.N.Y. 2014) ........ 43
*United States v. Christopher*,
142 F.3d 46, 54 (1st Cir. 1998) ........ 30
*United States v. Cornelson*,
609 F. Supp. 3d 258, 265-66 (S.D.N.Y. 2022) ........ 35

*United States v. Daugerdas*,
837 F.3d 212, 225 (2d Cir. 2016)........................................................................ 4, 5
*United States v. Dawkins*,
999 F.3d 767, 780 (2d Cir. 2021)...................................................................... 6, 11
*United States v. DiCristina*,
726 F.3d 92, 97 (2d Cir. 2013)............................................................................. 17
*United States v. Epksamp*,
832 F.3d 154, 169 ................................................................................................ 32
*United States v. Evans*,
844 F.2d 36, 39 (2d Cir. 1988)............................................................................. 29
*United States v. Figaro*,
568 F. Supp. 3d 459 (S.D.N.Y. 2021)................................................................... 55
*United States v. Gatto*,
986 F.3d 104, 116 (2d Cir. 2021)......................................................................... 30
*United States v. Gonzalez-Garcia*,
708 F.3d 682, 687 (5th Cir. 2013) ....................................................................... 44
*United States v. Greenberg*,
835 F.3d 295, 306-307 (2d Cir. 2016) ................................................................. 29
United States V. Grossman,
843 F.2d 78, 86 (2d Cir. 1988)............................................................................. 23
*United States v. Hallford*,
816 F.3d 850 (D.C. Cir. 2016) ............................................................................. 45
*United States v. Halloran*,
821 F.3d 321, 338 (2d Cir. 2016)......................................................................... 19
*United States v. Jaswal*,
47 F.3d 539, 542 (2d Cir. 1995)........................................................................... 41
*United States v. Juwa*,
508 F.3d 694, 701 (2d Cir. 2007)...................................................................... 5, 16
*United States v. Kennedy*,
64 F.3d 1465, 1476 (10th Cir. 1995) ................................................................... 30
*United States v. Leslie*,
103 F.3d 1093, 1100 (2d Cir. 1997)................................................................ 38, 39
*United States v. Little*,
2017 WL 1743837, at *7 (S.D.N.Y. May 3, 2017)............................................... 20
*United States v. Litvak*,
808 F.3d 160, 175 (2d Cir. 2015)................................................................... 15, 22
*United States v. Martinez*,
22 Cr. 251 (LJL), 2023 WL 2118081, at 3 (S.D.N.Y. Feb. 17, 2023)...................................... 29
*United States v. Martoma*,
12 Cr. 973 (PGG), 2013 WL 6632676, at *4-5 (S.D.N.Y. Dec. 13, 2013) .............................. 34
*United States v. McMillan*,
600 F.3d 434, 449-50 (5th Cir. 2010) .................................................................. 30
*United States v. Milani*,
739 F. Supp. 216, 218 (S.D.N.Y. 1990)............................................................... 19
*United States v. Morales*,
788 F.2d 883, 886 (2d Cir. 1986)......................................................................... 57

*United States v. Napout*,
963 F.3d 163, 180 (2d Cir. 2020) ........ 32, 39
*United States v. O'Hagan*,
521 U.S. 642, 654 (1997) ........ 23, 28, 29
*United States v. Patane*,
542 U.S. 630, 634 (2004) ........ 44
*United States v. Perez*,
575 F.3d 164, 166 (2d Cir. 2009) ........ 5, 32
*United States v. Perholz*,
842 F.2d 343 (D.C. Cir. 1988) ........ 23
*United States v. Phillips*,
155 F.4th 102, 113 (2d Cir. 2025) ........ passim
*United States v. Phillips*,
690 F. Supp. 3d 268, 292 (S.D.N.Y. 2023) ........ 19
*United States v. Porat*,
76 F.4th 213, 222-23 (3d Cir. 2023) ........ 30
*United States v. Prado*,
933 F.3d 121, 138 (2d Cir. 2019) ........ 32
*United States v. Ramsey*,
2021 WL 4244284,at *7 (E.D. Pa. Sept. 17, 2021) ........ 31
*United States v. Rosenfeld*,
23 Cr. 65 (CM), 2023 WL 8471947, at *3 (S.D.N.Y. Dec. 7, 2023) ........ 56
*United States v. Royer*,
549 F.3d 886, 895 (2d Cir. 2008) ........ 35
*United States v. Sampson*,
898 F.3d 270, 285 (2d Cir. 2018) ........ 12, 22
*United States v. Seidling*,
737 F.3d 1155, 1160-61 (7th Cir. 2013) ........ 30
*United States v. Seppala*,
16 Cr. 436 (KMW), 2017 WL 5633167, at *3 (S.D.N.Y. Nov. 22, 2017) ........ 54
*United States v. Shvartsman*,
722 F. Supp. 3d 276, 301 (S.D.N.Y. 2024) ........ 18, 19, 20
*United States v. Stavroulakis*,
952 F.2d 686, 693 (2d Cir. 1992) ........ 21
*United States v. Velastegui*,
199 F.3d 590, 592 (2d Cir. 1999) ........ 5
*United States v. Vilar*,
729 F.3d 62, 76 (2d Cir. 2013) ........ 34, 35
*United States v. Walters*,
910 F.3d 11, 26 (2d Cir. 2018) ........ 6, 12
*United States v. Wang*,
23 Cr. 118- (AT), 2024 WL 1251105, at *11 (S.D.N.Y. Mar. 22, 2024) ........ 57
*United States v. Wedd*,
993 F.3d 104, 120 (2d Cir. 2021) ........ passim
*United States v. Weigand*,
482 F. Supp. 3d 224, 237 (S.D.N.Y. 2020) ........ 29

*United States v. Williams*,
553 U.S. 285, 306-07 (2008) .......... 18
*United States v. Yannotti*,
541 F.3d 112, 127 (2d Cir. 2008).......... 20
*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489, 499 (1982).......... 20
*Wood v. Ercole*,
644 F.3d 83 (2d Cir. 2011).......... 54

Statutes

7 U.S.C. § 1a47(a)(1)(i)-(v) .......... 6
7 U.S.C. § 1a47(a)(1)(ii) .......... 6
7 U.S.C. § 1a(47)(A)(ii).......... 7, 8
7 U.S.C. § 1a(47)(A)(iii).......... 11
7 U.S.C. § 1a(47)(A)(iv), (vi) .......... 11
7 U.S.C. § 2(i) .......... 34, 38
7 U.S.C. § 13(a)(5).......... 3
7 U.S.C. § 7a-2(c)(5)(C) .......... 10
7 U.S.C § 9(1) .......... 3, 6, 33
17 CFR § 180.1 .......... 3
18 U.S.C. § 2.......... 3
18 U.S.C. § 1343 .......... 3
18 U.S.C. § 1956.......... 3
18 U.S.C. § 3238.......... 3
28 U.S.C. § 515.......... 58
Pub. L. No. 106-554, 114 Stat 2763 (2000).......... 10
Pub. L. No. 111-203, 124 Stat. 1376 .......... 6

Rules

Fed. R. Crim. P. 7(c)(1) .......... 5

Other Authorities

73 Fed. Reg. 25, 669, 25, 669-70 (May 7, 2008).......... 18

## PRELIMINARY STATEMENT

Defendant Michele Spagnuolo, an engineer at Google, an American technology company best known for running the world's most popular web search engine, abused his employer's trust and confidence by secretly using nonpublic, commercially significant information he learned about Google web search results to purchase event contracts on Polymarket. In doing so, he straightforwardly violated prohibitions against insider trading in multiple federal statutes.

Spagnuolo does not dispute that the indictment clearly sets forth each charged offense, the essential facts underlying those offenses, and the timeframe in which they occurred, providing him more than adequate notice of the allegations against him and fully enabling him to prepare his defense and invoke double jeopardy protections. Yet he takes the extraordinary remedy of pretrial dismissal, urging the Court to declare, without the benefit of a factual record, that his conduct falls outside the reach of statutes whose text plainly covers it. His arguments rest on cramped and textually unsound interpretations of the Commodity Exchange Act and the wire fraud statute, on factual claims that contradict or go beyond the Indictment, and on a misapplication of precedent that has no bearing at this stage.

Spagnuolo additionally asks the Court to suppress his voluntary post-arrest statements, even though the record shows he received *Miranda* warnings in Italian, in English, orally and in writing, repeatedly confirmed his understanding, and affirmatively elected to speak with agents because he wanted to discuss the evidence against him. His statements were voluntary, uncoerced, and obtained in full compliance with governing law.

These motions are without merit. Each asks the Court to adopt premature factual conclusions, disregard controlling law, or rewrite clear statutory text. For the reasons set forth below, the defendant's motions should be denied in their entirety.

## BACKGROUND

### I. Factual Overview

#### A. Polymarket

Polymarket is a prediction marketplace headquartered and operated in Manhattan, New York. (Ind. ¶ 5). Polymarket facilitates the trading of binary event contracts about whether or to what extent a future event will occur. Each market is framed as a Yes/No question, such as "Will X happen?" and pairs a YES share with a NO share. At resolution, the share on the correct side pays $1.00; the other pays $0.00. Shares trade between $0.00 and $1.00, and the share price reflects the market's real-time assessment of the probability that an event will occur. (Ind. ¶ 5).

In or about October 2025, Polymarket began offering binary event contracts related to whether certain individuals would or would not be the most "searched" individuals on Google for 2025, which Google planned to announce as part of an annual marketing campaign known as "Year in Search." (Ind. ¶ 5).

#### B. Insider Trading Scheme by Michele Spagnuolo a/k/a "AlphaRaccoon"

Spagnuolo abused his position as an employee of Google to misappropriate valuable and confidential nonpublic information. Spagnuolo used the stolen information to purchase event contracts about Google's search data on Polymarket. (Ind. ¶ 1). Because Spagnuolo, unlike others trading in the same event contracts on Polymarket, had access to non-public information, he profited more than $1.2 million from those trades. (Ind. ¶ 1).

Each year, Google invests substantial financial and personnel resources in a coordinated marketing campaign known as "Year in Search," in which it releases, to great fanfare, curated data reflecting the top trending searches from that year. (Ind. ¶ 2). This marketing event thus is the product of Google's ongoing investments in technology and infrastructure, as Google's "core business is search." (Ind. ¶ 2). As an engineer, Spagnuolo had access to Google's internal data

including a "software tool" that enabled Spagnuolo to access "confidential, nonpublic Year in Search data" before it was released to the public through Google's planned, commercial marketing campaign. (Ind. ¶¶ 2-4). The use of that data, as Spagnuolo well knew, was strictly limited. (*Id*). Indeed, as a Google employee, Spagnuolo certified he understood that he was required to comply with Google's confidentiality policies. (*Id.*)

In order to conceal his actions, Spagnuolo created a Polymarket account in the name "AlphaRaccoon," rather than associated with his true name. (Ind. ¶ 6). Spagnuolo used that account to trade Polymarket event contracts related to Year in Search based on confidential information he learned from his employment at Google. (Ind. ¶ 6). In total, Spagnuolo purchased approximately $2,754,092 worth of Year in Search event contracts in twenty-three Year in Search markets. (Ind. ¶ 6). After the Year in Search results were publicly announced, and because Spagnuolo used his access to confidential information when purchasing event contracts, Spagnuolo profited approximately $1.2 million. (Ind. ¶ 7). After receiving winnings in the form of cryptocurrency into his Polymarket account, Spagnuolo engaged in at least approximately 14 transactions to conceal the source of these proceeds. (Ind. ¶ 7).

## II. The Indictment and Prosecution

On May 26, 2020, the defendant was arrested on a criminal complaint. (Dkt. 1). On June 25, 2026, a grand jury returned Indictment 26 Cr. 278 (AT), charging the defendant in three counts:

(1) Fraud in connection with a commodity or swap, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1, Title 18, United States Code, Sections 3238, and 2;

(2) Wire fraud, in violation of Title 18, United States Code, Section 1343, 3238, and 2; and

(3) Money laundering, in violation of Title 18, United States Code, Section 1956, 3238, and 2.

On August 26, 2026, Spagnuolo filed a motion seeking to dismiss each count of the

Indictment. (Dkt. 40-42). In his memorandum supporting the motion (hereinafter "Mot. Dismiss"), Spagnuolo principally contends that his trades did not involve "swaps," and thus cannot be the subject of prosecution under the CEA, and did not involve "property," and thus cannot be the subject of prosecution for wire fraud. Spagnuolo also contends that Due Process cannot tolerate his prosecution because it represents a novel and unexpected application of an ambiguous statute. Spagnuolo filed a second motion, (Dkt. 43-45), seeking to suppress statements he made in a *Mirandized* post-arrest interview (hereinafter "Mot. Suppress").[1]

## ARGUMENT

### I. Count One Adequately Alleges Misconduct in Connection with a Swap

Spagnuolo vacillates between urging the Court to apply a narrow, crabbed misreading of the applicable statutes and presenting factual material beyond or different than the allegations in the Indictment. The Court should not accept either invitation, as neither would be appropriate in resolving a motion to dismiss. As the Indictment "track[s] the language of the statute[s] charged," gives the "time and place . . . of the alleged crime[s]," and describes the "core of criminality to be proven at trial," it is well pled. *See United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021) (quoting *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998)); *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016) (quoting *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012)). Nothing more is required, and the defendant's motion to dismiss the charges must be denied.

---

[1] Spagnuolo also submitted a letter signaling his intention to belatedly file additional motions, including a bill of particulars. (Dkt. 46). The issues in this letter are not ripe for the Court's consideration, as no motion has been filed; however, the Court should not grant Spagnuolo leave to file such a motion that is both outside the timeframe set forth in the Federal Rules of Criminal Procedure (*see* Rule 7(f) setting a deadline of 14 days from arraignment) and after the deadline the Court set for the filing of these pretrial motions.

### A. Applicable Law

#### *1. Motions to Dismiss*

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must, for each count, "give the official or customary citation of the . . . law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient under Rule 7 and the Fifth Amendment "as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Wedd*, 993 F.3d at 120.

To satisfy these requirements, "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime." *Id.* That is, it need only describe the "core of criminality to be proven at trial," not "the particulars of how a defendant effected the crime." *Daugerdas*, 837 F.3d at 225.

When considering a motion to dismiss an indictment, "the facts alleged by the government must be taken as true." *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999). The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). It is not proper to weigh the sufficiency of the evidence underlying the indictment, unless the Government has already made "a full proffer of the evidence it intends to present at trial." *United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009). This rule exists because indictments are "not meant to serve an evidentiary function," but rather, "to acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007). Accordingly,

"at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). "That is something [courts] do after trial." *Id.* Dismissal is a "drastic remedy that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018).

*2. CEA and Swaps*

Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act in the wake of the 2008 financial crisis. Pub. L. No. 111-203, 124 Stat. 1376. The Dodd-Frank Act amended the CEA to regulate "the previously unregulated derivative swaps market." *SIFMA v. CTFTC*, 67 F. Supp. 3d 373, 384 (D.D.C. 2014). That included new prohibitions against fraud and manipulation in connection with swaps. 7 U.S.C. § 9(1).

As part of the Dodd-Frank reforms, Congress provided a broad definition of "swap"—comprising five qualifying categories of instruments, 7 U.S.C. § 1a47(A)(i)-(v)—including agreements and contracts related to "any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a47(A)(ii).

**B. Year In Search Event Contracts Are Subject to the CEA**

Spagnuolo does not, and cannot, dispute that the Indictment alleges he committed fraud in connection with a "swap." Because the Indictment "track[s] the language of the statute[s] charged," gives the "time and place . . . of the alleged crime[s]," and describes the "core of criminality to be proven at trial," there is no basis for the Court to dismiss it. *Wedd*, 993 F.3d at 120. Spagnuolo's motion goes far beyond the proper role of a motion to dismiss in a criminal case and effectively asks the Court to decide how the definition of a "swap" in the CEA applies to the

particular facts at issue in this case. But the full factual record has yet to be developed, and the jury has a meaningful role to play in deciding how those facts apply to the applicable law.

Spagnuolo's legal and factual arguments are also off base. Spagnuolo's motion invites the Court to depart from the clear text of the CEA—which defines "swaps" broadly—and to narrow that clear definition based on separate statutory provisions and his stilted view of the relevant legislative history and purpose. These extra-textual arguments are not a basis for rewriting the law that Congress passed. *Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("courts 'must give effect, if possible, to every clause and word of a statute.'" (internal citation omitted)). More fundamentally, Spagnuolo's misreading of the statute necessarily invites the Court to usurp the role of the fact-finder, as the question of whether—or not—an event is "*associated with* a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii) (emphasis added), requires a factual inquiry. Spagnuolo may deny the Indictment's allegations, but trial, not dismissal, is the appropriate remedy.

*1. The Text of the CEA Reaches the Swaps Alleged in the Indictment*

The event contracts that Spagnuolo traded are "swaps" under the plain meaning of that term. Congress "defined 'swap' broadly," *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025), to include any "agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). As the Third Circuit held, "event contracts fit comfortably" within that statutory definition. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227 (3d Cir. 2026).

The allegations in the Indictment track that statutory definition. The Indictment explains that Polymarket offered market participants the chance to trade based on the occurrence, or non-occurrence, of particular events: Namely, whether Google would, or would not, announce that certain individuals were the top trending searched person for the year. The Indictment also alleges that those events are "associated with a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii), including the "user engagement" and "media interest" that Google derives from announcing the top-trending individuals each year. (Ind. ¶¶ 2-3). The Indictment does not spell out all of the evidence the Government may introduce at trial about the operation of the Year in Search contracts or the reason they are associated with a potential financial, economic, or commercial consequence, but that is not required. The Indictment puts Spagnuolo on notice, and that is all that is needed at this stage.

Urging the Court to dismiss the CEA charge without even hearing the evidence, Spagnuolo invents extra-textual limits on the definition of "swap" to narrow the statute's reach. None of those limitations on the statute Congress passed are appropriate, and they are certainly not a basis for dismissal.

Spagnuolo first claims that, in order to qualify as swaps, the occurrence of the reference event must "have a close or inherent connection" to the potential economic consequences. (Mot. Dismiss 14). But he has invented that standard out of whole cloth. Rather, in defining "swaps," Congress chose "associated with" to describe the relationship the occurrence or nonoccurrence of the event must have with the potential commercial consequence. The words "close" or "inherent connection" are nowhere to be found. "Associated" means "connected," *Associated*, Oxford American Dictionary and Thesaurus (2d ed. 2009); (Mot. Dismiss 13 ("'connected' with or 'related' to" (citation omitted)), a materially looser link than the "close" or "inherent" connection

to the Year in Search announcement that Spagnuolo inserts into the text. And "potential" modifies "consequence": a potential consequence, by definition, "exist[s] in possibility" and may or may not come to pass. *Potential*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Congress "could have imposed a more stringent requirement" but "chose to use 'potential,' which is broad." *Kalhiex LLC v. Orgel*, No. 3:26 Cv. 34 (AT), 2026 WL 474869, at *8 (M.D. Tenn. Feb. 19, 2026). The statute's text makes clear that an event need not be economic in nature to be associated with a potential economic effect; it need only be connected to the possibility of one. Rather than giving effect "to every clause and word of [the] statute," *Duncan v. Walker*, 533 U.S. 167, 174 (2001), Spagnuolo would strike "potential" from the statute altogether, since an event that has an "inherent" economic result produces a certain, not merely *potential*, consequence.

Spagnuolo next goes further, claiming that the "occurrence" which settles an event contract must "allow[ ] for hedging or facilitate[ ] price discovery." (Mot. Dismiss 14, 18). Spagnuolo writes this additional requirement into the statute based on his view of the CEA's "purpose and structure." (*Id.*) But inserting text in congressionally approved language is beyond the role of courts. *Alabama v. North Carolina*, 560 U.S. 330, 352 (2010) ("[The Supreme Court] cannot [] add provisions to a federal statute"). And Spagnuolo's extratextual limitation on the CEA makes little practical sense. Whether a contract is used for hedging or price discovery relates to the subjective intent of the traders who use that instrument. But there is no mechanism in the CEA for assessing traders' intentions, nor is there a clear way to determine when a sufficient number of traders use a contract for hedging or price discovery—as opposed to speculation—that it becomes a "swap."

Moreover, Spagnuolo misunderstands the CEA's history and structure. With respect to history, before the Commodity Futures Modernization Act of 2000, or CFMA, the CEA required

the Commodity Futures Trading Commission ("CFTC") to find that a proposed futures contract satisfied "an economic-purpose test whereby an exchange [was required to] demonstrate that its proposed contracts [would] be used for base-pricing and hedging, not just for speculation." *Jordon v. New York Mercantile Exch.*, 571 F. Supp. 1530, 1555 (S.D.N.Y. 1983) (citing 7 U.S.C. § 7(g)). The CFMA abolished those requirements outright. Pub. L. No. 106-554, 114 Stat 2763 (2000). When Congress added swaps and event contracts to the CEA in 2010, it did not revive the old economic-purpose requirement. Instead, it conferred authority over swaps to the CFTC, defined "swap" broadly, and created a Special Rule—discretionary, case-by-case authority to bar particular swaps when they are "contrary to the public interest" and involve an enumerated list of activities, including "gaming." 7 U.S.C. § 7a-2(c)(5)(C). A statute that eliminated categorical *ex ante* gatekeeping in 2000, and that in 2010 built only a narrow safety valve rather than restoring it, does not support the "purpose" Spagnuolo imagines. Indeed, the inclusion of "gaming" in the Special Rule shows that Congress contemplated that event contracts that had features akin to traditional gaming transactions could qualify as "swaps," while giving the CFTC the authority to prohibit such contracts if they were contrary to the public interest.

As for his claims regarding structure, Spagnuolo argues for a narrow reading of subpart (ii)—*i.e.* the statutory definition of "swap" to fit "context" found in subparts (i), (iii), and (v) regarding rates, currencies, and indices. (Mot. Dismiss 16-17). But using neighboring provisions "to limit the reach of subparagraph (ii) risks making that provision do nothing more than reiterate what subparagraphs (i) and (iii) already accomplish," a reading that "would, in fact, create surplusage." *CFTC v. Minnesota*, No. 26 Cv. 2661 (KMM/DTS), 2026 WL 2150211, at *13 (D. Minn. July 27, 2026). The narrow reading Spagnuolo urges that the "potential financial, economic, or commercial consequence" may not emerge for "external market activity," (Mot. Dismiss 17), is

impossible to square with the types of swaps enumerated in subsection (iii). Weather and emissions swaps are expressly defined as "swaps" under the CEA, *see* 7 U.S.C. § 1a(47)(A)(iii), even though neither has a "close or inherent connection" to economic occurrences. If Spagnuolo's interpretation of the CEA's structure were correct, decades of settled CFTC practice regulating weather, catastrophe, emissions, and longevity swaps would be *ultra vires*. Moreover, "redundancies are common in statutory drafting" and reflect "a congressional effort to be doubly sure." *Barton v. Barr*, 590 U.S. 222, 239 (2020). That's the case here. Congress wrote six overlapping definitions of "swap," including catchalls covering contracts "commonly known" as swaps and "any combination or permutation of" the other five, 7 U.S.C. § 1a(47)(A)(iv), (vi), precisely because it intended the term to be defined broadly beyond rates, currencies, and indices.

*2. The Year in Search Contracts Are Associated with a Potential Financial, Economic, or Commercial Consequence*

Shifting from legal to factual arguments, Spagnuolo next makes the fact-dependent claim that the event contracts at issue in his case lack sufficient economic substance to qualify as swaps. That factual argument cannot be adjudicated on a motion to dismiss because the Court lacks a full record, and the jury has not had an opportunity to make factual determinations. *See Dawkins*, 999 F.3d at 780 ("[T]hat is something [courts] do after trial."). But were this fact to be contested at trial, the Government would offer evidence concerning the economic reasons investors would buy event contracts tied to Year in Search. Indeed, the Indictment alleges that "Google's core business is search, and the substantial majority of its revenue derives from advertising products that depend on user engagement with its search platform." (Ind. ¶ 2). Maintaining that user engagement, including through the Year in Search marketing event, has *at least* potential economic consequences to the search engine marketplace, itself a $224 billion business. Alphabet Inc., Form 10-K, dated Dec. 31, 2025, at 33,

https://s206.q4cdn.com/479360582/files/doc_financials/2025/q4/GOOG-10-K-2025.pdf (last accessed Sept. 13, 2026). Spagnuolo claims that the "identity of the most-searched person" matters little to Google's Year in Search campaign. (Mot. Dismiss 17). But that presupposes this Court should answer a factual dispute, which it cannot now do. *United States v. Sampson*, 898 F.3d 270, 285 (2d Cir. 2018) ("factual dispute . . . cannot be resolved on a Rule 12(b) motion—at least when, as here, the government has not yet proffered all of its evidence.").

In any event, Spagnuolo ignores some other salient facts that search engine optimization is itself a *multi-billion*-dollar *market*, which companies, celebrities, and others utilize for promotion and commercial activity. Patrick Coffee, Wall Street Journal, *A Billion-Dollar Question Hangs Over the New AI Search Marketing Industry*, Dec. 18, 2025 ("The global SEO and AEO services market will grow to $171 billion by 2030 from $81.4 billion last year, partly driven by growing AI optimization efforts, according to a prediction by research firm MarkNtel Advisors"), https://www.wsj.com/articles/a-billion-dollar-question-hangs-over-the-new-ai-search-marketing-industry-06a039ec (last accessed Sept. 13, 2026). Google is the world's leader of internet search, and whether, and to what extent, particular people, events, and other terms are the leaders in Year in Search have a *close* and *inherent* connection to SEO related expenditures in an $80 billion market, to say the least. The fact-based claim that Year in Search "is of no meaningful financial, economic, or commercial consequence to any market participant," (Mot. Dismiss 17, *see id.* 21-22), cannot be resolved short of trial, and, when resolved based on factual development, will prove to be wrong.

*3. The Year in Search Contracts Meet the "Occurrence" Requirement*

Next Spagnuolo asserts that whether an individual will rank in Google's Year in Search is not an "occurrence" of "an event" because whether an individual would or, would not, top

Google's list is an outcome, not an event or contingency under the CEA's definition of "swaps." (Mot. Dismiss 22-23). That strained reading of the text is wrong.

An outcome is an event or contingency under the definition of "swaps." Dictionaries define "event" to include "the outcome, issue, or result of anything." "Event," Random House Webster's Unabridged Dictionary (2d ed. 2001). And they define "contingency" to include "something liable to happen as an adjunct to or result of something else." "Contingency," Merriam-Webster's Collegiate Dictionary (11th ed. 2003). The common usage of those terms also encompass outcomes. For example, any student of history would list the British winning the battle of Waterloo or Barack Obama winning the presidential election as important events of the past. Yet under Spagnuolo's awkward reading of the CEA, neither of those significant events would count as "events" at all, but only "outcomes"—the events would be limited to a battle taking place at Waterloo or an election taking place in 2008.

Spagnuolo's stilted interpretation of the term "event" also makes little sense in the context of the other extra-textual limitations he attempts to impose. As noted above, Spagnuolo tries to re-write the CEA to limit the "swaps" to transactions used for hedging or price discovery. But people typically try to hedge outcomes. A financier who had significant business interests in the success of Napoleon would care about placing a hedge based on which side would win the battle at Waterloo, not whether such a battle would occur. Similarly, many regulated entities might want to place hedges based on which candidate will win a presidential election, but likely have little interest (if any) in hedging whether an election will take place. As a result, Spagnuolo's definition of "swap," if adopted in full, would write out of the CEA many of the most straightforward situations when an event contract would be used to hedge an event.

To reach this nonsensical result, Spagnuolo relies on a recent Ninth Circuit decision, and several district court decisions, all of which arose in the context of civil litigation concerning whether Congress could have intended the CEA to preempt state gambling regulation. Those decisions are from outside of this Circuit and are not binding on this Court. Indeed, the decisions also appear to be based on the premise that preemption turns on whether sports-related event contracts are "swaps," which is a premise that this Court has rejected. *See Kalshiex LLC v. Williams*, 25 Civ. 8846 (AT), 2026 WL 2017466, at *6 (S.D.N.Y. July 13, 2026) (assuming without deciding that sports-event contracts are swaps).

Those gambling-related decisions are also a poor guide here because their analyses are animated by the underlying view that regulation of sports gambling is a province long left to the states—an issue not present here. Courts that have strained to find a distinction in the definitions of "event" and "occurrence" have done so in service of holding that the CEA does not displace all state gambling laws, as "[a] grant of exclusive authority in the CFTC that radical would surely call for a more explicit statement." *QCX LLC v. Nessel*, No. 26 Civ. 710, 2026 WL 1166362, at *2 (W.D. Mich. Mar. 10, 2026) (citing *N. Am. Derivatives Exch., Inc. v. Nevada*, 815 F. Supp. 3d 1169, 1175 (D. Nev. 2025), *aff'd*, 2026 WL 2546926 (9th Cir. Aug. 28, 2026)); *see also KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *6 (9th Cir. Aug. 28, 2026) ("The key question is whether Kalshi has shown a likelihood that the CEA preempts Nevada's gaming regulations."). The Ninth Circuit, again in the context of Kalshi's argument that state gambling laws were superseded as to *all* event-contract markets, found that the dictionary definition of "event" fairly encompassed Kalshi's sports events contracts, but went on to reason that this could not conclude the analysis because there was no way that Congress could have "intended to upend its decades of careful regulation of gambling based on broad definitions of the words used in a Wall Street

Reform Bill." *Assad*, 2026 WL 2543846, at *8-10. The historical context driving these decisions bears little on the question pending before this Court: namely, whether the Indictment contains the elements of the offense charged and fairly informs Spagnuolo of the charge against which he must defend.

Second, even if the Court were persuaded by the reasoning in these cases, it is difficult to imagine how the parsing of "event" versus an "outcome of an event" might be applied. Spagnuolo claims that these cases support dismissal because whether Google chose to release Year in Search results at all counts as the "event" and which individual won counts as the "outcome of the event," but—because event, occurrence, and outcome all mean essentially the same thing—there is no particular reason to accept his view. In the context of more traditional swaps, like weather swaps, event and occurrence could be similarly jumbled. Is the fact of a drought the "event" but the degree of the drought the "occurrence"? Or does it depend on the parameters of the particular event contract itself, such that a two-month drought might constitute an "event"? Indeed, whether a certain event contract qualifies as a "swap" is a mixed question of law and fact, and thus is "well suited for jury determination." *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) (explaining that materiality is a mixed question of law and fact best suited for a jury).

Third, Spagnuolo does not explain why the Court should be more persuaded by the Ninth Circuit's reasoning than the Third Circuit's. Rejecting attempts to "pile inference upon inference" to conclude that absurd events will fall under the CFTC's jurisdiction, the Third Circuit adopted a straightforward textual reading to conclude that because the "outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence," sports-related event contracts "fit within the Act's definition of 'swaps.'" *Flaherty*, 172 F.4th at 227-28.

*4. The Court Need Not Determine the Outer Boundary of the CEA*

Spagnuolo next urges the Court to reject a natural reading of the CEA because, he says, it would lead to "absurd results." (Mot. Dismiss 24). He argues that if "[t]aken to its logical end, the CEA's definition of a 'swap' would reach virtually every kind of wager that could possibly exist." (*Id.*) This Court is not being asked to define the limits of the CEA. The question at this stage is little more than does the Indictment "acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." *Juwa*, 508 F.3d at 701. It meets that threshold. In any event, the Year in Search contracts are not near the outer bounds of the CEA; they are nowhere near it. Spagnuolo's contracts concern a multibillion-dollar industry and are "associated with" a "potential" financial, economic, or commercial consequence. That is not a "capacious" read of the CEA, it is simply a what the statute states. (Mot. Dismiss 25). Spagnuolo's hypotheticals are for another day.

*5. The Indictment Is Consistent with the History of the CEA*

Spagnuolo further claims that looking to legislative history supports his proposition that Year in Search event contracts cannot be swaps because Congress intended swaps to refer only to "financial instruments at the root of the [2008] financial crisis." (Mot. Dismiss 29 (citation omitted)). Spagnuolo finds support for this proposition in floor debate statements in which senators disclaimed an interest in regulating sports gambling. (Mot. Dismiss 26-27). This tells part of the story, but a group of former members of Congress, some of whom authored Dodd-Frank, have stated that Dodd-Frank was intended to capture event contracts traded on contract markets, including event contracts related to gambling and sports betting. *See* Brief of Amici Curiae of Seven Former Members of Congress in Support of Plaintiff-Appellee, *KalshiEx v. Flaherty et al.*,

2025 WL 2306500, at *26. Regardless, this case is not about sports bets, and whatever history Spagnuolo marshals cannot displace the text.

In any event, it matters little even if Congress amended the CEA with certain commodities particularly in mind. Statutes routinely reach beyond the "principal evil" that motivated them, because "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998). With respect to the Special Rule, as explained above, Spagnuolo misunderstands it, but the Court need not resolve any of these disputes to resolve this motion; rather, the Court need look no further than the text of the CEA itself.

*6. The Rule of Lenity is Not Applicable*

Spagnuolo repeats his argument that the reading the Indictment implies would "sweep in every conceivable wager." (Mot. Dismiss 29). Once again, the limits of the CEA are not before this Court. In any event, Congress provided a "clear statement" as to whether the contracts at issue here are subject to the CEA and that is so, as explained previously, from its plain text. Lenity is no refuge here, (*cf.* Mot. Dismiss 41), as lenity requires a "grievous ambiguity"—not a close call, not a policy disagreement, but genuine equipoise after exhausting text, structure, history, and purpose. *United States v. DiCristina*, 726 F.3d 92, 97 (2d Cir. 2013); *Chapman v. United States*, 500 U.S. 453, 463 (1991). This case does not require the Court to find the outer edge of "swap," because under the plain text these contracts fall comfortably inside it—and, at minimum, the Indictment's allegation that they do is enough to proceed to trial.

## II. The CEA's Application to Spagnuolo Does Not Offend Due Process

Spagnuolo's "fair notice" claim, (Mot. Dismiss 32-38), fails at the threshold because the statute gives clear notice that it applies to his conduct. His argument is simply a repackaged version

of his statutory-construction theory: that the statute is vague everywhere. But breadth is not vagueness, and disagreement at the margins does not disable enforcement at the core. *See United States v. Williams*, 553 U.S. 285, 306-07 (2008). Nor does the existence of interpretive litigation, "[j]udicial disagreements," or "close cases" establish vagueness. *United States v. Shvartsman*, 722 F. Supp. 3d 276, 301 (S.D.N.Y. 2024); *see also Phillips*, 155 F.4th at 132 ("due process is not violated simply because the issue is a matter of first impression" (citations and quotation marks omitted)). If it did, no statute that ever generated disagreement could be enforced criminally while that disagreement persisted—a rule with no basis in the case law and no logical stopping point.

Next, Spagnuolo seeks to manufacture uncertainty by claiming that the CFTC, the primary regulator of the CEA, lacks a cogent position. (Mot. Dismiss 35-36). But of course, the CFTC's view of Spagnuolo's conduct is clear, as it has sued Spagnuolo for the conduct at issue. *See CFTC v. Spagnuolo*, No. 26 Civ. 4419 (MKV) (S.D.N.Y.). Furthermore, the CFTC recognized event contracts as subject to the CEA years before Spagnuolo's conduct. *See In re Blockratize, Inc. d/b/a "Polymarket.com,"* CFTC Dkt. No. 22-09 (Jan. 3, 2022); *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25,669, 25,669-70 (May 7, 2008).[2]

Spagnuolo's "arbitrary enforcement" argument collapses for similar reasons. He claims that prosecuting him violates due process because it leaves it to prosecutors and the courts to decide who engaged in misconduct, not Congress. (Mot. Dismiss 33). But the void-for-vagueness doctrine polices statutes that give law enforcement no standards to apply, it does not invalidate prosecutorial decisions made under a statute that does supply standards. *Grayned v. City of Rockford*, 408 U.S.

---

[2] Marketing statements by Polymarket's personnel matter little in a constitutional analysis, and Spagnuolo does not seriously contend otherwise. (Mot. Dismiss 36-37). Suffice it to say, at trial it will be the defendant's *mens rea* that matters, not third-party statements to the media.

104, 108-09 (1972), addressed an ordinance with no ascertainable standard at all; it did not hold that any statute under which one defendant is charged before others is therefore unconstitutional.[3] And the CEA's scienter requirement makes his claim even weaker: willfulness cabins discretion by requiring the Government to prove he knew his conduct was wrongful. Because that is a necessary element "in an insider trading prosecution … the Government does not have virtually unlimited or unfettered discretion to penalize insider trading." *Shvartsman*, 722 F. Supp. 3d at 301 (internal quotation marks and citation omitted).

All of this underscores why Spagnuolo's due process challenge is not only wrong but premature. The Indictment alleges that Spagnuolo acted willfully, and that allegation, if proven, forecloses his claim. A vagueness challenge turns on whether the statute, "standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016). That inquiry is fact-bound, and courts in this District "await conclusion of the trial" before resolving it. *United States v. Milani*, 739 F. Supp. 216, 218 (S.D.N.Y. 1990); *see also United States v. Phillips*, 690 F. Supp. 3d 268, 292 (S.D.N.Y. 2023) (denying a challenges to the CEA and wire fraud statutes under both the vagueness and novel construction doctrines as premature). Where the Government must prove willfulness, courts have repeatedly held that "a scienter requirement may mitigate a law's

---

[3] Spagnuolo layers on top that Congress considered legislating prediction markets but has not done so as a signal that the CEA does not cover the conduct here. (Mot. Dismiss 33). An article from the Congressional Research Service, which Spagnuolo cites, is not law nor is unpassed legislation, and "post enactment legislative history … tells us nothing about what Congress meant" at the time a statute was drafted. *Massachusetts v. E.P.A.*, 549 U.S. 497, 530 (2007). In any event, some proposed legislation presupposes that event contracts are swaps. For example, the BETS OFF Act, S. 4115, 119th Cong. (2026), cited in the article Spagnuolo puts forward, prohibits certain event contracts, which assumes they are swaps to begin with. Other proposals in the article relate to specific prohibitions on government officials and insiders, and propose prohibitions on "casino" style games. None squarely address the issues in this case.

vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982); *see also United States v. Little*, 2017 WL 1743837, at *7 (S.D.N.Y. May 3, 2017) (the "scienter requirement undercuts any due process void for vagueness challenge"); *Shvartsman*, 722 F. Supp. 3d at 301 (same). A defendant who must be proved to have known what he was doing cannot simultaneously claim he had no notice of what he was doing. That remains the case here, and the motion should therefore be denied.

## III. The Motion to Dismiss the Wire Fraud Count Should be Denied

Spagnuolo next argues that the wire-fraud charge should be dismissed because the information he misappropriated is not "property." This argument, too, should be rejected. Spagnuolo effectively seeks summary judgment, making factual arguments about what he expects the Government's proof will show and how he intends to meet that proof. That is not an appropriate basis for dismissing the wire-fraud count.

### A. The Indictment Alleges that Spagnuolo Misappropriated Google's Property

"An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008). That is why the indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Wedd*, 993 F.3d at 120.

The Indictment's wire-fraud charge easily satisfies the minimal requirements necessary to survive a motion to dismiss. There is no dispute that the Indictment alleges that an object of Spagnuolo's scheme was "property," "track[s] the language of the statute charged," and "state[s]

the time and place (in approximate terms) of the alleged crime." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). That is all that is required. *See Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) ("[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."). Spagnuolo's motion should be denied. *See United States v. Chastain*, 22 Cr. 305 (JMF), 2022 WL 13833637, at *2-3 (S.D.N.Y. Oct. 21, 2022) (denying motion to dismiss wire-fraud count alleging misappropriation of confidential business information because indictment tracked elements of the statute).

Of course, the Indictment charging Spagnuolo does more than track the language of the wire-fraud statutes. The Indictment also outlines the contours of Spagnuolo's criminal scheme to misappropriate Google's confidential business information—its property—so he could personally profit by trading Polymarket event contracts related to Google's "Year in Search" announcement. Ind. ¶¶ 1-8. It alleges that Spagnuolo's scheme involved misappropriating confidential business information because Spagnuolo misused "Google's search data," which "is commercially valuable proprietary information central to [Google's search business], the product of Google's significant ongoing investment . . . , and it directly informs Google's advertising products, marketing strategy, and relationships with content partners and advertisers." *Id.* ¶¶ 2-3. And the Indictment explains that, in addition to search data being generally valuable and central to Google's business, the search data pertaining to "Year in Search results" is particularly valuable because it is central to Google's annual, "coordinated marketing campaign," that relies on "making a 'splash'" to drive "user engagement" and "media interest." *Id.*

This additional context, however, is not an invitation to convert a motion to dismiss the Indictment into something akin to a motion to dismiss a complaint, or summary judgment, in the civil context. "At the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *Wedd*, 993 F.3d at 121. "That is something" for "after trial." *Id.* The Indictment is not "a full proffer of the evidence [the Government] intends to present at trial," and there is no rule in criminal law requiring the Government to "reveal its complete case" before that time, so the Court cannot at the Indictment stage evaluate the sufficiency of the Government's proof. *Sampson*, 898 F.3d at 280-82. These principles are particularly important for "mixed question[s] of law and fact"—such as whether certain information qualifies as property—which are "well suited for jury determination." *Litvak*, 808 F.3d at 175 (explaining that materiality is a mixed question of law and fact best suited for a jury). There is, then, no reason or legal basis for the Court to entertain Spagnuolo's factual challenges to the Indictment at this stage of the case.

### B. *Chastain* Does Not Support Dismissing the Indictment

The Second Circuit's decision in *Chastain* underscores why it would be inappropriate to dismiss the wire-fraud charge against Spagnuolo at this stage of the case. Spagnuolo explains *Chastain* as if the Second Circuit held that the information in that case did not amount to "property" under the wire-fraud statute. (Mot. Dismiss 47 ("The government's theory here is meaningfully weaker than the one the Second Circuit considered and rejected in *Chastain*.")). But that is not what happened. Rather, the Second Circuit in *Chastain* vacated a conviction based on instructional errors, but left it for the jury (once properly instructed) to decide whether the evidence showed that the information at issue amount to property. *United States v. Chastain*, 145 F.4th 282, 298 (2d Cir. 2025).

The wire-fraud statute requires the Government to show that the defendant engaged in a fraudulent scheme to obtain "money or property." *Kelly v. United States*, 590 U.S. 391, 391-92 (2020). In interpreting the phrase "money or property," the Supreme Court has relied on the "ordinary or natural meaning" of those terms, which "extend[s] to every species of valuable right and interest." *Pasquantino v. United States*, 544 U.S. 349, 356 (2005). Thus, while the phrase does not include the right to an employee's "honest services," *Skilling v. United States*, 561 U.S. 358, 399-402 (2010), or "purely regulatory" government decision making, *Cleveland v. United States*, 531 U.S. 12, 22 (2000), it encompasses "property rights" both "tangible" and "intangible." *Carpenter v. United States*, 484 U.S. 19, 25 (1987).

For decades, the Supreme Court has acknowledged that "confidential business information has long been recognized as property" under the wire-fraud statute. *Id.* at 26; *accord United States v. O'Hagan*, 521 U.S. 642, 654 (1997). For example, in *Carpenter*, the Supreme Court considered the conviction of a defendant who misappropriated information about what companies would be covered in the Wall Street Journal's "Heard on the Street" column, to trade based on that information. 484 U.S. at 22-23. The Court upheld the conviction, finding that the Journal's "interest in the confidentiality for the contents and timing of the 'Heard' column" was the Journal's property. *Id.* at 24-25. Consistent with that decision, the Second Circuit subsequently recognized that information can be a company's property, even when the company does not intend to sell or commercialize the information. Specifically, in *United States v. Grossman*, the Circuit held that client information was a law firm's "confidential business information," even though the firm could not "commercially exploit" it, because keeping the information confidential had value to the firm by "protect[ing] or enhanc[ing] [the firm's] reputation. 843 F.2d 78, 86 (2d Cir. 1988); *accord United States v. Perholz*, 842 F.2d 343 (D.C. Cir. 1988) (holding that information was property

when confidentiality was essential to "integrity of the competitive bidding process"); *United States v. Cherif*, 943 F.2d 692, 697 (7th Cir. 1991) (rejecting argument that bank's information about deals was not "property" because the information "had no value to the bank or its customers").

The Second Circuit's recent decision in *Chastain* did not upset those settled principles. In *Chastain*, the defendant was charged with misappropriating information about what non-fungible token, or "NFT," would be featured on his employer's homepage, so he could purchase those NFTs ahead of time and sell them for a profit. 145 F.4th at 288-89. At the close of trial, the District court gave instructions "that (1) proof [that the misappropriated information had' commercial value was not required, and (2) [that] a scheme to defraud may involve conduct that merely departs from traditional notions of honesty and fair play." *Id.* at 291. The jury convicted, and the Second Circuit vacated that conviction, finding that those two instructions were erroneous. *Id.* at 292. With respect to the first instruction, the Circuit held that the confidential business information does not qualify "as a traditional property interest . . . if it lacks commercial value to the business." *Id.* at 293. As for the second instruction, the Circuit found that it was erroneous because it potentially allowed the jury to convict without a finding of fraud. *Id.* at 297.

The Circuit in *Chastain* went to great lengths to explain that its decision was consistent with *Carpenter* and *Grossman*. The misappropriated information in *Carpenter*, the Court explained, had value because the Journal worked to gather the information and made money by distributing it. *Id.* at 292. And while the law firm in *Grossman* could not "commercially exploit" the information at issue in that case, the information nonetheless had "economic value" because keeping it confidential ensured the firm would not "suffer commercial harm." *Id.* at 293. The key point for the Circuit was that, in both cases, the information qualified as property because the

owner had some "economic interest in its exclusive use or in otherwise keeping the information confidential." *Id.* at 294.

*Chastain* also did not hold that the information in that case was not property. Rather, the Circuit made several observations about record evidence that left it unable to "confidently conclude that the jury did not convict . . . on the theory that although the featured NFT information did not have commercial value to OpenSea, Chastain nevertheless acted unethically by using the information for his own benefit." *Id.* at 298. That is why, rather than entering a judgment of acquittal, the Circuit "vacate[d] the judgment of conviction" and "remand[ed] for further proceedings," which it contemplated may result in "a new trial." *Id.*

Far from requiring dismissal, *Chastain* illustrates why it would be inappropriate to prevent the jury from considering this case. At bottom, *Chastain* held that the jury instructions given in that case were erroneous. Following that decision means instructing the jury in Spagnuolo's case in a manner that is consistent with the Second Circuit's decision. The panel in *Chastain* did not decide whether a reasonable jury could conclude that the information at issue in that case constituted "property," but instead left it for a properly instructed jury to make that decision. Doing the same here requires denying the motion to dismiss.

### C. Spagnuolo's Factual Arguments for Dismissal are Meritless

Finally, Spagnuolo's factual arguments are not a basis for dismissing the wire-fraud charge and are meritless. Spagnuolo begins by skipping an important part of the Indictment. Specifically, he glosses over the fact that the data he misappropriated to commit his crime was Google search data. The Indictment alleges that such data is "commercially valuable proprietary information central to [Google's search] business," which makes up "the substantial majority of its revenue." (Ind. ¶ 2). Google search data is similar to the information at issue in *Carpenter* in that it is

"gathered at the cost of enterprise, organization, skill, labor, and money," and is designed to be used for Google's profit. 484 U.S. at 25-26. It was not Spagnuolo's to use for his own gain.

Spagnuolo is wrong to argue that the search data his misappropriated did not have "any commercial value" to Google simply because it was going to be used in the "Year in Search" campaign. (Mot. Dismiss 47-48). For one, it is still valuable search data that Google spent the time to gather. The fact that Google decided this specific information was most valuable to feature in an ad campaign—rather than to sell or use for another purpose—does not render it valueless. And it is nonsensical for Spagnuolo to claim that, with respect to the Year in Search campaign, Google only cares about the "timing, coordination, and publicity" of the event, rather than the contents of the release. As the Indictment alleges, a core part of the success of the marketing campaign revolves around keeping the information about who will be featured confidential until Google is ready to release the results. Ind. ¶¶ 2-3. This shows that Google has an "economic interest in [the] exclusive use" of the data, "or in otherwise keeping the information confidential," until it is ripe to be announced. *Chastain*, 145 F.4th at 294.

Spagnuolo's response—that Google did not have an "economic interest" in the content of the information he stole, just the timing of its release, (Mot. Dismiss 47-49), misunderstands how data can be valuable to a company. The search data was property because Google devoted resources to gathering it; the data was a valuable part of Google's business; and Google decided that the most commercially valuable use of the data at issue was to release it to the public as part of a splashy marketing campaign. Similarly, in *Carpenter*, the Wall Street Journal did not have an economic interest in what company would be featured in the "Heard on the Street" column, or what information about the company the column would disclose. Rather, as with Google, the value was in being able to control when the contents of the column went public, so it could benefit

commercially from interesting, new information appearing in its pages. Likewise, the law firm in *Grossman* did not have an economic interest in the substance of its clients' information, but nonetheless had a commercially valuable interest in controlling its use because disclosure could hurt its standing with clients. In other words, both *Carpenter* and *Grossman* held that deriving value from control over the timing and manner by which information disclosed is a core way that information can be valuable to a business.

Neither *Ciminelli v. United States* nor *Chastain*, (Mot. Dismiss 49-50), hold otherwise. Spagnuolo is correct that *Ciminelli* held that "the wire fraud statute reaches only traditional property interests." 598 U.S. 306, 316 (2023). But that does not get him far: Confidential business information *is* a traditional property interest—at least so long as "its holder has [an] economic interest in its exclusive use or in otherwise keeping the information confidential"—and that is precisely the case with the search data that Spagnuolo misappropriated here. *Chastain*, 145 F.4th at 293-94. Spagnuolo is similarly wrong to rely on a sentence in *Chastain* observing that "[a]n abstract reputational harm that does not affect the interest of the company is too 'ethereal' to qualify as a traditional property interest." *Id.* at 297. There is nothing abstract here about the relationship between how Google used the search data in this case and commercial value: Google uses that data in a concrete marketing campaign. The company devotes significant resources to that campaign because it intends to reap meaningful value from it. In other words, it uses its "exclusive" control over the data to extract "commercial value." *Id.* at 294.

Spagnuolo's final argument—that Google did not actually treat the information as confidential—is wrong and plainly not a basis to dismiss. The idea that Google did not treat the Year in Search data as confidential blinks at reality. Every year people across the industry await Google's Year in Search release to see what people, terms, or events will top the company's list.

That would make no sense if the information was already public or easy to find. Similarly, the Year in Search event-contract market on Polymarket makes sense to create only if people do not know the results until Google releases its marketing campaign. Spagnuolo clearly understood this. The Government expects that the trial evidence will show, among other things, that Year in Search results were not widely shared within Google; that Spagnuolo signed agreements confirming that he would keep confidential Google's non-public business information; that Spagnuolo used an internal engineering tool with a confidentiality label to obtain the information; and that Spagnuolo took steps to hide that he was the one who profited by using that information to trade on Polymarket. Spagnuolo may believe he has arguments to the contrary, but those factual disputes are not a basis to dismiss the wire-fraud charge.

### D. The Profits Spagnuolo Obtained From Counterparties is "Money" or "Property"

In addition to alleging that Spagnuolo misappropriated Google's property, the Indictment also alleges that he schemed to obtain "money or property" in another way. Spagnuolo defrauded Google by surreptitiously misappropriating confidential business information to secure an informational advantage on Polymarket, then exploited that informational advantage to induce his Polymarket counterparties to take the losing side of wagers he already knew he would win. In so doing, he obtained their "money or property" when he won the bets.

That is precisely the type of scheme to defraud that *O'Hagan* and *Carpenter* describe. Misappropriating confidential information in breach of a duty of trust and deploying it in trading is a scheme to defraud. As the Supreme Court explained in *Carpenter*, the defendant engaged in "a scheme to defraud . . . within the meaning of the mail and wire fraud statutes" by taking his employer's confidential business information. 484 U.S. at 25; *see also United States v. O'Hagan*, 521 U.S. 642, 652-54 (1997) (explaining that a "fiduciary who pretends loyalty to the principal

while secretly converting the principal's information for personal gain … defrauds the principal" of "the exclusive use of that information"). To be sure, in *Carpenter* the Government's theory was solely that the misappropriated information was the "property" that was the object of the scheme. *Id.* But nothing in *Carpenter* limits such a fraudulent scheme to instances in which the information itself is the obtained property. Rather, *Carpenter* and *O'Hagan* establish that the misappropriation of confidential information for personal financial benefit is a scheme to defraud, provided that the object of the scheme counts as "money or property." Here, Spagnuolo did exactly what those cases condemn: He surreptitiously misappropriated confidential business operation from Google, then exploited the edge that fraudulently obtaining that information gave him by using it to obtain money or property from unsuspecting counterparties on Polymarket. That satisfies the "money or property" requirement entirely apart from the property analysis governing the confidential business information itself.

Spagnuolo may argue that the party deceived must be the same party whose money he obtained. The Second Circuit has squarely rejected any "convergence" requirement. In *United States v. Greenberg*, the court held that nothing in the text of § 1343 "suggests that the scheme to defraud must involve the deception of the same person or entity whose money or property is the object of the scheme," and that "wire fraud does not require convergence between the parties intended to be deceived and those whose property is sought in a fraudulent scheme." 835 F.3d 295, 306-07 (2d Cir. 2016). District courts in this Circuit have applied *Greenberg* repeatedly. *See United States v. Weigand*, 482 F. Supp. 3d 224, 237 (S.D.N.Y. 2020); *United States v. Martinez*, No. 22 Cr. 251 (LJL), 2023 WL 2118081, at *3 (S.D.N.Y. Feb. 17, 2023); *Azima v. Dechert LLP*,

No. 22 Civ. 8728 (PGG) (JW), 2024 WL 4665106, at *28-29 (S.D.N.Y. Sept. 26, 2024).[4] So have the other circuits, essentially uniformly. *See United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998); *United States v. Porat*, 76 F.4th 213, 222-23 (3d Cir. 2023); *United States v. McMillan*, 600 F.3d 434, 449-50 (5th Cir. 2010); *United States v. Seidling*, 737 F.3d 1155, 1160-61 (7th Cir. 2013); *United States v. Blumeyer*, 114 F.3d 758, 767-68 (8th Cir. 1997); *United States v. Kennedy*, 64 F.3d 1465, 1476 (10th Cir. 1995). The pattern in those cases is the pattern here: deceive one party—often a regulator, employer, or gatekeeper—and use that deception to obtain money from another.

The Supreme Court's recent decision in *Kelly* does not disturb those precedents. There, the Supreme Court held only that property must be "an object of the fraud" rather than "an incidental byproduct." 590 U.S. at 402. It said nothing about whose property must be obtained. The Second Circuit has read *Kelly* to ask whether "the loss of property . . . was at the heart of [the defendant's] scheme," *United States v. Gatto*, 986 F.3d 104, 116 (2d Cir. 2021), which is precisely the case here, where Spagnuolo engaged in misappropriation for the purpose of obtaining money through trading. And the fact that the "money or property" was obtained from a party other than the defrauded victim does not make property "incidental" or the wire fraud statute boundless. That the money must be obtained "by means of" the fraudulent conduct, *see Loughrin*, 573 U.S. at 362-63, requires that the obtaining of money naturally flow from the fraud—as it does here, where the misappropriation directly enabled the defendant's trading on nonpublic information—and not be

[4] The defendant my point to dictum in *United States v. Evans*, 844 F.2d 36, 39 (2d Cir. 1988), suggesting that a fraud's misrepresentations must run to the party deceived of money, *Evans* predates *Greenberg* by nearly three decades, was dictum even on its own facts, and cannot be reconciled with the unbroken line of post-*Evans* convergence cases cited above.

separated from the scheme by an attenuating, independent transaction, *see United States v. Berroa*, 856 F.3d 141, 156-57 (1st Cir. 2017). Spagnuolo's scheme presents no such gap: the obtaining money was not incidental or an attenuated action; it was the point. *See United States v. Ramsey*, 2021 WL 4244284, at *7 (E.D. Pa. Sept. 17, 2021) (object of scheme was "both property in the form of the proprietary information and money in the form of profits from sales that would not have taken place but for" the misappropriation). In short, he "had money in mind." *Kousisis v. United States*, 605 U.S. 114, 133 (2025).[5]

## IV. The Commodities- and Wire-Fraud Charges Are Not Impermissibly Extraterritorial

Spagnuolo misappropriated confidential information from his American employer, used that information to trade on markets run by an American company, and profited at the expense of American counterparties. Nonetheless, Spagnuolo argues that both the commodities- and wire-fraud charges are impermissible extraterritorial. That argument is not a proper basis for a motion to dismiss and wrong on the merits.

### A. Spagnuolo's Extraterritoriality Arguments Are Not a Basis for Dismissal

Procedurally, Spagnuolo's extraterritoriality argument must wait for full factual

[5] The wire-fraud counts in *Blaszczak* alleged that the defendants "schemed to defraud CMS of confidential information" and did not otherwise allege that the object of the scheme was to obtain any other form of money or property, so the question of whether trading profits can be the money or property obtained via misappropriation was not presented in that case. *United States v. Blaszczak*, Superseding Indictment, 17 Cr. 357, Dkt. 137, ¶¶ 86, 92, 98 (Mar. 5, 2018). The same can be said about the government's brief in *Blaszczak*, which neither addressed whether confidential military information was the government's property, nor considered whether the property element is satisfied where money is obtained from a counterparty to a trade. Nor are *Cleveland* or *Blaszczak* inconsistent. Both addressed a different question, whether an intangible interest held by the government—state licenses in *Cleveland* and CMS's regulatory information in *Blaszczak*—can itself be "property," and said nothing about whether a defendant who steals confidential information and immediately converts it into trading profit at another party's expense has obtained "money or property" from that party.

development at trial. The Supreme Court in *Morrison v. National Australia Bank*, held that extraterritoriality is a "merits question," not a question of "subject-matter jurisdiction" that implicates a court's "power to hear a case." 561 U.S. 247, 254 (2010). The Second Circuit has applied that logic in the criminal context, holding that whether an indictment alleges an impermissibly extraterritorial application of a statute "is a merits question." *United States v. Prado*, 933 F.3d 121, 138 (2d Cir. 2019).

Because extraterritoriality is a merits question, it is not a basis for dismissing an indictment, particularly where, as here, the extraterritoriality issue requires a full presentation of evidence. *See Perez*, 575 F.3d at 166 (holding that weighing evidence underlying indictment not allowed unless the Government has made "a full proffer of the evidence it intends to present at trial"). The Second Circuit and courts in this district routinely evaluate extraterritoriality arguments based on the full record developed at trial. *See, e.g.*, *United States v. Napout*, 963 F.3d 163, 180 (2d Cir. 2020) (finding Government "presented ample evidence" at trial to show charge was not extraterritorial); *United States v. Vilar*, 729 F.3d 62, 77 (2d Cir. 2013) (finding trial record contained sufficient evidence that charge was not extraterritorial); *United States v. Epskamp*, 832 F.3d 154, 169 (2d Cir. (2016) (same). This is akin to the rule that proof of jurisdictional elements—like proof of an effect on interstate commerce—is evaluated only upon a full presentation of the evidence. *See United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998).

Spagnuolo has not identified a single case in this District where a court has dismissed an indictment at the motion to dismiss stage on extraterritoriality grounds. And dismissal at this stage would be inconsistent with the legal rules governing indictments. The point of an indictment is to "inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in future prosecution." *Id.* at 776. A full exposition on extraterritoriality is not necessary

to accomplish either of those purposes. Accordingly, given the fact-intensive nature of extraterritoriality issues, resolving the matter at this stage would be inappropriate.

**B. The Commodities-Fraud Count is Not Impermissibly Extraterritorial**

On the merits, Spagnuolo's challenge to the commodities-fraud charge is wrong. When it comes to swaps, the commodities-fraud statute applies both domestically and extraterritorially. The charge here is a proper domestic application of the statute, but even if it were not, it would comfortably fall within the extraterritorial reach of the law.

*1. The CEA's Anti-Fraud Provisions Apply Domestically and Extraterritorially*

The CEA, like other statutes, is interpreted "in light of the presumption against extraterritoriality." *Prime Int'l Trad. v. BP PLC*, 937 F.3d 94, 102 (2d Cir. 2019). This requires applying a "two-step framework for analyzing extraterritoriality issues." *RJR Nabisco, Inc. v. European Cmty.*, 136 S.Ct. 2090, 2101 (2016). First, "courts look to the text of the statute to discern whether there is a clear indication of extraterritoriality." *Prime*, 937 F.3d at 102. If the statute lacks such a clear statement, it "does not apply abroad." *Id.* "[A]t the second step," then, courts must determine whether the case involves a proper "domestic application of the statute" by "evaluat[ing] whether the domestic activity pleaded is the focus of congressional concern." *Id.*

Generally speaking, the anti-fraud provisions at issue in this case—7 U.S.C. § 9(1) and Rule 180.1—do not apply extraterritorially because they "lack[] . . . a clear statement of extraterritorial effect." *Id.* at 103. The question, then, is whether a particular charge under those provisions is not "so predominantly foreign as to render the claims impermissibly extraterritorial." *Id.* at 107; *accord In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 267 (2d Cir. 2023). In answering that question, courts look to whether the case involves domestic activity related to the "focus" of Section 6(c)(1) and Rule 180.1, which is "rooting out manipulation and ensuring

market integrity." *Prime*, 937 F.3d at 107.

But while Section 6(c)(1) and Rule 180.1 *generally* do not apply extraterritorially, there is a statutory exception for conduct related to swap, including the conduct alleged in the CEA Counts. Under 7 U.S.C. § 2(i), the provisions of the CEA "relating to swaps" apply "to activities outside of the United States" if those activities "have a direct and significant connection with activities in, or effect on, commerce of the United States." This provision, which was enacted in light of "the interconnected nature of domestic and international swaps trading," provides "for the extraterritorial application" of CEA provisions related to swaps, including Section 6(c)(1). *SIFMA v. CFTC*, 67 F. Supp. 3d 373, 388 (D.D.C. 2014).

*2. The Commodities-Fraud Charge is a Proper Domestic Application of the Statute*

The CEA Count charges a domestic application of the statute. The focus of Section 9(1) and Rule 180.1 is to "root[] out manipulation and ensur[e] market integrity." *Prime*, 937 F.3d at 103. Spagnuolo brushes aside the possibility that this case could be a domestic application of the statute because he was in Switzerland when he used misappropriated information to trade. (Mot. Dismiss 42). But that is a misunderstanding of the statute.

In the analogous context of insider trading under the securities laws, the Second Circuit has held that, even when a defendant committed insider trading from abroad, that fraud implicates a domestic application of the insider-trading laws when it involved "a security purchased or sold in the United States," which occurs, among other places, where each of the parties "incur[s] irrevocable liability to carry out the transaction." *Vilar*, 729 F.3d at 76 (2d Cir. 2013) (citing *Morrison*, 561 U.S. 247, and *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012)). Accordingly, whenever counterparties to the defendant's insider trading made trades from the United States, the crime is domestic. *See id.* at 77-78; *see also United States v.*

*Martoma*, S1 12 Cr. 973 (PGG), 2013 WL 6632676, at *4-5 (S.D.N.Y. Dec. 13, 2013) (finding insider trading from abroad was domestic application of insider-trading laws because "liability was incurred, and title was transferred, within the United States").

Here, the Government expects the evidence will show that Spagnuolo's insider trading was similarly a domestic application of the CEA because some of that trading was with counterparties in the United States. Those counterparties "incur[red] irrevocable liability" in the United States—when they agreed to take the other side of Spagnuolo's trades, they bound themselves to pay him if he won—so Spagnuolo's crime was domestic. *Vilar*, 729 F.3d at 76. That application of traditional insider-trading principles also makes good sense in light of the CEA's focus on "root[ing] out manipulation and ensur[ing] market integrity." *Prime*, 937 F.3d at 103. Spagnuolo's criminal conduct in this case was not confined to Switzerland. By trading based on misappropriated information, Spagnuolo made an offer to trade that reached all counterparties who could accept that offer, some of whom were in the United States. Spagnuolo was, in effect, reaching out beyond Switzerland into the United States, so his crime affected market integrity here. *See United States v. Royer*, 549 F.3d 886, 895 (2d Cir. 2008) (holding that "misappropriated information" reaching people in a district constitutes conduct in that district).

Of course, Spagnuolo's crime also had other important touch points with the United States, including the fact that he traded based off of information that he obtained by breaching a duty to his American employer, and through accessing that company's system. *See United States v. Cornelson*, 609 F. Supp. 3d 258, 265-66 (S.D.N.Y. 2022) (finding allegations in Indictment were "predominantly domestic" when insider trading was based on information about "an American company"). But by itself, the fact that he traded with counterparties in the United States to monetize that stolen information is sufficient under settled insider-trading law to make his crime

domestic.

*3. In the Alternative, the Commodities-Fraud Charge is a Proper Extraterritorial Application of the Statute*

In the alternative, the commodities-fraud charge is a permissible extraterritorial application of the statute. While the CEA's anti-fraud provisions typically do not extend extraterritorially, Congress has extended the law's reach when it comes to the "regulations of swaps." *United States v. Phillips*, 155 F.4th 102, 114 (2d Cir. 2025). That extender statute "is disjunctive: it covers activities that have a 'direct and significant connection with activities in . . . [U.S.] commerce' *or* a 'direct and significant . . . effect on [U.S.] commerce." *Id.* at 117. The CEA charge here falls within both of those prongs.

Spagnuolo's crime falls within the "activities" prong because, among other things, it involved trading counterparties and a victim company in the United States. The Second Circuit recently addressed this prong in *United States v. Phillips*, where it found that a market-manipulation scheme outside the United States was within the extraterritorial reach of the CEA "[b]ecause the actual and potential victims of [the] scheme were U.S. financial institutions." *Id.* at 122. The Second Circuit concluded that there was a "direct" connection to "activities in U.S. commerce" because the counterparty to the trade at issue was a foreign branch of an American bank and because a bank within the country was obligated to make a payment as a result of the fraud. *Id.* at 120-21. The Second Circuit also concluded that the connection was "significant" because the "U.S. financial institution[s]" were "victim[s] of the fraud," and a reasonable juror could conclude that the particular swaps at issue were significant to the domestic commercial activities of those institutions. *Id.* 121-22.

Like in *Phillips*, Spagnuolo's crime had a direct and significant connection to activities in U.S. commerce because of the victims and counterparties involved. The Government expects the

evidence will show that, to carry out his illicit trading, Spagnuolo stole confidential business information straight from an American company, which it planned to use as part of a significant annual marketing campaign. Spagnuolo used that ill-gotten information on Polymarket—a platform run by an American company—on a "Year in Search" event contract market that was set up and run by employees in the United States. And the Government expects the evidence will show that some of the direct counterparties to Spagnuolo's trades were in the United States and so suffered losses in the country.

Spagnuolo counters that whatever connection Spagnuolo's conduct may have had to the United States, it was not "significant" because there were not large losses. (Mot. Dismiss 40-41). But that miscasts the applicable legal standard and is not a basis for a motion to dismiss. With respect to the legal standard, the word "significant" is not about the size of losses, but rather measures the quality of the connection between "activities" abroad and "activities in the United States." *See Phillips*, 155 F.4th at 115 (affirming jury instruction that significant means the "relationship between the activity outside the United States to the commercial activity in the United States must be of importance," instead of "random, fortuitous, attenuated, or merely incidental"). Citing the value of the swap in *Phillips*, the Circuit held that a reasonable jury could have found the swap in that case was "of significance to the U.S. financial institutions' commercial activities." *Id.* at 122. But the Court did not set a dollar-value based rule for assessing significance, and using $20 million as a reference point makes little sense because a $20 million swap is far less important to a major financial institution than a much smaller amount of money may be to an individual trader. The Second Circuit's reasoning also underscores why dismissal is inappropriate: The Circuit was clear that "significance depends on context" and deferred to the jury's judgment, which is incompatible with resolving the issue on a motion to dismiss. *Id.*

The crime here also falls within the extraterritorial reach of the CEA because it had a "direct and significant . . . effect on[] commerce of the United States." 7 U.S.C. § 2(i). There is no genuine dispute that Spagnuolo's crime had a direct effect on commerce of the United States, so Spagnuolo contends that the effect his illegal trade alone "could not have significantly affected the U.S. economy writ large." (Mot. Dismiss 40). That is not, however, a proper interpretation of the legal standard. Although the Second Circuit mentioned the "effects" prong in passing, it did not have occasion to seriously consider it because that prong was not at issue in the case before it. *See Phillips*, 155 F.4th at 114-15. The relevant agency guidance on that prong, however, makes clear that significance should not be evaluate on a "transaction-by-transaction" based approach, but rather by looking at whether a category of swap-related activities are significant "as a class or in the aggregate." 78 Fed. Reg. at 45,300; 85 Fed. Reg. at 56,930. This interpretation is in line with many federal statutes that regulate activities that, as a class, affect interstate commerce. 78 Fed. Reg. at 45,300; *see, e.g.*, *United States v. Leslie*, 103 F.3d 1093, 1100 (2d Cir. 1997) (explaining that, because the Hobbs Act and money laundering statutes "regulated activities which, in the aggregate, have a substantial effect on interstate commerce, then "the *de minimis* character of individual instances arising under [the] statute is of no consequence"); *Perez v. United States*, 402 U.S. 146, 154 (1971) ("Where the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.").

Under that standard, the question is not whether Spagnuolo's particular crime had a "significant" effect on commerce, but whether insider trading with counterparties in the United States is, as a class, sufficiently significant to fall within the CEA's reach. The answer is plainly yes because ensuring that the CEA reaches such conduct is essential to protecting "market integrity"—a core goal of the statute. *Prime*, 937 F.3d at 107. The fact that Spagnuolo's insider

trading, standing alone, might not risk harming the entire economy does not take it outside of Congress's reach. *Leslie*, 103 F.3d at 110 (allowing regulation of activities that "in the aggregate, have a substantial effect" on commerce). Holding otherwise would disarm Congress from preventing the markets from obviously deleterious conduct, simply because it may be hard to show that individual instances of such conduct harm the economy as a whole.

Moreover, even if significance should be assessed on a crime-by-crime basis, Spagnuolo's conduct had a significant effect on commerce in the United States. He stole important information from a major company and used it to profit, in part, by trading with American counterparties. A reasonable jury could conclude that such activity was significant for both Google and the counterparties to the trade, and so had a significant effect on commerce in the country. Dismissing the commodities-fraud count before it reaches the jury, or the Government has even presented evidence, would be inappropriate.

**C. The Wire-Fraud Charge is a Proper Domestic Application of the Statute**

Spagnuolo's half-hearted argument that the wire-fraud charge is impermissibly extraterritorial, (Mot. Dismiss 43-44), is also meritless. The Indictment charges a domestic application of the wire-fraud statute because the evidence will show that domestic wires were a core component of Spagnuolo's fraudulent scheme.

The wire-fraud statute does not apply extraterritorially, so whether the wire-fraud charge in this case requires "looking to the [wire-fraud] statute's focus." *Napout*, 963 F.3d at 178. "If the conduct [at issue] relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application of the statute, even if other conduct occurred abroad." *Id.* Applying that standard to wire fraud, the Second Circuit has held that "a claim predicated on . . . wire fraud involves sufficient domestic conduct when (1) the defendant used domestic . . . wires

in furtherance of a scheme to defraud, and (2) the use of the . . . wires was a core component of the scheme to defraud." *Buscanan v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019).

Here, domestic wires were a core component of Spagnuolo's scheme to defraud. As explained above, the Government expects the evidence will show that some of the counterparties to Spagnuolo's trades were located in the country, which necessarily required wire transmissions between Switzerland (where Spagnuolo was trading) and the United States. *See Cornelson*, 609 F. Supp. 3d at 267-68 (denying motion to dismiss based on extraterritoriality when some of defendant's trades used brokerages in the United States). Moreover, Spagnuolo was employed by, and breached a fiduciary duty to, an American company by using that company's computer systems to misappropriate confidential business information. The fact that Spagnuolo was living in Switzerland when he committed the crime does not render the wire-fraud charge impermissibly extraterritorial; the statute does "not give way simply because the alleged fraudster was located outside the United States." *Buscanan*, 927 F.3d at 123.

## V. The Court Should Deny the Defendant's Motion to Suppress His Statements

Contrary to Spagnuolo's current gloss, he did not unambiguously invoke his right to counsel. Instead, he mentioned wanting to speak to a lawyer and in the same breath asked the agents to continue talking so that he could learn more about the evidence and why he had been arrested. He was advised that he must choose—either stop speaking to agents and speak to a lawyer or continue speaking to agents and get a lawyer later—and he plainly chose to continue the interview. No *Miranda* violation occurred.

Moreover, Spagnuolo's statements were plainly voluntary and uncoerced. As the video of the interrogation demonstrates, he was treated cordially and respectfully. He was asked about his comfort and experience speaking in English, which he affirmed multiple times. He was seated

comfortably and given water and snacks, which he ate during the interview. Accordingly, even if the Court were to find a Miranda violation—which it should not—Spagnuolo's statements to FBI agents may be used to impeach him if he testifies inconsistently with those statements at trial. Finally, the fruit-of-the-poisonous tree doctrine does not apply, as a matter of well-settled law.

### A. Applicable Law

A defendant has a Fifth Amendment right to counsel when he is subject to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 470-71 (1966); *Edwards v. Arizona*, 451 U.S. 477, 481 (1981). In *Miranda*, the Supreme Court "adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the inherently compelling pressures of custodial interrogation." *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) (citation omitted) (internal quotation marks omitted).

#### *1. Invocation and Waiver*

The suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him," that "he has the right to the presence of an attorney," and that an attorney will be appointed if he cannot afford one. *Miranda*, 384 U.S. at 444. These rights can all be waived. To prove a valid waiver of *Miranda* rights, the Government must show, by a preponderance of the evidence, that the defendant relinquished his rights voluntarily and that the defendant had a full awareness of the rights being waived and the consequences of waiving those rights. *See Colorado v. Connelly*, 479 U.S. 157, 167-69 (1986); *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (per curiam). The defendant need not "know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). Rather, the accused need only be aware that his statements may be used against him in future prosecution, and that "he may choose not to talk to law enforcement officers,

to talk only with counsel present, or to discontinue talking at any time." *Id.*

The Supreme Court has extended *Miranda* to provide that, "when an accused has invoked his right to have counsel present during custodial interrogation . . ., [he] is not subject to further interrogation by the authorities until counsel has been made available to him." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). This "second layer of prophylaxis," *McNeil v. Wisconsin*, 501 U.S. 171, 176–77 (1991), "is designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights" and protects "a suspect's voluntary choice not to speak outside his lawyer's presence." *Montejo v. Louisiana*, 556 U.S. 778, 787 (2009) (citation omitted) (internal quotation marks omitted). If the police do subsequently initiate interrogation in the absence of counsel, "the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial." *McNeil*, 501 U.S. at 177. The U.S. Supreme Court has "frequently emphasized that the *Edwards* rule is not a constitutional mandate, but judicially prescribed prophylaxis." *Shatzer*, 559 U.S. at 105. While a violation of the *Edwards* rule will normally result in the suppression of statements made by the defendant, this prophylactic rule does not extend beyond the defendant's statements.

However, the Supreme Court also requires that a defendant seeking to invoke the right to counsel do so unambiguously. *See Davis v. United States*, 512 U.S. 452, 458-59 (1994) (The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."); *Diaz v. Senkowski*, 76 F.3d 61, 64-65 (2d Cir. 1996) (same). This is so because, even though "requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want to have a lawyer present" because "the

primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves." *Davis*, 512 U.S. at 460. On the other hand, if "the accused himself initiates further communication, exchanges, or conversations with the police," *Edwards*, 451 U.S. at 485, the defendant has waived his right to an attorney. *See also United States v. Choudhry*, 24 F. Supp. 3d 273, 279-80 (E.D.N.Y. 2014), *aff'd*, 649 F. App'x 60 (2d Cir. 2016) ("An arrestee who invokes his right to counsel, but then initiates an unsolicited conversation with police, cannot successfully suppress those statements from trial.").

*2. Voluntariness*

A related but distinct requirement is that a defendant's statement must be voluntary. A statement is not voluntary within the meaning of the Fifth Amendment if it is obtained by "'techniques and methods offensive to due process' or other circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 514-15 (1963)). "No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined after a careful evaluation of the totality of the surrounding circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1987). The critical issue relevant to voluntariness looks to whether the defendant's will was "overborne" by the conduct of law enforcement officers such that his statements cannot be deemed to be the "product of a rational intellect and a free will." *Lynumm v. Illinois*, 372 U.S. 528, 534 (1963) (internal quotation marks omitted). "In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green*, 850 F.2d at 901-02. The age of the accused,

education level, intelligence, advice regarding constitutional rights, length of detention, repeated and prolonged questioning, and the use of physical punishment are some of the criteria that courts consider when further evaluating the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Compliance with *Miranda*, although not dispositive, is a significant factor weighing in favor of a finding of voluntariness. *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984).

*3. Fruit of the Poisonous Tree*

The fruit-of-the-poisonous-tree analysis does not apply to statements taken in violation of the *Miranda* rules. *See Elstad*, 470 U.S. at 304–09 ("*Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made"). A violation of the prophylactic *Miranda* rule does not require "suppression of the [nontestimonial] physical fruits of the suspect's unwarned but voluntary statements." *United States v. Patane*, 542 U.S. 630, 634 (2004) (plurality opinion); *id.* at 645 (Kennedy, J., concurring) ("nontestimonial"). The same holds true for a violation of the prophylactic *Edwards* rule: when the evidence seized is "physical, nontestimonial evidence, an *Edwards* violation itself would not justify suppression." *United States v. Gonzalez-Garcia*, 708 F.3d 682, 687 (5th Cir. 2013). As the Supreme Court explained in *Patane*, "the *Miranda* rule is a prophylactic employed to protect against violations of the Self–Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement. Accordingly, there is no justification for extending the *Miranda* rule to this context." 542 U.S. at 636. A defendant's statements are "not automatically involuntary merely because his *Miranda* rights were violated." *Gonzalez-Garcia*, 708 F.3d at 688. Thus, unless the agents, in violation of the Due Process Clause, coerced a

defendant into making statements that led to the discovery of physical evidence, the physical evidence itself is admissible. *United States v. Hallford*, 816 F.3d 850, 856 (D.C. Cir. 2016) (citing *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion)). "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth*, 412 U.S. at 226 (factors include youth of accused, lack of education, low intelligence, lack of any advice of his constitutional rights, length of detention, repeated and prolonged nature of the questioning, and use of physical punishment such as deprivation of food or sleep); *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010) (evidence of coercion may include "an incapacitated and sedated suspect, sleep and food deprivation, and threats.").

**B. Relevant Facts**

Spagnuolo was arrested without incident and pursuant to an arrest warrant at approximately 6:10 a.m. on May 27, 2026, at his hotel room. (Crowley Aff., Ex. A at 2). He was provided with an advice of rights form in his native Italian, which advised him of his right to remain silent, that anything he said could be used against him in court, that he had the right to an attorney before being questioned and during any questioning, that a lawyer would be appointed if he could not afford an attorney, and that if he decided to answer questions without a lawyer present, he had the right to stop answering at any time. After reading the form in Italian, the defendant advised agents that he was comfortable speaking in English. (Crowley Aff. Ex. A at 1). He was then transported from his hotel in Chelsea to the FBI offices in lower Manhattan.

During transport, Spagnuolo, unprovoked, told transporting agents that:

> [H]e wished to learn about the evidence by speaking with the transporting agents and that he did not know what to do and whether or not he should talk to a lawyer first. SA Racz responded that the transporting agents would explain the process at the FBI office and

> that Spagnuolo would have the opportunity to decide how he wanted to proceed.

(Crowley Aff. Ex. A at 1).

Upon arrival at the FBI office, Spagnuolo was placed in a room with video recording capabilities. He was not restrained and was seated in a basic, soft-backed office chair, the same kind of chair the agents also used. He was provided with two bottles of water and several packages of snacks. (Crowley Aff. Ex. B, 0:00 to 3:15).

Before beginning the interview, agents confirmed the pronunciation of the defendant's name and what he preferred to be called. (Crowley Aff. Ex. C at 1). They confirmed that he was comfortable proceeding in English. (Crowley Aff. Ex. C at 1-2). Agent-2[6] handed the defendant the same Italian advice of rights form he had previously been provided, and read the same form to him in English. (Crowley Aff. Ex. C at 2; Ex. B. at 03:35-04:435). Specifically, he was advised:

- Before we ask any questions, you must understand your rights.
- You have the right to remain silent.
- Anything you say can be used against you in court.
- You have the right to talk to a lawyer for advice before we ask any questions, and you have the right to have a lawyer with you during the questioning.
- If you cannot afford a lawyer, one will be appointed for you before any questions if you wish.
- If you decide to answer any questions now without a lawyer present you have the right to stop answering at any time.

(*Id.*). Agent-2 asked Spagnuolo if he understood these rights, and he said, "Yes I understand." (*Id.*).

---

[6] The designation of the two interviewing FBI agents conforms to the designations in the AI-generated transcript submitted by defense counsel as Exhibit C.

Spagnuolo then asked agents the question, "How will I know if my wife was able to get me a lawyer for now." Agent-2 responded that he had provided Spagnuolo's wife with his cell phone number. (Crowley Aff. Ex. C at 2). Agent-2 then asked again if Spagnuolo understood the rights he had been read, and Spagnuolo again said, "Yes." (Crowley Aff. Ex. C at 2-3). Agent-2 proceeded to begin speaking to Spagnuolo about the charges against him, including that he had been charged by a criminal complaint.[7] Agent-2 explained, "so now is an opportunity if you wanted to, if there were things that you observed in [the criminal complaint] that you wanted to explain or, uh, provide some information about, umm, you're free to do so if you choose. So, I'll leave it to you if you, if you'd like to say anything about that." (Crowley Aff. Ex. C at 4).

Spagnuolo asked agents, "How does it work," appearing to refer to the process of swearing a criminal complaint, adding that he was aware of "the story of this," appearing to refer to the subject matter of the complaint. He then stated:

MS: So, I, I mean, I, I feel that since it is accusing me, I would like to have a lawyer for that, but at the same, at the same time I am aware of the story. So, I mean, I can, I would love to see basically evidence of me doing any, anything about, like, the money laundering, for example, or, or things because I did not.

A2: So I can talk to you about…

MS: And, and I mean, I sorry, I, I don't know because I, I've been, I just know from… I can say a movie, right, that I should not talk…

A2: You said you would like to talk to a lawyer. You, you can do that…

MS: Because I don't know the process. If maybe something I, I say, I say, it could be damaging me even if I didn't do anything.

A2: So that's your right to talk to a lawyer as I've outlined a couple of times now.

---

[7] Agents specifically noted for Spagnuolo that they could not provide legal advice, but could generally outline the process of charges by criminal complaint. (Crowley Aff. Ex. C at 4).

MS: Is it possible to talk about, I don't know, maybe evidence or something like that?

A2: So we can, [MS crosstalk: "Ah, thank you"] but, but you have to agree to talk about the evidence without your lawyer, without a lawyer present.

MS: Ah, OK.

A1: We're happy to hear from you right now without your lawyer present.

MS: I'd like to collaborate, because I, I really, I, because I, I feel I, I didn't do anything wrong.

A1: So, if you want to answer questions with us without a lawyer present, we need you to [unintelligible crosstalk] signal that you agree to…

A2: So, we can say something to you. You can provide answers or not provide answers. You could also stop at any time, but it's your choice and it just, you know, so you can proceed.

MS: I would love to because I, I really, I feel like I haven't done anything wrong. I just feel that if I, if I do it, it, I don't know, I might be in danger if I do it. Not because I did anything wrong or I I, but maybe I could say things in the wrong words.

A2: Like I said, it's entirely your decision. And as I said, the last thing here. So, if you decide to answer questions now, though, you have the right to stop at any time. So, it's your decision.

MS: I understand that.

A2: It's your decision. You can proceed for as long as you want and you can stop it at any time, but it's entirely up to you. You just have to tell us…

(Crowley Aff. Ex. C at 4-5). Spagnuolo then asked again about the process of getting a lawyer and how long it would take and stated that it would "make me feel better if there's like a lawyer present and then I just, I'd like to just openly talk with you, cooperate with you." (Crowley Aff. Ex. C at 5). Agents responded that it would not be possible to arrange a meeting with a lawyer before processing him or bringing him to court, explaining:

> this part, you can elect to either proceed without the lawyer or not proceed at all. And that's your right as, as I've outlined a few times now, umm, you just need to choose one way or the other. You can stop at any time, like I said, but it's entirely your decision. If at a later time you want to meet with a lawyer and with us, you could do that later with the lawyer.

(Crowley Aff. Ex. C at 5).[8] Spagnuolo asked again about the process, and Agent-2 again explained that he would be transported to the courthouse that morning and appear before a judge at a time to be set by the judge, likely in the early afternoon. He reiterated: "As far as this right here, it's you either elect to proceed without the lawyer present or you say no." (Crowley Aff. Ex. C at 6).

Spagnuolo's next statements are unclear. He appears to say both that he wants to proceed and that he doesn't want to talk, but he stammers and the words are overlapping and unintelligible. (Crowley Aff. Ex. C at 6; Ex. B. at 13:03-13:11). His next statement, however, is very clear. Spagnuolo said, "I would like to, to understand also, uh, I mean, you, you, you probably have evidence that I did this. I, I would like to see this." (Crowley Aff. Ex. C at 6; Ex. B. at 13:12-13:21). Agent-2 proceeded to ask him questions about the case, and Spagnuolo answered questions and volunteered information for approximately 75 minutes.

During the interview, among other things, Spagnuolo denied owning or controlling relevant "Adorable Raccoon" and "Alpha Raccoon" accounts, denied trading in Year in Search on Polymarket, and stated that his total crypto holdings were approximately worth tens of thousands of dollars. He also stated he had been looking into, from a security perspective, how easy it would have been for someone at Google to misappropriate Google information to trade on Polymarket. (E.g., Crowley Aff. Ex. C at 8). He stated that he had discussed the legality or propriety of trading on Google information with his colleagues, including his manager, and that he had created a

---

[8] Agents also noted that he would have a lawyer at the court hearing. (Crowley Aff. Ex. C at 6).

document about the Polymarket risk to Google and shared it with other Google employees. After Agent-2 asked him about the spelling of one of the names, Spagnuolo said the spelling was difficult for him to recall and requested permission to write the name for agents. Agent-2 gave him a piece of paper to write the names. (Crowley Aff. Ex. C at 12, 14; Ex. B at 22:00-23:13, 25:35-26:13). At one point, Spagnuolo also offered to show agents some of his Google work product, if it would be possible to access it during the interview. (It was not possible). (Crowley Aff. Ex. C at 12; Ex. B at 24:08-24:14).

At the end of the interview, Spagnuolo said, "I would also like to be able to talk with someone, with a, with a lawyer and understand…frankly, from the thing you said, you told me, the thing I would like to understand is that you said that I used like to Nexo from that account. That is something that is very surprising to me." (Crowley Aff. Ex. C at 54). Agent-2 told Spagnuolo he would get that information in a process called discovery and ended the interview. (*Id.*).

**C. Discussion**

*1. The Defendant Did Not Unambiguously Invoke*

Spagnuolo's motion to suppress his statements should be denied because he did not make an unambiguous, unequivocal invocation of the right to counsel. Under well-established Supreme Court precedent, a suspect must clearly articulate a desire for counsel before questioning must cease. *E.g.*, *Moran v. Burbine*, 475 U.S. 412, 433 n.4 (1986) (" 'the interrogation must cease until an attorney is present' *only* '[i]f the individual states that he wants an attorney.' ") (quoting *Michigan v. Mosley,* 423 U.S. 96, 104 n.10 (1975)) (emphasis in *Burbine*). Ambiguous or equivocal references to a lawyer do not constitute an invocation, and officers are not required to stop questioning when a suspect expresses uncertainty or asks questions about whether to proceed.

*Davis*, 512 U.S. at 459. The defense has cherry-picked a few references to lawyers and insisted that the mere mention of the word should have been an end to the interview (Mot. Suppress 7-10), but that is not the law. Here, "a reasonable officer in light of the circumstances would have understood only"—at best—"that the suspect *might* be invoking the right to counsel," which is insufficient to invoke the right, and thus cessation of questioning was not required. *Davis*, 512 U.S. at 459. Spagnuolo's statements, viewed in context and in full, reflect his initial indecision and a desire for information, not a clear request for counsel. After receiving appropriate warnings multiple times, in Italian, in English, in writing, orally, through additional follow-up conversation, and having his initial questions answered, Spagnuolo made the informed decision to waive his right to wait for an attorney before submitting to questioning. He did so after being repeatedly advised that whether or not to proceed without a lawyer was his choice, that he must choose, and that he could change his mind and stop answering questions at any point. There is no basis to suppress his informed and voluntary statements.

First, Spagnuolo was advised of his rights in writing in his native Italian. He himself then informed agents that he could proceed in English. During transport he made a voluntary and unprompted statement that "he wished to learn about the evidence by speaking with the transporting agents and that he did not know what to do and whether or not he should talk to a lawyer first." (Crowley Aff. Ex. A at 1). Although the defense motion treats this as an invocation, (Mot. Suppress 7), the law is clear that merely wondering aloud if he should speak to an attorney is insufficiently clear and unambiguous to constitute an assertion of the right to counsel. " 'Maybe I should talk to a lawyer' [is] not a request for counsel." *Davis*, 512 U.S. at 462. Agents responded appropriately, indeed, conservatively; rather than proceeding to questioning, they explained that he would have an opportunity to decide how he wished to proceed once at the office.

Once in the interview room, after again receiving *Miranda* warnings in both written and oral form and confirming his understanding, Spagnuolo asked, "How will I know if my wife was able to get me a lawyer for now." (Crowley Aff. Ex. C at 2). That question seeking information about how to get updates from his wife about hiring a lawyer did not constitute an invocation. *See Davis*, 512 U.S. at 459. ("a statement either is such an assertion [of the right to counsel] or it is not." (quoting *Smith v. Illinois*, 469 U.S. 91, 97-98)). Further, even if Spagnuolo's wife had called the agents to inform them that a lawyer had been obtained, that would have been insufficient. The right is individual; the suspect himself, not someone on his behalf, must invoke the right to attorney. *Burbine*, 475 U.S. at 419 (the right to the presence of counsel belongs solely to the accused and may not be asserted by "benign third parties, whether or not they happen to be attorneys (quoting *State v. Burbine*, 451 A.2d 22, 28 (1982))).

The agents answered his question and again confirmed his understanding of his rights. (Crowley Aff. Ex. C at 2-4). Upon receiving that confirmation of Spagnuolo's understanding, Agent-2 then invited him to speak about the charges only if he wished, emphasizing it was his choice. (Crowley Aff. Ex. C at 4). Spagnuolo stated, "I feel that since it is accusing me, I would like to have a lawyer for that, *but at the same, at the same time* I am aware of the story" and "would love to see . . . evidence." (Crowley Aff. Ex. C at 4). This is textbook equivocation. Spagnuolo expressed competing desires to speak to a lawyer but also to speak about the substance of the case and to hear what the agents would be willing to share with him. Once more, the agents reacted conservatively; they did not begin asking questions in response to Spagnuolo's equivocation. Instead, they reiterated at least four more times that Spagnuolo had the right to consult with an attorney. They reiterated at least twice more that it was entirely his decision. They also reiterated

twice more that if Spagnuolo elected to proceed, he could change his mind and stop at any time. (*See* Crowley Aff. Ex. C. at 4-6).

Spagnuolo continued to mull his decision aloud, but none of his statements constituted a clear invocation under the law. He stated that he "would love to" proceed but expressed concern that he could use the wrong words and be misunderstood. (Crowley Aff. Ex. C. at 5). In context, this was not an invocation; it was part of a longer expression of his confusion about the process and fear of saying the wrong thing. He oscillated between wanting a lawyer "for that," wanting to understand the evidence, wanting to collaborate, and wanting to continue speaking. Each time, the agents reminded him of his rights and made clear that the choice belonged entirely to him. In between mentioning lawyers and asking about the process, Spagnuolo also repeatedly expressed a desire to speak with agents about the evidence. For example, immediately after mentioning that he had learned from "the movies" that he shouldn't speak without a lawyer, Spagnuolo asked, "Is it possible to talk about, I don't know, maybe evidence or something like that?" (Crowley Aff. Ex. C. at 4-5). The agents explained again that they could have a discussion of the evidence if he made clear that he wanted to proceed without a lawyer present. He then affirmed, "Ah, OK," stated, "I'd like to collaborate," and explained that he felt he had done nothing wrong. (Crowley Aff. Ex. C. at 5). The agents again emphasized that it was his decision whether to proceed without counsel. Spagnuolo confirmed his understanding, twice, and continued to engage. Although he momentarily stammered about not knowing whether he wanted to talk, he followed in the same breath with a clear statement of his desire to continue: "I would like to, to understand also, uh, I mean, you, you, you probably have evidence that I did this. I, I would like to see this." (Crowley Aff. Ex. C. at 6). Having clearly, properly, and repeatedly advised Spagnuolo that he did not have to speak, that he had a right to a lawyer, that he could wait for a lawyer before discussing the case

and the evidence, and that he could stop answering questions at any time, agents were entitled to interpret Spagnuolo's statement that he would like to discuss the evidence as a knowing and voluntary waiver. *See Berghuis*, 560 U.S. at 388–89 ("a suspect who has received and understood the *Miranda* warnings" waives them by proceeding to make voluntary and uncoerced statements).

The cases cited by in the defense motion do not support suppression. First, the defense quotes Spagnuolo out of context to argue that he made a more definite invocation than the accused in *Wood v. Ercole*, 644 F.3d 83 (2d Cir. 2011), who said, "I think I should get a lawyer." In response to that statement, the interrogating officer said simply, "OK," handed the suspect a telephone to call his attorney, and left the room. *Id.* at 91. The Second Circuit concluded that the statement constituted an unambiguous request for counsel, as the interrogating officer had himself recognized. *Id.* at 92. By contrast, here, Spagnuolo did not simply say, "I would like to have a lawyer," as the defense brief suggests. (Mot. Suppress 7). Instead, he said: "I would like to have a lawyer for that, ***but at the same time,*** at the same time I am aware of the story. So, I mean, ***I can, I would love to see basically evidence*** of me doing any, anything about, like, the money laundering, for example, or, or things because I did not." This is an equivocal sentence: maybe he wants to have a lawyer, but he's conflicted and may prefer to proceed in order to see the evidence first. *Cf. United States v. Seppala,* No. 16 Cr. 436 (KMW), 2017 WL 5633167, at *3 (S.D.N.Y. Nov. 22, 2017) (statements suppressed because suspect's question, which agents effectively ignored, "Do I have an opportunity to call an attorney?" was an unambiguous and unequivocal invocation). Importantly, agents here did not begin interrogating Spagnuolo after he made this ambiguous reference to an attorney. Instead, they reminded him that it is his right to speak to an attorney and reiterated that he would have to choose between speaking with agents about the evidence now or speaking with an attorney first. Only after agents repeated these rights multiple times and

Spagnuolo asked multiple clarifying questions about the process and his rights did the interrogation begin. This is more than the law requires, as "[i]If an accused makes a statement concerning the right to counsel that is ambiguous or equivocal . . . the police are not required to end the interrogation, . . . or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis*, 560 U.S. at 381.

Indeed, the facts are similar to another case cited by the defense in which the statements were also not suppressed. In *United States v. Figaro*, arresting agents read the defendant his *Miranda* rights at the hospital, where he had been transported after his arrest. 568 F. Supp. 3d 459, 462-63 (S.D.N.Y. 2021). The defendant invoked, but in the transportation from the hospital and during processing, the defendant peppered agents with questions. *Id.* at 463. Agents did not engage in any subsequent questioning and repeatedly advised the defendant that he could have his questions answered by the case agent; the defendant then requested to speak with the case agent. *Id.* In response to the defendant's request, the case agent interviewed him, and he made substantive statements. *Id.* Though the defendant later argued that he did not speak voluntarily, the court found a knowing and voluntary waiver of his *Miranda* rights and also concluded that his Fifth Amendment rights were not violated, and denied any evidentiary hearing. *Figaro*, 568 F. Supp. 3d at 469 ("An evidentiary hearing is not required since Defendant acknowledges having been read his *Miranda* rights and speaking anyhow, and does not show an unequivocal request for a lawyer and being denied that right.").

*2. Even if Spagnuolo Invoked, He Voluntarily Re-Initiated the Interview*

Because Spagnuolo never clearly invoked, *Edwards*'s "second layer of prophylaxis," *McNeil*, 501 U.S. at 176–77, requiring interrogation cease until counsel has been made available does not apply. But even if the Court were to find that one of Spagnuolo's questions about whether

he should wait for a lawyer were sufficiently unambiguous, which it should not, the Court should likewise find that Spagnuolo reinitiated through his "willingness and a desire for a generalized discussion about the investigation," *Oregon v. Bradshaw*, 462 U.S. 1039, 1040 (1983). Spagnuolo himself continued the conversation by asking whether it is "possible to talk about, I don't know, maybe evidence or something like that." (Crowley Aff. Ex. C at 4). Spagnuolo continued to engage the agents, using phrases like "I'd like to collaborate" and "I would love to [speak] because I, I really feel like I haven't done anything wrong." Spagnuolo accordingly waived his right to an attorney through this subsequent initiation. *Edwards*, 451 U.S. at 485.

Nor is there any merit to the defense suggestion that Spagnuolo was "bewildered," "confused," or insufficiently proficient in English. (Mot. Suppress 9). Spagnuolo has worked for a sophisticated American company since 2014, and the video of the interrogation shows that he is plainly fluent in English; it also showed that he was calm and collected throughout the interview. *See United States v. Rosenfeld*, No. S1 23 Cr. 65 (CM), 2023 WL 8471947, at *3 (S.D.N.Y. Dec. 7, 2023) ("Having watched the videotape of the interrogation, I find that Rosenfeld speaks excellent English and does not suffer from deficiencies that prevented him from understanding what the agents were saying to him," noting also that the suspect had been given a copy of the *Miranda* warnings his native language.).

*3. The Defendant's Statements Were Voluntary and Uncoerced*

As the cases make clear, *Miranda* is a judicially-created prophylaxis. A separate inquiry is required concerning voluntariness. "[A] confession is involuntary only when it results from police misconduct." *Rosenfeld*, 2023 WL 8471947, at *1 (citing *Connelly*, 479 U.S. at 167-69). Here, each of the three sets of circumstances that courts look to in order to determine whether the defendant's will was "overborne" by the conduct of law enforcement—namely, (1) the

characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials," *Green*, 850 F.2d at 901-02—all overwhelmingly establish that Spagnuolo's statements were voluntary and uncoerced. Spagnuolo, though never before arrested and an Italian citizen, is a sophisticated professional who conducts business in English for an American company. He was interrogated in a comfortable chair in an ordinary room after being given food and water. He was not restrained. Law enforcement officers were cordial and professional, inquiring not only about whether he wanted something to eat but also how he pronounces his name and what he prefers to be called. They conducted the interrogation in a calm, pleasant, and professional manner at all times, as the video establishes. There can be no reasonable argument that Spagnuolo's statements were involuntary under these circumstances; accordingly, even if the Court were to suppress the statements from being used in the prosecution's case in chief, they could still be used to impeach Spagnuolo should he testify inconsistently with his statements to law enforcement. *See Harris v. New York*, 401 U.S. 222, 226 (1971); *United States v. Morales*, 788 F.2d 883, 886 (2d Cir. 1986).

*4. The Fruit of the Poisonous Tree Doctrine Does Not Apply*

The law is clear that the fruit of the poisonous tree doctrine does not apply to statements obtained in violation of *Miranda*. The defense attempts to create ambiguity in well settled law by arguing that the statements were actually in violation of *Edwards*, and that no Court has ruled explicitly that *Edwards* violations are likewise exempt from the fruit of the poisonous tree analysis. But *Edwards* is simply an additional layer of prophylaxis on top of *Miranda*; if *Miranda* violations are not subject to the rule, by application of logic *Edwards* violations would not be, either. In any event, the Court need not "wade into these novel constitutional waters," *United States v. Wang*,

No. 23 Cr. 118-3 (AT), 2024 WL 1251105, at *11 (S.D.N.Y. Mar. 22, 2024), as no *Edwards* (or *Miranda*) violation occurred.[9]

**CONCLUSION**

For the reasons set forth above, the defendant's motions should be denied in their entirety.

Dated: New York, New York
September 16, 2026

Respectfully submitted,

SEAN S. BUCKLEY
Deputy United States Attorney
Attorney for the United States, Acting Under Authority Conferred by 28 U.S.C. § 515

By: /s/
Thomas S. Burnett
Ryan Finkel
Allison Nichols
Assistant United States Attorneys

[9] If the Court were to indulge the defense argument, independent source and inevitable discovery exceptions would apply. For example, Spagnuolo's phone, which was seized pursuant to a valid search warrant, contained conversations with several of the individuals that he mentioned to agents during his post-arrest statement. These conversations included a text exchange with one of those individuals about Spagnuolo's reaction to another company firing employees for using confidential information to trade on prediction markets. As to the internal document Spagnuolo created and claimed to have shared with coworkers concerning how easy it would have been for an employee to misappropriate information to trade on Polymarket, (Crowley Aff. Ex. C at 9), a reference to Spagnuolo investigating and authoring that document—which included the keywords "AlphaRacoon [sic]", "Google YIS" and Polymarket"—was likewise located in a notes file on his phone. As to the May 28, 2026 subpoena, prior to Spagnuolo's arrest the Government had been in contact with attorneys for Google and had made various document requests; however, the Government had not identified Spagnuolo in these conversations or requests due to the confidential nature of its investigation at that point. Therefore, it is not correct, as the defense speculates, that any subpoenas or document requests to Google after the Spagnuolo interview necessarily relied on information Spagnuolo shared during the interview. Rather, the Government made more specific and targeted document requests to Google after Spagnuolo's identity was no longer confidential.